JUDGE HOLWELL

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

BENNETT GOLDBERG,

                        Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

                     Defendant.

-------------------------------------------------------x

07 Civ.

**07 CIV 7841**

**NOTICE OF REMOVAL**



RECEIVED
SEP 0 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

       Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, defendant Level 3 Communications, LLC ("Defendant"), by and through its undersigned attorneys, files this notice of removal of this case from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York, on the following grounds:[1]

       1.     This Court has original diversity jurisdiction over this action as provided in 28 U.S.C. § 1332(a) and (c) because the citizenship of all parties is diverse and plaintiff seeks damages which exceed the sum or value of $75,000, exclusive of interest and costs. Defendant is thus entitled to remove this action to the District Court in accordance with 28 U.S.C. § 1441(a).

       2.     Plaintiffs filed the complaint in this action in the Supreme Court of the State of New York, County of New York, on August 7, 2007. A copy of the complaint is attached hereto as Exhibit A.

---

[1] By filing this Notice of Removal, defendant does not waive, and specifically reserves, all of its rights with respect to this action, including, but not limited to, the defendant's right to challenge jurisdiction and to assert its right to compel arbitration. See Moss v. Atlantic Coast Line R.R. Co., 157 F.2d 1005, 1006 (2d Cir. 1946) ( "defendant is not precluded from having the suit dismissed because its motion to remove was in any sense a waiver of a right, for it has waived nothing by taking that action"); Media Edge v. W.B. Doner, Inc., 112 F. Supp. 2d 383 (S.D.N.Y.) (removal to federal court prior to moving to compel arbitration does not waive right to arbitration).

3.    This notice is being filed within thirty days of notice of the complaint and within one year of the commencement of this action.  Accordingly, this notice of removal is timely filed pursuant to 28 U.S.C. § 1446 (b).

4.    Plaintiff Bennett Goldberg ("Goldberg" or "Defendant") is a resident of the State of New York.  (Complaint ¶ 1.)

5.    Defendant Level 3 is a foreign limited liability company organized under the laws of Delaware.  (Complaint ¶ 2.)

6.    Defendant Level 3 has its principal place of business in the State of Colorado.

7.    Plaintiff alleges in the complaint that he is claiming damages based on a five-year contractual relationship between the parties and attorney's fees.  (Complaint ¶¶ 5, 20.)  Plaintiff's claim for damages and attorney's fees is worth in excess of $75,000.

8.    Defendants have attached all process, pleadings, and orders in this action.

Dated:  September 5, 2007

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____

James J. Stricker (JS 5337)
Olga Fuentes Skinner (OF 6956)
1633 Broadway
New York, New York 10019
(212) 506-1700

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC

Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| BENNETT GOLDBERG,<br><br>                                        Plaintiff,<br><br>                  - against -<br><br>LEVEL 3 COMMUNICATIONS, LLC<br>                                        Defendant. | Index No. 07602609<br><br>**SUMMONS** |

To the above-named defendant:

You are hereby summoned and required to serve upon plaintiff's attorney, at his address stated below, an answer to the attached complaint.

If this summons was personally served upon you in the State of New York, the answer must be served within twenty days after such service of the summons, excluding the date of service. If the summons was not personally delivered to you within the State of New York, the answer must be served within thirty days after service of the summons is complete as provided by law.

If you do not serve an answer to the attached complaint within the applicable time limitation stated above, a judgment may be entered against you, by default, for the relief demanded in the complaint, without further notice to you.

The action will be heard in the Supreme Court of the State of New York, in and for the County of New York. This action is brought in the County of New York because Plaintiff Bennett Goldberg resides in New York County, New York.

Dated: August 7, 2007

Adam Cohn
Law Offices of David K. Bowles

_____
Attorney for Plaintiff
44 Wall Street, 12th Floor
New York, NY 10005
(212) 461-7150

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| BENNETT GOLDBERG<br><br>Plaintiff,<br><br>- against -<br><br>LEVEL 3 COMMUNICATIONS, LLC<br><br>Defendant. | Index No. 07602609<br><br>**AMENDED COMPLAINT** |

Plaintiff, Bennett Goldberg ("Goldberg" or "Plaintiff"), by his attorney, Adam Cohn, as and for an

amended complaint, complains of the Defendant, Level 3 Communications, LLC ("Level 3") and allege as

follows:

## DESCRIPTION OF THE PARTIES

1.    Plaintiff Goldberg is a resident of New York with his permanent residence at 300 E. 34th

Street, New York, New York 10016.

2.    Defendant Level 3 is a foreign limited liability company organized under the laws of

Delaware and doing business in New York with offices at 100 William Street, #19, New York, New York

10038.

## NATURE OF PROCEEDING

3.    Plaintiff brings this action against Defendant Level 3 for breach of contract, reformation

of contract, promissory estoppel, breach of express warranty, fraud in the inducement and for violation of

New York General Business Law Section 349 (Consumer Protection from Deceptive Acts and Practices).

As will be described below, Goldberg entered into two sales contracts with Broadwing Communications

(Level 3's predecessor in interest), a supplier of telecommunications services, to sell Broadwing's services

to consumers. Goldberg's sole compensation for performance of these marketing duties was a percentage of

1

the value of the services and contracts sold. Under both of those agreements Broadwing was obligated to provide Goldberg's customers with telecommunications services, accurate billing records and other customary customer services such as facilitating the business relationship between Broadwing and its consumers, and consequently benefit Goldberg through his expected percentage of sales. Goldberg was successful in selling Broadwing's services to his customers, but Broadwing consistently and repeatedly failed to perform its obligations under its contract with Goldberg. Broadwing provided substandard telecommunications and customer's services such that many of Goldberg's customers became dissatisfied and cancelled their service contracts with Broadwing. Goldberg had opportunities to ameliorate his situation; by offering his customers alternative telecommunications providers Goldberg could have salvaged his reputation with these dissatisfied customers and protected his future earning potential. But Broadwing induced him to remain a Broadwing salesman, and to convince his customers to remain with Broadwing, by the promise of improved management and an increased percentage of his sales. Broadwing never implemented these promised changes. Moreover, with respect to the 2005 Agreement, Broadwing never intended to. Goldberg's customers became increasingly dissatisfied. His reputation and sales and monthly commission percentage suffered. Ultimately Level 3 terminated his sales contract.

4.      As will be described below, Plaintiffs seek compensatory damages and legal fees from Defendant.

## FACTUAL ALLEGATIONS

### Facts Relating to Goldberg's Course of Dealing with Broadwing

### The 2001 Agreement:

5.  On July 23, 2001 Goldberg, a novice independent contractor to the telecommunications industry, entered into an "Agent Services Agreement" (the "2001 Agreement") with Broadwing Telecommunications Inc. A copy of the 2001 Agreement is attached hereto as Exhibit A ("Ex. A.").

6.  The essence of the 2001 Agreement is that Goldberg would sell Broadwing's services to contacts he would generate in exchange for a commission fee based upon a percentage of Goldberg's

2

customer's actual billing volume.

7. Under the terms of the 2001 Agreement, Goldberg was obligated to commit to reaching, within a year of execution, a minimum of $200,000.00 in services, as well as attain a minimum level of $50,000 in new billed revenue within a year of execution, or face termination.

8. According to the 2001 Agreement, Goldberg, as an independent agent, was obligated to shoulder the burden of all the expenses incurred in attempting to make sales.

9. Under the terms of the 2001 Agreement, Broadwing was obligated to provide, subject to its approval, telecommunications services to Goldberg's clients, maintain accurate records of those accounts, and provide customer service in accord with Broadwing's customary business practices.

10. Under the terms of the 2001 Agreement Broadwing would have no liability whatsoever for any losses to Goldberg attributable to its violation of their covenant to provide accurate and customary levels of customer service.

11. According to the 2001 Agreement, if Goldberg violated certain covenants to which he was bound under the Agreement then Broadwing would be entitled to compel Goldberg to disgorge completely any money earned by Goldberg in connection with that violation.

12. Under the terms of the 2001 Agreement, each party to the Agreement indemnified the other for any liabilities arising out of either party's violation of a covenant in the Agreement.

13. Neither the clause absolutely limiting Broadwing's liability to Goldberg for any breach, nor the clause requiring Goldberg further indemnify Broadwing for any liabilities not so limited, were negotiated aspects of the 2001 Agreement.

14. Under the terms of the 2001 Agreement the parties were obligated to settle any dispute via arbitration in Texas, under the laws of Texas.

15. During the course of dealing between the parties Goldberg expended significant capital, in both time and money, making sales for Broadwing, and Broadwing, at first, provided adequate services to Goldberg's customer and to Goldberg.

3

16. However, around 2003 Goldberg began to note persistent breakdowns in both Broadwing's customer support as well as its agent support via Goldberg's direct channel management team. These breakdowns resulted in chronic customer complaints, eventually leading said customers to cancel their service agreements with Broadwing, and also resulted in Goldberg being undercompensated for the value of some accounts.

17. On information and belief these breakdowns in support from Broadwing were the result of distinct management changes implemented prior to and during Broadwing's merger negotiations with Level 3.

18. When Goldberg complained, on behalf of himself and his customers, about the disruptions caused by Broadwing's failure to provide adequate services he was repeatedly told that management would rectify the problems and that he should do his best to pacify his customers and himself. But the disruptions continued.

19. The net effect of these continued disruptions of service was the loss or diminution, to Goldberg and Broadwing, of seven customer's accounts in good standing and with heretofore lucrative amounts of telecommunications commissions.


**The 2005 Agreement:**

20. Sometime prior to April of 2005 Goldberg was offered a new contract with Broadwing (the "2005 Agreement"). A copy of the 2005 Agreement is attached hereto as Exhibit B ("Ex. B.").

21. As an inducement to sign a new agreement Goldberg was offered a higher sales commission rate.

22. Broadwing also made additional promises that Broadwing's channel management team would change and that Management would act to repair the deficiencies in service to the customers and Goldberg.

23. However, in actual fact Broadwing had at that time a policy opposite to those promises:

4

Broadwing management would only take action to address customer complaints if the salesman who sold these customers on Broadwing's services were generating sufficient revenue.

24. In essence the terms of the 2005 Agreement are similar to the 2001 Agreement, except that the clause limiting Broadwing's liability to Goldberg includes direct, cost of cover, consequential, incidental, reliance, special, exemplary, or punitive damages, but does not include damages that flow directly from Broadwing's actions.

25. As in the case of the 2001 Agreement, the 2005 Agreement contains an indemnification clause, as well as an arbitration clause; none of these clauses was negotiated by the parties.

26. During the course of dealing between the parties, after execution of the 2005 Agreement, the disruptions in customer service continued. As a result more of Goldberg's customers cancelled or failed to renew their agreements with Goldberg and Broadwing.

27. Broadwing's promise to Goldberg to implement changes in management never occurred.

28. While Goldberg continued to try to get Broadwing's management to address his and his customer's complaints, on the belief that both he and his customers were entitled to the service, he was eventually informed by his superior of the actual Broadwing policy: Goldberg, at that time, simply didn't generate enough sales to merit the maintenance of his customer accounts.

29. On information and belief Broadwing merged with Level 3 in early 2007.

30. On February 27, 2007 Level 3, Broadwing's successor in interest, terminated Goldberg's 2005 Agreement. The stated reason was for having failed to meet the $50,000.00 minimum sales level.

## FIRST CAUSE OF ACTION
## REFORMATION OF 2001 CONTRACT

31. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 30 of this Complaint with equal force and effect as if set forth at length herein.

32. The 2001 Agreement, drafted entirely by Broadwing, was not negotiated by the parties.

Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses, such as the requirement of arbitration, and the absolute limits on liability, and the indemnification, are standard throughout the telecommunications service industry; if Goldberg wanted to work in his field he had no option but to acquiesce to this contract. This evidences weakness in the contracting process sufficient to constitute procedural unconscionability.

33. To give full effect to the 2001 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual violations of Broadwing's covenants. This result is substantively unconscionable.

34. Plaintiff seeks the reformation of the 2001 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

<u>SECOND CAUSE OF ACTION</u>
<u>REFORMATION OF 2005 CONTRACT</u>

35. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 34 of this Complaint with equal force and effect as if set forth at length herein.

36. The 2005 Agreement was not negotiated by the parties. Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses are standards throughout the telecommunications service industry. This evidences weakness in the contracting process such as to constitute procedural unconscionability under the laws of New York.

37. To give full effect to the 2005 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

47. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 of this Complaint with equal force and effect as if set forth at length herein.

48. During the course of dealings between the parties Broadwing made certain promises to Goldberg. Among those promises were, *inter alia*, repeated promises to change the management of Broadwing to the extent that Goldberg believed necessary to rectify the continued disruptions in customer services.

49. These promises were made to induce Goldberg to stay on at Broadwing prior to and during the merger period between Broadwing and Level 3.

50. Goldberg relied upon these promises and did stay on, and used his influence and reputation with his customers to ensure them that services provided by Broadwing would improve.

51. Goldberg relied upon these promises to his detriment; he lost revenue when these customers eventually did leave, and he lost future business with these customers because they no longer believed he could deliver good service.

52. Plaintiff seeks damages that directly and consequentially flow from his detrimental reliance upon these promises.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY IN 2001 AGREEMENT

53. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 52 of this Complaint with equal force and effect as if set forth at length herein.

54. Under the terms of the 2001 Agreement Broadwing warranted that the quality of

8

violations of Broadwing's covenants. This result is substantively unconscionable.

38. Plaintiff seeks the reformation of the 2005 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

## THIRD CAUSE OF ACTION
## BREACH OF 2001 CONTRACT

39. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 38 of this Complaint with equal force and effect as if set forth at length herein.

40. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2001 Agreement.

41. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently lost future earnings.

42. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2001 Agreement.

## FOURTH CAUSE OF ACTION
## BREACH OF 2005 CONTRACT

43. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 42 of this Complaint with equal force and effect as if set forth at length herein.

44. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2005 Agreement.

45. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently most future earnings.

46. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2005 Agreement.

telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

55. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

56. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2001 Agreement.

57. Goldberg suffered economic loss as a direct result of this breach of warranty.

58. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2001 Agreement.

**SEVENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY IN 2005 AGREEMENT**

59. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 of this Complaint with equal force and effect as if set forth at length herein.

60. Under the terms of the 2001 Agreement Broadwing warranted that the quality of telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

61. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

62. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2005 Agreement.

63. Goldberg suffered economic loss as a direct result of this breach of warranty.

64. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2005 Agreement.

## EIGHTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT 2005 AGREEMENT

65. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 of this Complaint with equal force and effect as if set forth at length herein.

66. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

67. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales quotas.

68. On information and belief, Goldberg's supervisors at Broadwing were aware of the discrepancy between their obligations under the 2005 Agreement and their unarticulated policy in contradiction there-of.

69. On information and belief, Broadwing intended to deceive Goldberg about its unarticulated customer service policy so that Goldberg would sign the 2005 Agreement.

70. Goldberg did sign the 2005 Agreement having been in fact deceived by Broadwing about its customer support policy.

71. Goldberg suffered significant economic loss as a result of his reliance upon the assertions as made in the 2005 Agreement.

72. Goldberg seeks all damages that flow directly and proximately from this fraud, including but not limited to recession of the arbitration clause.

10

**NINTH CAUSE OF ACTION**
**PRIVATE RIGHT OF ACTION UNDER NEW YORK GENERAL BUSINESS LAW SECTION**
**349**

73. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 72 of this Complaint with equal force and effect as if set forth at length herein.

74. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

75. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales levels.

76. The discrepancy between Broadwing's promises under the 2005 Agreement and its actual policy with regards to promised levels of customer and agent support constitutes a deceptive act in the conduct of business.

77. Goldberg was injured as a result of this deceptive business act when he lost customers, suffered damage to his business reputation, and lost time and money trying to keep his Broadwing customers satisfied despite the policy of Broadwing itself.

78. Under New York GBL Section 349, any private person injured as a result of a deceptive act in the conduct of business may bring suit to recover his actual damages as well as reasonable attorney's fees.

11

79. Goldberg seeks his actual damages as well as his legal fees.

**WHEREFORE**, Plaintiff pray for judgment against Defendants as follows:

A.    Reformation of the 2001 and 2005 Agreements to correct the oppressive result that would occur if all of the clauses were given full effect;

B.    Money damages that flow directly and consequentially from the various breaches that occurred through the fault of Broadwing under both the 2001 and the 2005 Agreements in an amount to be determined at trial;

C.    Whatever damages would serve the interest of equity for Plaintiff's detrimental reliance upon the promises made to him in the commercial context of the 2001 and 2005 Agreements;

D.    Whatever equitable or money damages that are directly and proximately the result of Broadwing's fraud in inducing Plaintiff to sign the 2005 Agreement;

E.    Whatever relief is available under New York General Business Law Section 349, including but not limiting to Plaintiff's reasonable legal fees in the maintenance of this action.

F.    For such other and further relief as this Court may determine is just, proper and equitable under the circumstances.

Dated: New York, New York
      August 7, 2007

                                 Adam Cohn, Esq.
                                 Law Offices of David K. Bowles, Attorney for the Plaintiff
                                 44 Wall Street, 12th Floor
                                 New York, NY 10005
                                 (212) 461 7150

                                 By: _____
                                      Adam Cohn

# EXHIBIT A

*Dennis Harwell 800-619-3025*



# AGENT SERVICES AGREEMENT BETWEEN

## BROADWING TELECOMMUNICATIONS INC.

## AND

THIS AGREEMENT (the "Agreement") is made and entered into as of this $23^{th}$ day of _July_, 2001 by and between Broadwing Telecommunications Inc., a Delaware corporation with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas 78746-6426, hereinafter referred to as ("Company"), and _Bennett Goldberg_, a _sole proprietorship_ (corporation, partnership, or sole proprietorship) with its principal place of business at _300 East 34th St. #236, NYC, NY 10016_ (hereinafter referred to as "Agent").

### WITNESSETH

WHEREAS, Company is engaged primarily in providing communications services to individuals and businesses; and

WHEREAS, Company desires to expand its customer base to include a greater number of active individual and business customers through a Sales Agent Program; and

WHEREAS, Company has agreed to permit Agent to sell and market Company's communications services to individual and business customers under the terms and conditions hereinafter set forth.

NOW THEREFORE, Company and Agent, for the mutual benefits and under the conditions described below, do agree as follows:

## I. AGENT AGREES TO:

A.  Represent Company, and Company's products and services with the highest degree of ethics, professionalism, and skill.

B.  Assist Company to the best of Agent's ability in providing a high level of customer satisfaction and to properly complete and submit to Company all appropriate application forms for prospective sales.

C.  Agent shall obtain the proper signature or authorization of the customer on Broadwing's then-current standard service agreement, service order form, or other document provided or approved by Broadwing. All service agreements and service order forms are subject to credit approval and acceptance by Broadwing. Broadwing reserves the right to cancel or reject any request for services and any service agreement or service order form for any reason without liability to Agent.

D.  Only sell products and services at then-current Agency rates. Agent understands Company reserves the right to establish, revise, or change the prices and/or terms of its agency rates at

any time regardless of how it affects Agent's commissions. When such changes are provided in writing to Agent or posted on Company's Alternate Channel Web site, such changes are automatically and immediately effective and shall become part of this Agreement without further action.

E.    Attain a level of $25,000.00 in new billed revenue within six (6) months and $50,000.00 in new billed revenue within one (1) year of the execution of this Agreement. This Agreement may be terminated if either of the attainment levels is not met.

## II.  COMPANY AGREES TO:

A.    Provide communications services to those customers offered by Agent and accepted by Company, subject to the exclusions set forth in Section V below.

B.    Maintain records indicating the accounts provided to Company by Agent and the services and products (including the rates and charges) purchased by said customers.

C.    Provide customer service, billing, postage, and collection services in accordance with Company's customary business practices.

D.    Compensate Agent according to Section IV below.

E.    Allow Agent to use Company's name and logo on sales brochures and other advertising material provided Agent obtains Company's prior written approval of form and content on all printed material before circulating any such materials to the public. Company may provide advertising materials to Agent. Any request by Agent for additional advertising materials may be billed to Agent at Company's cost.

## III.  AGENT IS AN INDEPENDENT CONTRACTOR:

Agent is an Independent Contractor. Accordingly, Agent understands and agrees that:

A.    Neither Agent nor Company shall have the authority to bind the other, by contract or otherwise, or make representations as to the policies and procedures of the other except as provided herein. Agent's employees and any representative of Agent shall not be deemed to be Company's agents, and Agent assumes all responsibility for the supervision, control, acts and omissions of its employees and representatives. Consequently, neither Agent, Agent's representatives, nor anyone employed by Agent shall be considered an agent of Company for any purpose including but not limited to Unemployment or Workman's Compensation coverage, the same being expressly waived and excluded by the parties hereto.

B.    All of the expenses incurred by Agent in connection with Agent's efforts to obtain orders for Company's services will be entirely Agent's responsibility. Company will not in any way be responsible or liable for such expenses.

C.    Agent will be responsible for payment of its own taxes and other fees due as a result of Company's payments of commissions to Agent hereunder.

## IV.  COMPENSATION:

A.    In exchange for Agent's performance under this Agreement, Company will compensate Agent for providing qualified sales to Company in accordance with Attachment A. Agent understands that pricing below Company's standard pricing levels may be subject to reduced commissions. Company must accept and agree in advance to any lower pricing offered by Agent.

Zoom In   Zoom Out   Reset Size   Printable (Use back button to return)
Statistics
Goto Page(s): 1-5 6-10 11-12


B.   Notwithstanding the foregoing, either party may terminate this Agreement upon sixty (60) days written notice.

C.   In addition, Company may terminate this Agreement effective immediately in the event of any of the following occurrences:

   1.   Agent's insolvency, bankruptcy, receivership or dissolution;

   2.   Agent's actual or attempted assignment of this Agreement or any duties under this Agreement to another party without Company's prior written consent (such consent shall not be unreasonably withheld by Company);

   3.   Agent's material breach of any provision of this Agreement;

   4.   Agent's making of misrepresentations about Company;

   5.   Agent's attempted or actual sale of unauthorized services or unauthorized rates;

   6.   Conduct by Agent or any of Agent's employees or representatives or any other person, firm or entity acting on Agent's behalf which subjects Company to any fine, penalty, complaint, inquiry or investigation regarding customer slamming, cramming, or any other unfair, illegal or unethical business practice.

### VII.  AGENT'S STANDARD OF CONDUCT:

A.   In performing this Agreement, Agent will observe the highest standard of integrity and fair dealing, and Agent will do nothing to discredit, dishonor, reflect adversely upon, or in any way injure the reputation or business of Company.

B.   In performing this Agreement, Agent agrees to obey, fulfill, and abide by all terms and conditions hereof including, but not limited to, all terms and conditions regarding customer slamming, cramming, and payment to and indemnification of Company therefor.

### VIII.  AUTHORITY TO ENTER INTO THIS AGREEMENT:

Each party hereto warrants and represents that it has full authority to enter into this Agreement and to consummate the transactions contemplated herein and that this Agreement is not in conflict with any other agreement or contract to which such party is a party to or by which it may be bound.

### IX.  ASSIGNABILITY:

Company may assign, transfer or encumber this Agreement in whole or in part without obtaining prior written consent from Agent.

### X.  CONFIDENTIAL TREATMENT:

A.   The terms and conditions of this Agreement and materials provided by Company including, but not limited to, customer lists, price sheets, price quotes, information regarding Company's facilities, information relating to customers or prospective customers of Agent and/or Company, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Agent shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of three (3) years after termination of this Agreement. Agent shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or

Broadwing Telecommunications Inc. – Confidential          0900V.02                Page 4

07/20/2001　15:44　　　　　OFFICE DEPOT 505　　　　PAGE　05

07/11/2001　09:43　　　　　SE...........UB　　　　　PAGE　05

B.　For purposes of computing commission payments, Company shall use the gross monthly billings for services provided by Company for the accounts provided by Agent hereunder, net any discounts, directory assistance or operator services, Customer Premise Equipment (CPE), and excluding all credits, pass-through charges, non-recurring charges, and taxes of any kind.

C.　All commissions will be paid on billings at the end of the following month of said billings. For example, commissions on July billings will be paid at the end of August.

D.　With each commission payment, Company will provide Agent a statement summarizing the computation of the amount paid. All such payments will be final and binding on Agent unless written objection is delivered to Company within thirty (30) days of Agent's receipt of such payment.

E.　No commissions will be paid on sales made to existing Company customers (not derived from Agent) converted by Agent to other products or rates without the prior written consent of Company. Company reserves the right to lower a customer's rates in an attempt to avoid cancellation by the customer. Commissions may be adjusted to reflect any changes associated with Agent's customers.

F.　Company, in its sole discretion and without prior notice, may cancel an account for any reason including, but not limited to, credit, bankruptcy, or inactivity. No further commission shall be due and payable to Agent on terminated accounts.



G.　Company will continue to pay Agent the (applicable residual commissions for all accounts provided by Agent hereunder for as long as said accounts remain active with Company unless this Agreement is terminated by Company in accordance with Section VI paragraph C or if the totality of the accounts sold by Agent fails to bill in excess of $10,000 in a given month after the Agreement has been terminated. This Subsection G shall survive termination of this Agreement.

H.　Company will not pay any commission to Agent for any fraudulent use of the service by any customer provided by Agent.

## V.　EXCLUDED ACCOUNTS:

The following customers and/or accounts are hereby excluded from this Agreement and shall not constitute any part hereof:

A.　Any account(s) deemed not creditworthy by Company or delinquent accounts resulting in service(s) being denied or disconnected.

B.　Any account(s) that is an existing customer of Company or has been converted from one Company product to another by Agent on an account not sold by Agent.

C.　Any account(s) not in the service regions where Company presently provides services or where Company determines not to provide services.

## VI.　TERM AND DURATION OF AGREEMENT:

A.　The term of this Agreement shall be for one (1) year commencing on the date first written above. This Agreement shall be automatically renewed in consecutive additional periods of one (1) year each unless terminated by either party in writing at least thirty (30) days prior to the expiration of the term then in effect.

07/20/2001  15:44   2127798687        OFFICE DEPOT 505              PAGE  07
07/11/2001  09:43   18007959775       SENGELAUB                    PAGE  07

representatives, or by any other authorized person having access to such information. Except as specifically authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any such confidential information. At the expiration or termination of this Agreement, Agent shall return to Company all written and tangible materials provided to or produced by Agent to Company. *Confidential information is such as defined*

B.  No termination or expiration of this Agreement shall release Agent from the above obligations.

C.  Agent understands that if Agent violates any of the foregoing covenants, Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration or other benefits that Agent directly or indirectly realized or may realize as a result of or in connection with the violation. The foregoing remedies shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Company is or may be entitled to at law, in equity, or under this Agreement.

D.  In the event of a breach or threatened breach by Agent of any of the provisions of this Section, Agent agrees the restrictions contained herein are fair, reasonable, and reasonably required for the protection of the interests of Company.

## XI. LIMITATION OF LIABILITY:

Company shall not be liable to Agent in any way for any losses, including but not limited to, loss of commissions or loss of business due to mistakes, omissions, interruptions, delays, errors, defects or otherwise occurring in the course of furnishing the services.

## XII. INDEMNIFICATIONS, ETC.:

A.  Each party shall indemnify and hold harmless the other from all liabilities, claims, demands, costs (including reasonable attorney's fees), judgments, or any cause of action arising out of or in connection with this Agreement caused by the failure of a party to abide by the terms and conditions herein or the negligence or willful misconduct of that party's employees or representatives.

B.  Agent agrees not to violate any FCC rules or federal, state, or local laws regarding customer slamming or cramming. Agent agrees to fully and immediately reimburse, in cash, Company and the employees, officers, directors, partners, shareholders, successors, and assigns of Company for all claims, damages, liabilities, or expenses of any kind (including reasonable attorney's fees and costs) arising out of the violation by Agent or any of Agent's employees or representatives of any applicable FCC rule or federal, state, or local law regarding customer slamming or cramming. Agent further agrees that Agent will not settle any claim without consulting with Company and obtaining Company's prior written consent. Agent must allow Company to participate in its own defense at Agent's expense.

C.  In connection with the services to be rendered under this Agreement, Agent shall not engage in any pyramid scheme or multilevel marketing plan which violates any state or federal laws. Any such unlawful action will be grounds for immediate termination of this Agreement.

D.  Agent shall be solely and singularly responsible for payment of any commissions owed to Agent's employees, contractors, or representatives.

E.  Nothing contained herein shall be construed to create any obligation by Company whatsoever to pay commissions to any of Agent's employees or representatives. Agent, as an Independent Contractor, warrants and represents that it shall fully and faithfully pay commissions owed to its employees, contractors, and representatives in accordance with its