KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
James J. Stricker (JS 5337)
Olga Fuentes Skinner (OF 6956)
1633 Broadway
New York, New York 10019-6799
Tel.: (212) 506-1700
Fax: (212) 506-1800
Attorneys for Defendant

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
BENNETT GOLDBERG,                                  :
                                                   :          07 Civ. 7841(RJH)
                               Plaintiff,          :
                                                   :
v.                                                 :
                                                   :
LEVEL 3 COMMUNICATIONS, LLC,                       :
                                                   :
                               Defendant.          :
-----------------------------------------------------------x

### AFFIDAVIT OF JAMES J. STRICKER IN SUPPORT OF
### DEFENDANT'S MOTION TO COMPEL ARBITRATION

JAMES J. STRICKER, ESQ., being duly sworn, hereby deposes and says:

1.      I am an attorney admitted to practice in New York and a partner at the law firm

Kasowitz, Benson, Torres & Friedman, LLP, attorneys for defendant Level 3 Communications,

LLC. I submit this affirmation in support of defendant's motion to compel arbitration.

2.      A true and correct copy of the Complaint served on or about August 9, 2007 with

exhibits is attached hereto as Exhibit 1.

3.      A true and correct copy of the letter from Adam Cohn to the Court dated

December 24, 2007, is attached hereto as Exhibit 2.

    4.     A true and correct copy of the following unreported case is attached hereto as

Exhibit 3: *Bar-Ayal v. Time Warner Cable, Inc.*, No. 03 CV 9905 (KMW), 2006 WL 2990032

(S.D.N.Y. Oct. 16, 2006).

Dated: New York, New York
       February 15, 2008

                                                          James J. Stricker (JS 5337)

# EXHIBIT 1



CORPORATION SERVICE COMPANY

# Notice of Service of Process

SLM / ALL
Transmittal Number: 5282772
Date Processed: 08/09/2007

**Primary Contact:**
Darvi Brooks
Level 3 Communications, Inc.
1025 Eldorado Blvd.
Broomfield, CO 80021

| | |
|---|---|
| **Entity:** | Level 3 Communications, LLC<br>Entity ID Number  2398223 |
| **Entity Served:** | Level 3 Communications, LLC |
| **Title of Action:** | Bennett Goldberg vs. Level 3 Communications, LLC |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Contract |
| **Court:** | New York Supreme Court, New York |
| **Case Number:** | 07602609 |
| **Jurisdiction Served:** | New York |
| **Date Served on CSC:** | 08/09/2007 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| **Plaintiff's Attorney:** | Adam Cohn<br>212-461-7150 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | | |
|---|---|---|
| BENNETT GOLDBERG, | | Index No. 07602609 |
| | Plaintiff, | |
| - against - | | **SUMMONS** |
| LEVEL 3 COMMUNICATIONS, LLC | | |
| | Defendant. | |

To the above-named defendant:

You are hereby summoned and required to serve upon plaintiff's attorney, at his address stated below, an answer to the attached complaint.

If this summons was personally served upon you in the State of New York, the answer must be served within twenty days after such service of the summons, excluding the date of service. If the summons was not personally delivered to you within the State of New York, the answer must be served within thirty days after service of the summons is complete as provided by law.

If you do not serve an answer to the attached complaint within the applicable time limitation stated above, a judgment may be entered against you, by default, for the relief demanded in the complaint, without further notice to you.

The action will be heard in the Supreme Court of the State of New York, in and for the County of New York. This action is brought in the County of New York because Plaintiff Bennett Goldberg resides in New York County, New York.

Dated: August 7, 2007

Adam Cohn
Law Offices of David K. Bowles

Attorney for Plaintiff
44 Wall Street, 12th Floor
New York, NY 10005
(212) 461-7150

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| BENNETT GOLDBERG | Index No. 07602609 |
| Plaintiff, | |
| - against - | **AMENDED COMPLAINT** |
| LEVEL 3 COMMUNICATIONS, LLC | |
| Defendant. | |

Plaintiff, Bennett Goldberg ("Goldberg" or "Plaintiff"), by his attorney, Adam Cohn, as and for an amended complaint, complains of the Defendant, Level 3 Communications, LLC ("Level 3") and allege as follows:

### DESCRIPTION OF THE PARTIES

1.    Plaintiff Goldberg is a resident of New York with his permanent residence at 300 E. 34th Street, New York, New York 10016.

2.    Defendant Level 3 is a foreign limited liability company organized under the laws of Delaware and doing business in New York with offices at 100 William Street, #19, New York, New York 10038.

### NATURE OF PROCEEDING

3.    Plaintiff brings this action against Defendant Level 3 for breach of contract, reformation of contract, promissory estoppel, breach of express warranty, fraud in the inducement and for violation of New York General Business Law Section 349 (Consumer Protection from Deceptive Acts and Practices). As will be described below, Goldberg entered into two sales contracts with Broadwing Communications (Level 3's predecessor in interest), a supplier of telecommunications services, to sell Broadwing's services to consumers. Goldberg's sole compensation for performance of these marketing duties was a percentage of

1

the value of the services and contracts sold. Under both of those agreements Broadwing was obligated to provide Goldberg's customers with telecommunications services, accurate billing records and other customary customer services such as facilitating the business relationship between Broadwing and its consumers, and consequently benefit Goldberg through his expected percentage of sales. Goldberg was successful in selling Broadwing's services to his customers, but Broadwing consistently and repeatedly failed to perform its obligations under its contract with Goldberg. Broadwing provided substandard telecommunications and customer's services such that many of Goldberg's customers became dissatisfied and cancelled their service contracts with Broadwing. Goldberg had opportunities to ameliorate his situation; by offering his customers alternative telecommunications providers Goldberg could have salvaged his reputation with these dissatisfied customers and protected his future earning potential. But Broadwing induced him to remain a Broadwing salesman, and to convince his customers to remain with Broadwing, by the promise of improved management and an increased percentage of his sales. Broadwing never implemented these promised changes. Moreover, with respect to the 2005 Agreement, Broadwing never intended to. Goldberg's customers became increasingly dissatisfied. His reputation and sales and monthly commission percentage suffered. Ultimately Level 3 terminated his sales contract.

    4.    As will be described below, Plaintiffs seek compensatory damages and legal fees from Defendant.

## FACTUAL ALLEGATIONS

### Facts Relating to Goldberg's Course of Dealing with Broadwing

### The 2001 Agreement:

    5.  On July 23, 2001 Goldberg, a novice independent contractor to the telecommunications industry, entered into an "Agent Services Agreement" (the "2001 Agreement") with Broadwing Telecommunications Inc. A copy of the 2001 Agreement is attached hereto as Exhibit A ("Ex. A.").

    6.  The essence of the 2001 Agreement is that Goldberg would sell Broadwing's services to contacts he would generate in exchange for a commission fee based upon a percentage of Goldberg's

2

customer's actual billing volume.

. 7. Under the terms of the 2001 Agreement, Goldberg was obligated to commit to reaching, within a year of execution, a minimum of $200,000.00 in services, as well as attain a minimum level of $50,000 in new billed revenue within a year of execution, or face termination.

8. According to the 2001 Agreement, Goldberg, as an independent agent, was obligated to shoulder the burden of all the expenses incurred in attempting to make sales.

9. Under the terms of the 2001 Agreement, Broadwing was obligated to provide, subject to its approval, telecommunications services to Goldberg's clients, maintain accurate records of those accounts, and provide customer service in accord with Broadwing's customary business practices.

10. Under the terms of the 2001 Agreement Broadwing would have no liability whatsoever for any losses to Goldberg attributable to its violation of their covenant to provide accurate and customary levels of customer service.

11. According to the 2001 Agreement, if Goldberg violated certain covenants to which he was bound under the Agreement then Broadwing would be entitled to compel Goldberg to disgorge completely any money earned by Goldberg in connection with that violation.

12. Under the terms of the 2001 Agreement, each party to the Agreement indemnified the other for any liabilities arising out of either party's violation of a covenant in the Agreement.

13. Neither the clause absolutely limiting Broadwing's liability to Goldberg for any breach, nor the clause requiring Goldberg further indemnify Broadwing for any liabilities not so limited, were negotiated aspects of the 2001 Agreement.

14. Under the terms of the 2001 Agreement the parties were obligated to settle any dispute via arbitration in Texas, under the laws of Texas.

15. During the course of dealing between the parties Goldberg expended significant capital, in both time and money, making sales for Broadwing, and Broadwing, at first, provided adequate services to Goldberg's customer and to Goldberg.

16. However, around 2003 Goldberg began to note persistent breakdowns in both Broadwing's customer support as well as its agent support via Goldberg's direct channel management team. These breakdowns resulted in chronic customer complaints, eventually leading said customers to cancel their service agreements with Broadwing, and also resulted in Goldberg being undercompensated for the value of some accounts.

17. On information and belief these breakdowns in support from Broadwing were the result of distinct management changes implemented prior to and during Broadwing's merger negotiations with Level 3.

18. When Goldberg complained, on behalf of himself and his customers, about the disruptions caused by Broadwing's failure to provide adequate services he was repeatedly told that management would rectify the problems and that he should do his best to pacify his customers and himself. But the disruptions continued.

19. The net effect of these continued disruptions of service was the loss or diminution, to Goldberg and Broadwing, of seven customer's accounts in good standing and with heretofore lucrative amounts of telecommunications commissions.

**The 2005 Agreement:**

20. Sometime prior to April of 2005 Goldberg was offered a new contract with Broadwing (the "2005 Agreement"). A copy of the 2005 Agreement is attached hereto as Exhibit B ("Ex. B.").

21. As an inducement to sign a new agreement Goldberg was offered a higher sales commission rate.

22. Broadwing also made additional promises that Broadwing's channel management team would change and that Management would act to repair the deficiencies in service to the customers and Goldberg.

23. However, in actual fact Broadwing had at that time a policy opposite to those promises:

4

Broadwing management would only take action to address customer complaints if the salesman who sold these customers on Broadwing's services were generating sufficient revenue.

24. In essence the terms of the 2005 Agreement are similar to the 2001 Agreement, except that the clause limiting Broadwing's liability to Goldberg includes direct, cost of cover, consequential, incidental, reliance, special, exemplary, or punitive damages, but does not include damages that flow directly from Broadwing's actions.

25. As in the case of the 2001 Agreement, the 2005 Agreement contains an indemnification clause, as well as an arbitration clause; none of these clauses was negotiated by the parties.

26. During the course of dealing between the parties, after execution of the 2005 Agreement, the disruptions in customer service continued. As a result more of Goldberg's customers cancelled or failed to renew their agreements with Goldberg and Broadwing.

27. Broadwing's promise to Goldberg to implement changes in management never occurred.

28. While Goldberg continued to try to get Broadwing's management to address his and his customer's complaints, on the belief that both he and his customers were entitled to the service, he was eventually informed by his superior of the actual Broadwing policy: Goldberg, at that time, simply didn't generate enough sales to merit the maintenance of his customer accounts.

29. On information and belief Broadwing merged with Level 3 in early 2007.

30. On February 27, 2007 Level 3, Broadwing's successor in interest, terminated Goldberg's 2005 Agreement. The stated reason was for having failed to meet the $50,000.00 minimum sales level.

### FIRST CAUSE OF ACTION
### REFORMATION OF 2001 CONTRACT

31. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 30 of this Complaint with equal force and effect as if set forth at length herein.

32. The 2001 Agreement, drafted entirely by Broadwing, was not negotiated by the parties.

Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses, such as the requirement of arbitration, and the absolute limits on liability, and the indemnification, are standard throughout the telecommunications service industry; if Goldberg wanted to work in his field he had no option but to acquiesce to this contract. This evidences weakness in the contracting process sufficient to constitute procedural unconscionability.

33. To give full effect to the 2001 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual violations of Broadwing's covenants. This result is substantively unconscionable.

34. Plaintiff seeks the reformation of the 2001 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

## SECOND CAUSE OF ACTION
## REFORMATION OF 2005 CONTRACT

35. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 34 of this Complaint with equal force and effect as if set forth at length herein.

36. The 2005 Agreement was not negotiated by the parties. Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses are standards throughout the telecommunications service industry. This evidences weakness in the contracting process such as to constitute procedural unconscionability under the laws of New York.

37. To give full effect to the 2005 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual

6

violations of Broadwing's covenants. This result is substantively unconscionable.

38. Plaintiff seeks the reformation of the 2005 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

### THIRD CAUSE OF ACTION
### BREACH OF 2001 CONTRACT

39. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 38 of this Complaint with equal force and effect as if set forth at length herein.

40. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2001 Agreement.

41. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently lost future earnings.

42. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2001 Agreement.

### FOURTH CAUSE OF ACTION
### BREACH OF 2005 CONTRACT

43. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 42 of this Complaint with equal force and effect as if set forth at length herein.

44. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2005 Agreement.

45. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently most future earnings.

46. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2005 Agreement.

### FIFTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL

47. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 of this Complaint with equal force and effect as if set forth at length herein.

48. During the course of dealings between the parties Broadwing made certain promises to Goldberg. Among those promises were, *inter alia*, repeated promises to change the management of Broadwing to the extent that Goldberg believed necessary to rectify the continued disruptions in customer services.

49. These promises were made to induce Goldberg to stay on at Broadwing prior to and during the merger period between Broadwing and Level 3.

50. Goldberg relied upon these promises and did stay on, and used his influence and reputation with his customers to ensure them that services provided by Broadwing would improve.

51. Goldberg relied upon these promises to his detriment; he lost revenue when these customers eventually did leave, and he lost future business with these customers because they no longer believed he could deliver good service.

52. Plaintiff seeks damages that directly and consequentially flow from his detrimental reliance upon these promises.

### SIXTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY IN 2001 AGREEMENT

53. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 52 of this Complaint with equal force and effect as if set forth at length herein.

54. Under the terms of the 2001 Agreement Broadwing warranted that the quality of

8

telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

55. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

56. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2001 Agreement.

57. Goldberg suffered economic loss as a direct result of this breach of warranty.

58. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2001 Agreement.

## SEVENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY IN 2005 AGREEMENT

59. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 of this Complaint with equal force and effect as if set forth at length herein.

60. Under the terms of the 2001 Agreement Broadwing warranted that the quality of telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

61. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

62. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2005 Agreement.

63. Goldberg suffered economic loss as a direct result of this breach of warranty.

64. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2005 Agreement.

## EIGHTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT 2005 AGREEMENT

65. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 of this Complaint with equal force and effect as if set forth at length herein.

66. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

67. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales quotas.

68. On information and belief, Goldberg's supervisors at Broadwing were aware of the discrepancy between their obligations under the 2005 Agreement and their unarticulated policy in contradiction there-of.

69. On information and belief, Broadwing intended to deceive Goldberg about its unarticulated customer service policy so that Goldberg would sign the 2005 Agreement.

70. Goldberg did sign the 2005 Agreement having been in fact deceived by Broadwing about its customer support policy.

71. Goldberg suffered significant economic loss as a result of his reliance upon the assertions as made in the 2005 Agreement.

72. Goldberg seeks all damages that flow directly and proximately from this fraud, including but not limited to recession of the arbitration clause.

### NINTH CAUSE OF ACTION
### PRIVATE RIGHT OF ACTION UNDER NEW YORK GENERAL BUSINESS LAW SECTION
### 349

73. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 72 of this Complaint with equal force and effect as if set forth at length herein.

74. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

75. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales levels.

76. The discrepancy between Broadwing's promises under the 2005 Agreement and its actual policy with regards to promised levels of customer and agent support constitutes a deceptive act in the conduct of business.

77. Goldberg was injured as a result of this deceptive business act when he lost customers, suffered damage to his business reputation, and lost time and money trying to keep his Broadwing customers satisfied despite the policy of Broadwing itself.

78. Under New York GBL Section 349, any private person injured as a result of a deceptive act in the conduct of business may bring suit to recover his actual damages as well as reasonable attorney's fees.

79. Goldberg seeks his actual damages as well as his legal fees.

**WHEREFORE**, Plaintiff pray for judgment against Defendants as follows:

      A.      Reformation of the 2001 and 2005 Agreements to correct the oppressive result that would occur if all of the clauses were given full effect;

      B.      Money damages that flow directly and consequentially from the various breaches that occurred through the fault of Broadwing under both the 2001 and the 2005 Agreements in an amount to be determined at trial;

      C.      Whatever damages would serve the interest of equity for Plaintiff's detrimental reliance upon the promises made to him in the commercial context of the 2001 and 2005 Agreements;

      D.      Whatever equitable or money damages that are directly and proximately the result of Broadwing's fraud in inducing Plaintiff to sign the 2005 Agreement;

      E.      Whatever relief is available under New York General Business Law Section 349, including but not limiting to Plaintiff's reasonable legal fees in the maintenance of this action.

      F.      For such other and further relief as this Court may determine is just, proper and equitable under the circumstances.

Dated: New York, New York
       August 7, 2007

                   Adam Cohn, Esq.
                   Law Offices of David K. Bowles, Attorney for the Plaintiff
                   44 Wall Street, 12th Floor
                   New York, NY 10005
                   (212) 461 7150

                   By: _____
                         Adam Cohn

# EXHIBIT A

*Dennis Hamel 800-619-7025*

---

07/20/2001  15:44    2127798687        OFFICE DEPOT 505        PAGE  03
07/11/2001  09:43    18007969775       SENSELAUB               PAGE  03



**Broadwing**

### AGENT SERVICES AGREEMENT BETWEEN

### BROADWING TELECOMMUNICATIONS INC.

### AND

THIS AGREEMENT (the "Agreement") is made and entered into as of this **23**rd day of _July_, 2001 by and between Broadwing Telecommunications Inc., a Delaware corporation with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas  78746-6426, hereinafter referred to as ("Company"), and _Bennett Goldberg_, a _sole proprietorship_ (corporation, partnership or sole proprietorship) with its principal place of business at _350 East 34th St. #236, NYC, NY 10016_ (hereinafter referred to as "Agent").

### WITNESSETH

WHEREAS, Company is engaged primarily in providing communications services to individuals and businesses; and

WHEREAS, Company desires to expand its customer base to include a greater number of active individual and business customers through a Sales Agent Program; and

WHEREAS, Company has agreed to permit Agent to sell and market Company's communications services to individual and business customers under the terms and conditions hereinafter set forth.

NOW THEREFORE, Company and Agent, for the mutual benefits and under the conditions described below, do agree as follows:

### I. AGENT AGREES TO:

A.  Represent Company, and Company's products and services with the highest degree of ethics, professionalism, and skill.

B.  Assist Company to the best of Agent's ability in providing a high level of customer satisfaction and to properly complete and submit to Company all appropriate application forms for prospective sales.

C.  Agent shall obtain the proper signature or authorization of the customer on Broadwing's then-current standard service agreement, service order form, or other document provided or approved by Broadwing. All service agreements and service order forms are subject to credit approval and acceptance by Broadwing. Broadwing reserves the right to cancel or reject any request for services and any service agreement or service order form for any reason without liability to Agent.

D.  Only sell products and services at then-current Agency rates. Agent understands Company reserves the right to establish, revise, or change the prices and/or terms of its agency rates at

any time regardless of how it affects Agent's commissions. When such changes are provided in writing to Agent or posted on Company's Alternate Channel Web site, such changes are automatically and immediately effective and shall become part of this Agreement without further action.

E.  Attain a level of $25,000.00 in new billed revenue within six (6) months and $50,000.00 in new billed revenue within one (1) year of the execution of this Agreement. This Agreement may be terminated if either of the attainment levels is not met.

## II. COMPANY AGREES TO:

A.  Provide communications services to those customers offered by Agent and accepted by Company, subject to the exclusions set forth in Section V below.

B.  Maintain records indicating the accounts provided to Company by Agent and the services and products (including the rates and charges) purchased by said customers.

C.  Provide customer service, billing, postage, and collection services in accordance with Company's customary business practices.

D.  Compensate Agent according to Section IV below.

E.  Allow Agent to use Company's name and logo on sales brochures and other advertising material provided Agent obtains Company's prior written approval of form and content on all printed material before circulating any such materials to the public. Company may provide advertising materials to Agent. Any request by Agent for additional advertising materials may be billed to Agent at Company's cost.

## III. AGENT IS AN INDEPENDENT CONTRACTOR:

Agent is an Independent Contractor. Accordingly, Agent understands and agrees that:

A.  Neither Agent nor Company shall have the authority to bind the other, by contract or otherwise, or make representations as to the policies and procedures of the other except as provided herein. Agent's employees and any representative of Agent shall not be deemed to be Company's agents, and Agent assumes all responsibility for the supervision, control, acts and omissions of its employees and representatives. Consequently, neither Agent, Agent's representatives, nor anyone employed by Agent shall be considered an agent of Company for any purpose including but not limited to Unemployment or Workman's Compensation coverage, the same being expressly waived and excluded by the parties hereto.

B.  All of the expenses incurred by Agent in connection with Agent's efforts to obtain orders for Company's services will be entirely Agent's responsibility. Company will not in any way be responsible or liable for such expenses.

C.  Agent will be responsible for payment of its own taxes and other fees due as a result of Company's payments of commissions to Agent hereunder.

## IV. COMPENSATION:

A.  In exchange for Agent's performance under this Agreement, Company will compensate Agent for providing qualified sales to Company in accordance with Attachment A. Agent understands that pricing below Company's standard pricing levels may be subject to reduced commissions. Company must accept and agree in advance to any lower pricing offered by Agent.

Zoom In  Zoom Out  Reset Size  Printable (Use back button to return)
Statistics
Goto Page(s): 1-5 6-10 11-12

```
07/28/2001  15:44    2                    OFFICE DEPOT 585              PAGE  06
07/11/2001  09:43                                                       PAGE  06
```

B.  Notwithstanding the foregoing, either party may terminate this Agreement upon sixty (60) days written notice.

C.  In addition, Company may terminate this Agreement effective immediately in the event of any of the following occurrences:

   1.  Agent's insolvency, bankruptcy, receivership or dissolution;

   2.  Agent's actual or attempted assignment of this Agreement or any duties under this Agreement to another party without Company's prior written consent (such consent shall not be unreasonably withheld by Company);

   3.  Agent's material breach of any provision of this Agreement;

   4.  Agent's making of misrepresentations about Company;

   5.  Agent's attempted or actual sale of unauthorized services or unauthorized rates;

   6.  Conduct by Agent or any of Agent's employees or representatives or any other person, firm or entity acting on Agent's behalf which subjects Company to any fine, penalty, complaint, inquiry or investigation regarding customer slamming, cramming, or any other unfair, illegal or unethical business practice.

## VII. AGENT'S STANDARD OF CONDUCT:

A.  In performing this Agreement, Agent will observe the highest standard of integrity and fair dealing, and Agent will do nothing to discredit, dishonor, reflect adversely upon, or in any way injure the reputation or business of Company.

B.  In performing this Agreement, Agent agrees to obey, fulfill, and abide by all terms and conditions hereof including, but not limited to, all terms and conditions regarding customer slamming, cramming, and payment to and indemnification of Company therefor.

## VIII. AUTHORITY TO ENTER INTO THIS AGREEMENT:

Each party hereto warrants and represents that it has full authority to enter into this Agreement and to consummate the transactions contemplated herein and that this Agreement is not in conflict with any other agreement or contract to which such party is a party to or by which it may be bound.

## IX. ASSIGNABILITY:

Company may assign, transfer or encumber this Agreement in whole or in part without obtaining prior written consent from Agent.

## X. CONFIDENTIAL TREATMENT:

A.  The terms and conditions of this Agreement and materials provided by Company including, but not limited to, customer lists, price sheets, price quotes, information regarding Company's facilities, information relating to customers or prospective customers of Agent and/or Company, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Agent shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of three (3) years after termination of this Agreement. Agent shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or

B.    For purposes of computing commission payments, Company shall use the gross monthly billings for services provided by Company for the accounts provided by Agent hereunder, net any discounts, directory assistance or operator services, Customer Premise Equipment (CPE), and excluding all credits, pass-through charges, non-recurring charges, and taxes of any kind.

C.    All commissions will be paid on billings at the end of the following month of said billings. For example, commissions on July billings will be paid at the end of August.

D.    With each commission payment, Company will provide Agent a statement summarizing the computation of the amount paid. All such payments will be final and binding on Agent unless written objection is delivered to Company within thirty (30) days of Agent's receipt of such payment.

E.    No commissions will be paid on sales made to existing Company customers (not derived from Agent) converted by Agent to other products or rates without the prior written consent of Company. Company reserves the right to lower a customer's rates in an attempt to avoid cancellation by the customer. Commissions may be adjusted to reflect any changes associated with Agent's customers.

F.    Company, in its sole discretion and without prior notice, may cancel an account for any reason including, but not limited to, credit, bankruptcy, or inactivity. No further commission shall be due and payable to Agent on terminated accounts.

G.    Company will continue to pay Agent the applicable residual commissions for all accounts provided by Agent hereunder for as long as said accounts remain active with Company unless this Agreement is terminated by Company in accordance with Section VI paragraph C or if the totality of the accounts sold by Agent fails to bill to bill in excess of $10,000 in a given month after the Agreement has been terminated. This Subsection G shall survive termination of this Agreement.

H.    Company will not pay any commission to Agent for any fraudulent use of the service by any customer provided by Agent.

## V. EXCLUDED ACCOUNTS:

The following customers and/or accounts are hereby excluded from this Agreement and shall not constitute any part hereof:

A.    Any account(s) deemed not creditworthy by Company or delinquent accounts resulting in service(s) being denied or disconnected.

B.    Any account(s) that is an existing customer of Company or has been converted from one Company product to another by Agent on an account not sold by Agent.

C.    Any account(s) not in the service regions where Company presently provides services or where Company determines not to provide services.

## VI. TERM AND DURATION OF AGREEMENT:

A.    The term of this Agreement shall be for one (1) year commencing on the date first written above. This Agreement shall be automatically renewed in consecutive additional periods of one (1) year each unless terminated by either party in writing at least thirty (30) days prior to the expiration of the term then in effect.

Broadwing Telecommunications and MB - Umhomge               -00009.01               Page 6

07/20/2001  15:44    2127798687        OFFICE DEPOT 505              PAGE  07

07/11/2001  09:43    18007969775        SENGELAUB                     PAGE  07

representatives, or by any other authorized person having access to such information. Except as specifically authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any such confidential information. At the expiration or termination of this Agreement, Agent shall return to Company all written and tangible materials provided to or produced by Agent to Company. *~~confidential interests term the defined*

B.   No termination or expiration of this Agreement shall release Agent from the above obligations.

C.   Agent understands that if Agent violates any of the foregoing covenants, Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration or other benefits that Agent directly or indirectly realized or may realize as a result of or in connection with the violation. The foregoing remedies shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Company is or may be entitled to at law, in equity, or under this Agreement.

D.   In the event of a breach or threatened breach by Agent of any of the provisions of this Section, Agent agrees the restrictions contained herein are fair, reasonable, and reasonably required for the protection of the interests of Company.

## XI.  LIMITATION OF LIABILITY:

Company shall not be liable to Agent in any way for any losses, including but not limited to, loss of commissions or loss of business due to mistakes, omissions, interruptions, delays, errors, defects or otherwise occurring in the course of furnishing the services.

## XII.  INDEMNIFICATIONS, ETC.:

A.   Each party shall indemnify and hold harmless the other from all liabilities, claims, demands, costs (including reasonable attorney's fees), judgments, or any cause of action arising out of or in connection with this Agreement caused by the failure of a party to abide by the terms and conditions herein or the negligence or willful misconduct of that party's employees or representatives.

B.   Agent agrees not to violate any FCC rules or federal, state, or local laws regarding customer slamming or cramming. Agent agrees to fully and immediately reimburse, in cash, Company and the employees, officers, directors, partners, shareholders, successors, and assigns of Company for all claims, damages, liabilities, or expenses of any kind (including reasonable attorney's fees and costs) arising out of the violation by Agent or any of Agent's employees or representatives of any applicable FCC rule or federal, state, or local law regarding customer slamming or cramming. Agent further agrees that Agent will not settle any claim without consulting with Company and obtaining Company's prior written consent. Agent must allow Company to participate in its own defense at Agent's expense.

C.   In connection with the services to be rendered under this Agreement, Agent shall not engage in any pyramid scheme or multilevel marketing plan which violates any state or federal laws. Any such unlawful action will be grounds for immediate termination of this Agreement.

D.   Agent shall be solely and singularly responsible for payment of any commissions owed to Agent's employees, contractors, or representatives.

E.   Nothing contained herein shall be construed to create any obligation by Company whatsoever to pay commissions to any of Agent's employees or representatives. Agent, as an Independent Contractor, warrants and represents that it shall fully and faithfully pay commissions owed to its employees, contractors, and representatives in accordance with its

07/28/2001  15:44    2127798687                OFFICE DEPOT 585                PAGE  08
27/11/2001  09:43   1820/859770               SENGELAUB                        PAGE  08

own internal policies and procedures. Agent shall indemnify and hold harmless Company from and against any and all claims by any Agent's employee, contractors, and representatives for payment of commissions. Company shall have no responsibility for the payment or withholding of taxes in connection with any commissions due hereunder.

## XIII. BINDING ARBITRATION:

A.  The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement promptly through discussions between themselves at the operational level. In the event a resolution cannot be reached, such controversy or claim shall be negotiated between appointed counsel or senior executives of the parties who have authority to settle the controversy.

B.  The disputing party shall give the other party written notice of the dispute. If the parties fail to resolve such controversy or claim within thirty (30) days of the disputing party's notice, either party may seek arbitration as set forth below.

C.  Any controversy or claim arising out of or relating to this Agreement, or a breach of this Agreement, shall be finally settled by binding arbitration in Austin, Texas and shall be resolved under the laws of the State of Texas, without regard to its choice of law principles. The arbitration shall be conducted before a single arbitrator in accordance with the commercial rules and practices of the American Arbitration Association then in effect.

D.  Any award, order, or judgment pursuant to such arbitration shall be deemed final and binding and may be enforced in any court of competent jurisdiction. The parties agree the arbitrator shall have no power or authority to make awards or issue orders of any kind except as expressly permitted by this Agreement, and in no event shall the arbitrator have the authority to make any award that provides for punitive or exemplary damages. All arbitration proceedings shall be conducted on a confidential basis. The arbitrator may, as part of the arbitration award, permit the substantially prevailing party to recover all or part of its attorney's fees and other out-of-pocket costs incurred in connection with such arbitration.

## XIV. FORCE MAJEURE:

Neither party shall be liable for delays in performing, or failure to perform, this Agreement or any obligations hereunder, which are directly attributable to causes beyond the reasonable control of the party so delayed or failing to perform, including but not limited to, acts of God, fires, floods, strikes, war, failure of a common carrier or equipment or suppliers, cable cuts, or acts of intervention by any third party or governmental authority. However, the party whose performance is delayed shall use good faith efforts to minimize the effects of such delay.

## XV. NOTICES:

A.  Every notice, demand, consent, approval or other communication which either party is required or desires to give to the other party shall be in writing and shall be sent via U.S. Registered Mail, Return Receipt Requested or overnight courier with tracking capabilities as follows:

If to Company:        Broadwing Telecommunications Inc.
                      Two Riverway, Suite 800
                      Houston Texas 77056
                      Attention: Vice President, Alternate Channel Sales

With a copy to:       Broadwing Telecommunications Inc.
                      1122 Capital of Texas Highway South

07/20/2001  15:44    2127798687         OFFICE DEPOT 505              PAGE  09
07/11/2001  09:43    19007969775              SENSELAUB                    PAGE  09

Austin, Texas 78746-6426
Attention: Legal

If to Agent:    Bennett Goldberg
                300 East 34th St #33E
                Nyc NY 10016
Attn:           Bennett Goldberg

Said notices may be sent to such other address or addresses as the parties may from time to time designate by written notice hereunder.

B.  Every notice, demand, request or other communication sent in the manner aforesaid shall be deemed to have been given and shall be effective on the third business day after the same has been properly addressed and deposited as aforesaid.

## XVI. GENERAL:

A.  Company may execute similar Agreements with other Agents.

B.  All Preferred Interexchange Carrier charges for customers sold by Agent will be paid by customer.

C.  Company shall in no way be considered or represented as an official endorser of any party or customer represented by Agent.

D.  Company may offset any amounts owed to Company by Agent against any commissions Company may owe to Agent under this Agreement or any other agreement.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, acknowledged and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

COMPANY:
Broadwing Telecommunications Inc.

By:

Title: Director Alt. Channels

AGENT:
Name:    Bennett Goldberg
By:      Bennett Goldberg      7/13/01
Title:   - sole proprietor
Phone Number:  212-447-9733
Fax Number:    N/A
E-Mail Address:  silvergold 1836@aol.com
Social Security No:  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
Tax Id No.:

07/28/2001  15:44    2127798687              OFFICE DEPOT 505              PAGE  10
07/16/2001  12:46    18887969775              SENSELAUB                    PAGE  82

## ATTACHMENT A

## VOLUME TIERS/COMMISSION SCHEDULE

| | |
|---|---|
| $0-50,000 | 11% |
| $50,001-200,000 | 13% |
| $200,001-500,000 | 16% |
| $500,001+ | 19% |

Broadwing Telecommunications Inc. – Confidential          0900V.02          Page 8



## IMPORTANT !!

```
AGENT SERVICES AGREEMENT BETWEEN

BROADWING TELECOMMUNICATIONS, INC.

                    AND
        Bennett Goldberg
```

1. For accounting and commission purposes, the information that is provided on this contract must reflect the correct (Business) Name, (business) type and corresponding ID.

2. The 'AND' name provided should be the payable name for commission purposes.

3. The ID - whether, Fed ID, Social Security Number or EIN must match the 'AND' name as it is registered with the Internal Revenue Service.

Zoom In   Zoom Out   Reset Size   Printable (Use back button to return)
Statistics
Goto Page(s): 1-5 6-10 11-12

07/20/2001  15:44    2127798687              OFFICE DEPOT 585              PAGE  11

## ADDENDUM/AMENDMENT
## TO
## SALES AGENT AGREEMENT

**THIS ADDENDUM/AMENDMENT** (the "Amendment") is made and entered into as of this 23rd day of _July_____, 200_1_, by and between Broadwing Telecommunications Inc. (hereinafter referred to as "Company"), and _Bennett Goldberg_____ (hereinafter referred to as "Agent").

### WITNESSETH

**WHEREAS**, Company and Agent have previously entered into a Sales Agent Agreement dated the 23rd day of _July_____, 200_1_ (the "Agreement"); and

**WHEREAS**, Company and Agent now mutually desire to amend the Agreement in certain respects and attach this Amendment as an Addendum to the Agreement.

**NOW THEREFORE**, Company and Agent, for the mutual benefits and under the conditions described below, do hereby amend the Agreement in the following particulars:

### IV. COMPENSATION

I.    **Add the following paragraph in its entirety:**

"I. Agent agrees to commit to a minimum of fifty thousand dollars ($50,000) in monthly billings beginning in October 2001, one hundred thousand dollars ($100,000) in monthly billings beginning in January 2002, one hundred and seventy-five thousand dollars ($175,000) in monthly billings beginning in April 2002 and two hundred thousand dollars ($200,000) in monthly billings beginning in July 2002. In consideration of said commitments, Agent will be immediately eligible for the $200,001-$500,000 volume tier and associated commission percentages in Attachment A. Should Agent not reach each of the above commitments, Agent's volume tier and associated commission percentages in Attachment A will be adjusted to reflect Agent's actual billing volume. Agent must maintain the above billing thresholds to be eligible for the associated volume tier and commission percentages or Agent's volume tier and associated commission percentages will be reduced to reflect Agent's actual billing volume."

### X. CONFIDENTIAL TREATMENT

A.    **Replace this paragraph in its entirety with the following:**

"A. The terms and conditions of this Agreement and materials provided by Company including, but not limited to, customer lists, price sheets, price quotes, information regarding Company's facilities, information relating to customers or prospective customers of Agent and/or Company, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Agent shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of two (2) years after termination of this Agreement. Agent shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or representatives, or by any other authorized person having access to such information. Except as specifically

authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any such confidential information. At the expiration or termination of this Agreement, Agent shall return to Company all written and tangible materials provided to or produced by Agent to Company."

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, acknowledged and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

COMPANY:                                    AGENT:

BroadWing Telecommunications, Inc.

By:_____                  By:_____ 7/23/01
Name: Dennis Harrell                         Name:_____
Title: Director, Alternate Channel Sales     Title:_____

# EXHIBIT B

# *Broadwing*

## NON-EXCLUSIVE HIGH VOLUME INDEPENDENT
## BUSINESS PARTNER MARKETING AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of this 1st day of April 2005 (the "Effective Date") by and between Broadwing Communications, LLC, a Delaware limited liability company with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas 78746-6426, hereinafter referred to as ("Broadwing"), and, Ben Goldberg a sole proprietorship with its principal place of business at 300 East 34th Street, #33G, New York, New York 10016 (hereinafter referred to as "Business Partner").

### WITNESSETH

WHEREAS, Broadwing is engaged primarily in providing communications services; and

WHEREAS, Broadwing desires to expand its customer base to include a greater number of active business customers through a Business Partner Marketing Program; and

WHEREAS, Broadwing has agreed to permit Business Partner to sell and market Broadwing's communications services to business customers under the terms and conditions hereinafter set forth.

NOW THEREFORE, Broadwing and Business Partner, for the mutual benefits and under the conditions described below, do agree as follows:

### I. BUSINESS PARTNER RESPONSIBILITIES.

A.    In performing under this Agreement, Business Partner represents, warrants, and covenants that it shall:

1. comply with the Terms and Conditions of this Agreement;

2. conduct itself in an honest, professional, and ethical manner and do nothing to discredit, dishonor, reflect adversely upon, or in any way injure the reputation or business of Broadwing;

3. comply with all applicable federal, state and local laws, rules, regulations, and ordinances;

4. only employ personnel who are fully qualified to perform Business Partner's duties hereunder;

5. deal directly with, and only with, designated Broadwing personnel with regard to all matters arising hereunder;

6. provide current customer information requested by Broadwing as reasonably required for customer site surveys;

7. maintain documents and records as required in the normal course of business, supporting its promotion and marketing of Broadwing services to customers, in a commercially reasonable manner and in compliance with all applicable laws;

8. make only representations concerning Broadwing and the services that have been expressly approved in advance by authorized Broadwing personnel and refrain from doing anything which might discredit, reflect adversely upon or in any way injure the name or reputation of Broadwing;

9. use commercially reasonable efforts to give prompt, courteous, and efficient service to customers and to act in accordance with the highest standards of honesty and integrity in all customer dealings; and

10. immediately notify Broadwing of: (a) any customer or prospective customer complaints relating to Broadwing or the services about which the Business Partner has knowledge; (b) any Business Partner actions, customer actions, or prospective customer actions about which the Business Partner has knowledge, relating to this Agreement or otherwise relating to Broadwing's provision of services, that are or may be in violation of any laws or otherwise give rise to liability of Broadwing.

11. not engage in any pyramid scheme or multilevel marketing plan which violates any state or federal laws in connection with this Agreement or the services to be rendered pursuant to this Agreement.

B.     Business Partner shall obtain the proper signature or authorization of the customer on Broadwing's then-current standard service agreement, service order form, and/or other documents provided or approved by Broadwing. All service agreements and service order forms are subject to prior credit approval and acceptance by Broadwing. Broadwing reserves the right to cancel or reject any request for services and any service agreement or service order form for any reason without liability and without any further commissions due to Business Partner.

C.     Business Partner shall only sell Broadwing products and services at Broadwing's then-current Business Partner rates. Business Partner understands and agrees that Broadwing reserves the right to establish, revise, or change the prices and/or terms of its customer's rates at any time regardless of how it affects Business Partner's commissions. When such changes are provided in writing to Business Partner or posted on Broadwing's Business Partner Channel extranet site, such changes are automatically and immediately effective and shall become part of this Agreement without further action.

## II. BROADWING RESPONSIBILITIES.

A.     Broadwing will provide communications services to those customers offered by Business Partner and accepted by Broadwing, subject to the exclusions set forth in Section V below.

B.     Broadwing will maintain records indicating the accounts provided to Broadwing by Business Partner and the services and products (including the rates and charges) purchased by said customers.

C.     Broadwing will provide customer service, billing, postage, and collection services in accordance with Broadwing's customary business practices.

D.    Broadwing will compensate Business Partner according to Section IV below.

E.    Broadwing will allow Business Partner to use Broadwing's name and logo on sales brochures and other advertising material provided Business Partner obtains prior written approval from Broadwing's Marketing Department of the form and content of all printed material before using or circulating any such material. Broadwing may provide advertising and other sales collateral material to Business Partner from time to time.

### III. BUSINESS PARTNER IS AN INDEPENDENT CONTRACTOR.

A.    Although the term "Partner" is used to describe the relationship between the parties, Business Partner is nevertheless an Independent Contractor, and the relationship that exists between Business Partner and Broadwing is not a legal partnership in any way.

B.    This Agreement does not contemplate, create, or constitute a joint venture, partnership, or similar relationship between Business Partner and Broadwing. Business Partner is, and shall act, operate, and hold itself out only as, an Independent Contractor and as such shall be solely responsible for all costs associated with operating its business and incurred by Business Partner in procuring, promoting, marketing, and/or soliciting orders from customers or prospective customers. Business Partner shall have no right, authority, or power to represent or act on behalf of Broadwing unless expressly authorized to do so in this Agreement. Business Partner shall have no right or authority, nor shall Business Partner hold itself out as having any right or authority, to create any contract or obligation, express or implied, binding upon Broadwing, including accepting orders for services or agreeing to or offering prices, or terms and conditions of sale that in any way differ from the current standard prices, terms and conditions provided by Broadwing to Business Partner. Nothing in this Agreement shall restrict Broadwing, its affiliates or its representatives from independently procuring, promoting, marketing and/or soliciting services to any third party nor shall Business Partner be restricted from marketing competing products and services to prospective customers.

C.    Neither Business Partner nor its employees and/or its representative shall be deemed to be Broadwing's employees, and Business Partner assumes all responsibility for the supervision, control, acts, and omissions of its employees, agents, and representatives. Consequently, neither Business Partner, its representatives, nor anyone employed by Business Partner shall be considered an employee or agent of Company for any purpose including but not limited to Unemployment or Workman's Compensation coverage, the same being expressly waived and excluded by the parties hereto.

D.    Business Partner will be responsible for payment of its own taxes and other fees due as a result of Broadwing's payments of commissions to Business Partner hereunder.

### IV. COMPENSATION.

A.    In exchange for Business Partner's performance under this Agreement, Broadwing will compensate Business Partner for providing qualified sales prospects who become Broadwing customers in accordance with Attachment A. Business Partner understands that any pricing below Broadwing's then-current standard Business Partner pricing levels may be subject to reduced commissions at Broadwing's discretion. Broadwing must accept and agree and in advance to any

lower pricing offered by Business Partner and that agreement must be in writing, and signed by an authorized representative of Broadwing in order for such pricing to be accepted by and binding on Broadwing.

B.      For purposes of computing commission payments, Broadwing shall use the Qualifying Charges. "Qualifying Charges" is defined as: the gross monthly recurring revenue billed for services provided by Broadwing for the accounts provided by Business Partner hereunder net any discounts, directory assistance or operator services, 976/900 services, Customer Premise Equipment (CPE), local loop access charges, and excluding all credits, pass-through charges, non-recurring charges, and Federal, State, or local taxes, surcharges, and any FCC charges including Preferred Inter Exchange Carrier Charges ("PICC") and Payphone Surcharges.    Business Partner's commission amount will be adjusted to reflect any credits, billing errors, charge-backs, bad debt, write offs, or any other adjustments made by Broadwing.   Broadwing will offset (and therefore reduce) any commission payments owed to Business Partner by any credits, billing errors, charge-backs, bad debt, write offs, or any other adjustments to a customer's account regardless of the amount of time that has passed between the date the customer's account was billed and the date said credit, billing error, charge-back, bad debt, write-off, or other adjustment to a customer's account was made.

C.      All commissions will be paid pursuant to Section IV, Subsection B thirty (30) days from the customer's invoice date.

D.      With each commission payment, Broadwing will provide Business Partner a statement summarizing the computation of the amount paid.  All such payments will be final and binding on Business Partner unless written objection is delivered to Broadwing within sixty (60) days of Business Partner's receipt of such payment.

E.      No commissions will be paid on sales made to existing Broadwing customers (not derived from Business Partner) converted by Business Partner to other products or rates without the prior written consent of Broadwing.  Broadwing reserves the right to lower a customer's rates in an attempt to avoid cancellation by the customer.  Commissions to Business Partner may be adjusted to reflect any such changes.

F.      Broadwing, in its sole discretion and without prior notice, may cancel an account for any reason including, but not limited to, credit, bankruptcy, or inactivity.  No further commission shall be due or paid to Business Partner on cancelled, disconnected, or terminated accounts.

G.      Broadwing will continue to pay Business Partner the applicable residual commissions for all accounts provided by Business Partner hereunder for the term of the original customer agreement and as long as said accounts remain active with Broadwing, unless this Agreement is terminated by Broadwing in accordance with Section VI Subsections B, 1 through 8. In the event the foregoing occurs, Broadwing will discontinue payment of residual commissions to Business Partner.

H.      Broadwing will not pay any commission to Business Partner for any fraudulent or illegal use of the service as defined by Broadwing by any customer provided by Business Partner.

## V. EXCLUDED ACCOUNTS.

A.      The following customers and/or accounts are hereby excluded from this Agreement and shall not constitute any part hereof for any purpose whatsoever including the payment of commissions:

     1.      any account(s) deemed not creditworthy by Broadwing, delinquent accounts, or accounts resulting in service(s) being suspended, denied, or disconnected.

     2.      any account(s) that is an existing customer of Broadwing or has been converted from one Broadwing product to another by Business Partner on an account nor sold by Business Partner.

     3.      any account(s) not in the service regions where Broadwing presently provides services or where Broadwing reasonably determines not to provide services for any reason.

B.      Broadwing reserves the right to offset from future commission payments, any amounts previously paid as commission on accounts that later become excluded accounts for any of the above reasons.

## VI.  DURATION OF AGREEMENT.

The term of this Agreement shall be for one (1) year commencing on the Effective Date.  This Agreement shall be automatically renewed on a month-to-month basis unless terminated by either party with at least sixty (60) days written notice prior to the first anniversary of the agreement or thereafter.

A       Broadwing reserves the right to terminate this Agreement on 30 days notice if the aggregate Qualifying Charges for any calendar quarter does not meet or exceed the aggregate Qualifying Charges minimum set forth in Attachment A or, with respect to renewal terms, as otherwise agreed.

B.      Either party may terminate this Agreement (reserving cumulatively all other rights and remedies at law and in equity unless otherwise expressly stated herein) immediately, without affording the other party an opportunity to cure if a party:

     1.      has intentionally or recklessly made any materially false representation, report, or claim relative to the other party's company, its business, or its services;

     2.      materially breaches any representation, warranty, or covenant contained herein;

     3.      becomes insolvent, invokes as a debtor any laws providing for the relief of debtors or the rights of creditors, or had such law invoked against it;

     4.      becomes subject to a proceeding for the liquidation or termination of its business;

     5.      is adjudicated as bankrupt;

     6.      makes an assignment for the benefit of its creditors,

7    ceases doing business, liquidates, or dissolves without the appointment of a direct
     successor in interest; or

8.   engages in any unlawful activity.

C.   Business Partner shall have a Net Billed Revenue Minimum of $10,000 in new Qualifying
     Charges for Services per calendar year commencing on the ninth (9th) month from the date of
     this Agreement; after this period Business Partner will be required to sell a minimum of
     $10,000 of new Qualifying Charges each year, after the initial nine (9) months of the
     program. Failure to meet this minimum may result in termination from the Agent program.

D.   Either party may terminate this Agreement after providing written notice for any other
     breach of this Agreement if the breach is not cured to the reasonable satisfaction of the other
     party within thirty (30) days.

## VII.  AUTHORITY TO ENTER INTO THIS AGREEMENT.

Each party hereto warrants and represents that it has full authority to enter into this
Agreement and to consummate the transactions contemplated herein and that this Agreement is not
in conflict with any other agreement or contract to which such party is a party to or by which it may
be bound. Both Parties understand and agree this is a Non-Exclusive Agreement, and that each party
is free to enter into other agreements similar to this Agreement.

## VIII.  ASSIGNMENT.

Neither this Agreement nor the rights, obligations, or duties of Business Partner may be
assigned or delegated to any other entity without the prior written consent of Broadwing, which
consent will not be unreasonably withheld. Broadwing may assign all of its rights and obligations
hereunder to a subsidiary, affiliate, successor, or purchaser of Broadwing. Broadwing agrees that if
Business Partner goes public, this Agreement will remain in full force and effect. This Agreement
shall be binding upon and shall inure to the benefit of the parties hereto and their respective
successors and permitted assigns

## IX.  CONFIDENTIAL TREATMENT.

A.   The terms and conditions of this Agreement and the materials provided by Broadwing
including, but not limited to, customer lists, price sheets, price quotes, information regarding
Broadwing's facilities, information relating to customers or prospective customers of Business
Partner and/or Broadwing, marketing and business plans and projections, are disclosed in confidence
and are intended to be used solely to carry out the terms and conditions of this Agreement. Business
Partner shall keep all such information confidential and shall not release or disclose it to any other
party during the term of this Agreement and for a period of three (3) years after termination of this
Agreement, regardless of the reason for termination.   Business Partner shall take appropriate
precautions to prevent the unauthorized disclosure or misuse of all confidential information by any
of its employees or representatives, or by any other authorized person having access to such
information. Except as specifically authorized by the parties in advance and in writing, neither party
will publish, communicate, or otherwise disclose to any third party any confidential information  At

the expiration or termination of this Agreement. Business Partner shall return to Broadwing all written and tangible materials provided to or produced by Business Partner to Broadwing.

B      Business Partner understands that if Business Partner violates any of the foregoing covenants, Broadwing shall be entitled to an accounting and repayment of all compensation. commissions, remuneration, or other benefits that Business Partner directly or indirectly realized or may realize as a result of or in connection with the violation. The foregoing remedies shall be in addition to and not in limitation of any injunctive relief or other rights or remedies Broadwing is or may be entitled to at law, in equity, or under this Agreement.

C.     In the event of a breach or threatened breach by Business Partner of any of the provisions of this Section, Business Partner agrees the restrictions contained herein are fair. reasonable, and reasonably required for the protection of the interests of Broadwing.

## X.  LIMITATION OF LIABILITY.

Broadwing will not be liable to Business Partner or any third party for any indirect, cost of cover, consequential, incidental, reliance, special, exemplary, or punitive damages regardless of the legal theory of recovery. In no event will Broadwing be liable to Business Partner for any amount in excess of the aggregate net, billed revenue from the accounts sold by Business Partner

## XI.  INDEMNIFICATIONS.

A.     Each party shall indemnify and hold harmless the other from all liabilities, claims, demands. costs (including reasonable attorney's fees), judgments. or any cause of action arising out of or in connection with this Agreement caused by the failure of a party to abide by the terms and conditions herein or the negligence or willful misconduct of that party's employees or representatives.

B.     Business Partner agrees not to violate any FCC rules or federal, state, or local laws regarding customer slamming or cramming. Business Partner agrees to fully and immediately reimburse, in cash, Broadwing and the employees, officers, directors, partners, shareholders, successors, and assigns of Broadwing for all claims. damages, liabilities, or expenses of any kind (including reasonable attorney's fees and costs) arising out of the violation by Business Partner or any of Business Partner's employees or representatives of any applicable FCC rule or federal, state, or local law regarding customer slamming or cramming. Business Partner further agrees that Business Partner will not settle any claim without consulting with Broadwing and obtaining Broadwing's prior written consent.

C.     Business Partner shall be solely and singularly responsible for payment of any commissions owed to its employees, contractors, and representatives; Business Partner represents and warrants that it shall fully and faithfully pay commissions owed to its employees, contractors, and representatives in accordance with its own internal policies and procedures. Nothing contained herein shall be construed to create any obligation of Broadwing to pay commissions to any of Business Partner's employees, contractors, or representatives. Business Partner shall indemnify and hold harmless Broadwing from and against any and all claims by any Business Partner's employees. contractors, and representatives for payment of commissions.   Broadwing shall have no responsibility for the payment or withholding of taxes in connection with any commissions due hereunder.

## XII. BINDING ARBITRATION.

A.      The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement promptly through discussions between themselves at the operational level. In the event a resolution cannot be reached at the operational level, the disputing party shall give the other party written notice of the dispute and such controversy or claim shall be negotiated between appointed counsel or senior executives of the parties who have authority to settle the controversy. If the parties fail to resolve such controversy or claim within thirty (30) days of the disputing party's notice, either party may seek arbitration as set forth below.

B.      Any controversy or claim arising out of or relating to this Agreement, or a breach of this Agreement, shall be finally settled by binding arbitration in Austin, Texas and shall be resolved under the laws of the State of Texas. The arbitration shall be conducted before a single arbitrator in accordance with the commercial rules and practices of the American Arbitration Association then in effect.

C.      Any award, order, or judgment obtained pursuant to such arbitration shall be deemed final and binding and may be enforced in any court of competent jurisdiction. The parties agree that the arbitrator shall have no power or authority to make awards or issue orders of any kind except as expressly permitted by this Agreement, and in no event shall the arbitrator have the authority to make any award that provides for punitive or exemplary damages. All such arbitration proceedings shall be conducted on a confidential basis. The arbitrator may, as part of the arbitration award, permit the substantially prevailing party to recover all or part of its attorney's fees and other out-of-pocket costs incurred in connection with such arbitration

## XIII. FORCE MAJEURE.

        Neither party shall be liable for delays in performing, or failure to perform, this Agreement or any obligations hereunder, which are directly attributable to causes beyond the reasonable control of the party so delayed or failing to perform, including but not limited to, acts of God, fires, floods, strikes, war, failure of a common carrier or equipment or suppliers, cable cuts, or acts of intervention by any third party or governmental authority. However, the party whose performance is delayed shall use good faith efforts to minimize the effects of such delay.

## XIV. NOTICES.

A.      Every notice, demand, consent, approval, or other communication which either party is required or desires to give to the other party shall be in writing and shall be sent via U.S. Registered Mail, Return Receipt Requested or overnight commercial courier with tracking capabilities as follows:

If to Broadwing:
To:                    Broadwing Communications, LLC
                       1122 Capital of Texas Highway South
                       Austin, TX 78746
                       Attention: General Counsel

With a copy to:        Broadwing Communications, LLC

1821 Barrington Dr.
Roanoke, TX 76262
Attention: Vice President, Channel Sales

Said notices may be sent to such other address or addresses as the parties may from time to time designate by written notice hereunder.

B.      Every notice, demand, request, or other communication shall be deemed to have been given upon confirmed receipt or on the third business day after the same has been properly addressed and deposited as aforesaid, whichever is sooner.

## XV. GENERAL.

A.      This is a Non-Exclusive Agreement.  Both parties may execute similar Agreements with other companies.

B.      Broadwing shall be the carrier of record for Broadwing customers for the services provided by Broadwing

C       Broadwing shall in no way be considered or represented as an official endorser of any party or customer represented by Business Partner.

D.      Broadwing may offset any amounts owed to Broadwing by Business Partner against any commissions Broadwing may owe to Business Partner under this Agreement or any other agreement.

E.      The provisions of Sections IV, X, XI, XII, and XIII hereof shall survive the termination of this Agreement, regardless of the reason for termination.

**IN WITNESS WHEREOF**, the parties hereto have caused these presents to be executed, acknowledged, and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

**BROADWING**                          **BUSINESS PARTNER**

Broadwing Communications, LLC          Ben Goldberg

By: _____           By: _____

Name: Zane Long                        Name: ___Ben Goldberg___

Date: __5-27-05__                      Date: __4/1/05__

Title:  Vice President                 Title: ___President___

Phone Number:  817-741-7879            Phone Number: _917-655-5000_

## Attachment A

### Commission Schedule

Net Billed Revenue Minimums

$10,000 in new Qualifying Charges for Services per calendar year commencing on the ninth (9th) month from the date of this Agreement; after this period Business Partner will be required to sell a minimum of $10,000 of new Qualifying Charges each year, after the initial nine (9) months of the program. Failure to meet this minimum may result in termination from the Agent program.

Broadwing acknowledges that Business Partner's Residual Commission(s) for accounts established as of April 1, 2005 is at the $25,001 - $50,000 level.

| Qualifying Charges (U.S. Dollars) | Voice Commission % | Data Commission % |
|---|---|---|
| $1.00 - $25,000.00 | 12% | 14% |
| $25,001.00 - $50,000 | 13% | 16% |
| $50,001.00 - $75,000 | 14% | 18% |
| $75,001.00 + | 16% | 19% |

1)     Qualifying Charges shall be calculated in accordance with Section IV, Subsection B of the Agreement.

1)     Commissions will be paid for the life of the customer and as long as said accounts remain active with Broadwing, providing the Business Partner remains in good standing. (Section IV, Subsection G)

2)     Commission adjustments will be retroactive to the beginning of the month when Business Partner meets or exceeds each qualifying billing threshold; Business Partner will be paid that commission percentage for their entire base of business on a going-forward basis.

3)     Commission percentages are subject to any adjustments Broadwing makes in accordance with the Agreement.

28-Jun-07    14:20    From-FedEx Kinkos        310 477 5936        T-662   P.001/002   F-396

# Broadwing

## AMENDMENT No. 1 TO THE
## AGENT SERVICES AGREEMENT

This Amendment No. 1 to the Agent Services Agreement is made and entered into by and between **Broadwing Communications, LLC,** a Delaware limited liability company that is successor in interest to Broadwing Telecommunications Inc., with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas 78746-6426 ("Broadwing"), and **Bennett Goldberg**, with its principal place of business at 300 East 34th Street #33G New York City, New York, 10016 ("Business Partner").

For purposes of this Amendment, terms and conditions set forth herein shall become effective on the last date of execution below (the "Amendment Effective Date").

This Amendment is made with reference to the following facts:

    A.    Business Partner and Broadwing are parties to that certain Agent Services Agreement dated as of 6/1/05 (as amended, the "Agreement").

    B.    The parties desire to amend the Agreement pursuant to the terms set forth below.

### Terms of Amendment

Accordingly, in consideration of the mutual promises set forth below, the parties agree as follows:

    1.    Exhibit B, *Local Access Commission Schedule*, attached hereto shall be added in its entirety to the Agreement.

    2.    All other terms and conditions, provisions, supplements and exhibits of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date last written below.

**Broadwing Communications, LLC**

By: _____

Name: _____

Title: _____VP_____

Date: ____8-5-05_____

**Full Business Address:**
1122 Capital of Texas Highway South

Austin, Texas 78746-6426
Telephone:  512-742-3700
Facsimile:  512-328-7902

By: _____

Name: ____BENNETT GOLDBERG____

Title: _____President_____

Date: ____6/6/05_____

**Full Business Address:**
300 East 34th Street #33G New York City, New York, 10016

Telephone: ████████
Facsimile: ████████

C:\Documents and Settings\BultN.real Settings\Temporary Internet Files\OLK202\ agent local Total Amendment 0."05 (3).doc

© 1995 JULIUS BLUMBERG, INC.,

STATE OF NEW YORK, COUNTY OF _____ ss.:
I, the undersigned, an attorney admitted to practice in the courts of New York State,

☐ **Certification By Attorney**  certify that the within
has been compared by me with the original and found to be a true and complete copy.

☐ **Attorney's Affirmation**  state that I am
the attorney(s) of record for _____ in the within
action; I have read the foregoing _____ and know the contents thereof;
the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters
I believe it to be true. The reason this verification is made by me and not by

The grounds of my belief as to all matters not stated upon my own knowledge are as follows:

I affirm that the foregoing statements are true, under the penalties of perjury.
Dated:
........................................................................................
The name signed must be printed beneath

STATE OF NEW YORK, COUNTY OF _____ ss.:
I, the undersigned, being duly sworn, depose and say: I am

☐ **Individual Verification**  in the action; I have read the foregoing
and know the contents thereof; the same is true to my own knowledge, except
as to the matters therein stated to be alleged on information and belief, and as to those matters I believe it to be true.

☐ **Corporate Verification**  the _____ of
a _____
corporation and a party in the within action; I have read the foregoing
and know the contents thereof; and the same is true to my own knowledge,
except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true. This
verification is made by me because the above party is a corporation and I am an officer thereof.
The grounds of my belief as to all matters not stated upon my own knowledge are as follows:

Sworn to before me on
........................................................................................
The name signed must be printed beneath

STATE OF NEW YORK, COUNTY OF _____ ss.:    (If more than one box is checked—indicate after names type of service used.)
I, the undersigned, being sworn, say: I am not a party to the action, am over 18 years of age and reside at

On _____    I served the within

☐ **Service By Mail**  by mailing a copy to each of the following persons at the last known address set forth after each name below.

☐ **Personal Service on Individual**  by delivering a true copy of each personally to each person named below at the address indicated. I knew each person served
to be the person mentioned and described in said papers as *a party therein:*

☐ **Service by Electronic Means**  by transmitting a copy to the following persons by ☐ FAX at the telephone number set forth after each name below ☐ E-MAIL
at the E-Mail address set forth after each name below, which was designated by the attorney for such purpose, and by mailing a
copy to the address set forth after each name.

☐ **Overnight Delivery Service**  by dispatching a copy by overnight delivery to each of the following persons at the last known address set forth after each name
below.

Sworn to before me on
........................................................................................
The name signed must be printed beneath

Index No.                          Year
                                   2007

Bennett Goldberg,

                              Plaintiff,

                              - against -

Level 3 Communications, LLC

                              Defendant.

Signature (Rule 130-1.1-a)

Print name beneath

Adam Cohn

*Attorney for*
                    *Office and Post Office Address, Telephone*
                    Plaintiff

Law Offices of David K. Bowles
44 Wall Street, 12th Floor
New York, NY 10005

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated

........................................................

Attorney(s) for

(800 - Blumberg Excelsior INC., NYC 10013)

---

NOTICE OF ENTRY

PLEASE take notice that the within is a *(certified)*
true copy of a
duly entered in the office of the clerk of the within
named court on

Dated,                 Yours, etc.

*Attorney for*
            *Office and Post Office Address*

To

Attorney(s) for

---

NOTICE OF SETTLEMENT

PLEASE take notice that an order

of which the within is a true copy will be presented
for settlement to the Hon.

one of the judges of the within named Court, at

on
at              M.
Dated,             Yours, etc.

*Attorney for*
            *Office and Post Office Address*

To

Attorney(s) for

# EXHIBIT 2

**LAW OFFICES**
**OF**
# DAVID K. BOWLES

December 24, 2007

**BY FAX (212 ) 805-7948**

The Honorable Richard J. Holwell
United States District Court
   For the Southern District of New York
500 Pearl Street, Courtroom 17B
New York, New York  10007

> Re: *Bennett Goldberg v. Level 3 Communications, LLC,*
> 07 Civ. 7841(S.D.N.Y.)(RJH)

Dear Judge Holwell:

    We represent Bennett Goldberg in the above-captioned matter. We respectfully request oral argument on the motion in order to more fully discuss the controlling law, including that Texas law applies prior to the entry of arbitration.[1]

Respectfully Yours,

Adam Cohn

cc: James J. Stricker, Esq. (Via Facsimile and regular mail)

---

[1] *Haynsworth v. Lloyd's of London,* 933 F. Supp. 1315 S.D. Tex. 1996

**44 WALL STREET, 12TH FLOOR**
**NEW YORK, NY 10005**
**PHONE: 212-461-7150**
**FAX: 866-844-8305**
**DAVID@DKBOWLESLAW.COM**

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

c
Bar-Ayal v. Time Warner Cable Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Shlomo BAR-AYAL, Plaintiff,
v.
TIME WARNER CABLE INC., Defendant.
**No. 03 CV 9905(KMW).**

Oct. 16, 2006.

Kenneth F. McCallion, Michael A. Freeman, McCallion & Associates, L.L.P., New York, NY, for Plaintiff.

*ORDER*

WOOD, U.S.D.J.

### I. Overview

*1 Plaintiff Shlomo Bar-Ayal, individually and on behalf of a putative class, brings this action against defendant Time Warner Cable, Inc., to recover damages Plaintiff alleges he (and other class members) suffered as a result of what he claims to be Defendant's "unlawful practice of levying certain customers with additional charges above its itemized rate for cable television and Internet access services, and failing or refusing to refund those charges."Am. Compl. ¶ 1. Specifically, Plaintiff claims that Defendant unlawfully collected from him and other similarly situated consumers "franchise fees" that amounted to five percent of all billed services provided by Defendant, including cable television services and Internet access, when Internet access services should not have been included in the calculation of the franchise fee. Defendant has moved to stay proceedings and compel arbitration, and has also

moved, in the alternative, to dismiss to action. For the reasons stated below, Defendant's motion to stay the proceedings and compel arbitration is granted.

### II. Background

Plaintiff makes the following allegations in his Amended Class Action Complaint. Plaintiff, a resident of the State of New York and the County of New York, was and continues to be, from July 2001 through the present, a subscriber to Time Warner Cable's [FN1] cable television service as well as its Internet access service marketed under the "Road Runner" brand (hereinafter the "Road Runner Internet service"). For the period from July 2001 through March 2002, in its monthly billing, Defendant billed Plaintiff for cable television services and Internet access services, and added " franchise fees" amounting to five percent of all of those billed services.[FN2]In March 2002, the Federal Communications Commission (the "FCC") issued a declaratory ruling, holding that, for the purpose of the Communications Act of 1934, 47 U.S.C. §§ 151*et seq .,* as amended by the Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (1996), a high-speed Internet access service offered through a cable system-i.e., a cable-modem service-is "properly classified as an interstate information service, not as a cable service, and that there is no separate offering of telecommunications service," and concluding that " revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined."In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, Declaratory Ruling and Notice of Proposed Rulemaking, 17 F.C.C.R. 4798, ¶ 7, ¶ 105 (2002) ("FCC 2002 Order").

FN1. Although Plaintiff named Time

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 2

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Warner Cable Inc. as the defendant, Time Warner N.Y. Cable Inc. has appeared, claiming that the New York City cable system to which Plaintiff subscribed is currently owned and operated by Time Warner N.Y. Cable Inc., which does business as TWCNYC, and is a successor in interest to Time Warner Cable Inc. *See* Defendant's Memorandum of Law in Support of Time Warner N.Y. Cable's Motion to Stay Proceedings and Compel Arbitration 1 n. 1. Time Warner N.Y. Cable Inc. is a wholly-owned subsidiary of Time Warner Cable Inc. *See* Disclosure Statement of Time Warner N.Y. Cable Inc. Pursuant to Fed.R.Civ.P. 7.1(a). Time Warner N.Y. Cable Inc. has not made a motion to be substituted for Time Warner Cable Inc. as the defendant in this action; therefore, the action will continue against the original party. *See*Fed.R.Civ.P. 25(c) (" In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. "); Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, 7C Federal Practice and Procedure § 1958 (2d ed. 1986) ("The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named.").

FN2. A "franchising authority," often a local or municipal authority, grants cable operators franchises "to authorize the construction of a cable system over public rights-of-way, and through easements."47 U.S.C. § 541(a)(2)."[A]ny cable operator may be required under the terms of any franchise to pay a franchise fee,"47 U.S.C. § 542(a), defined as "any tax, fee, or assessment of any kind imposed by a franchising authority or other

governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such,"*id.* § 542(g)(1); but " [f]or any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services,"*id.* § 542(b)-where "cable service" is defined as "the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and ... subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service."47 U.S.C. § 522(6).

Between March 2002 and June 2002, Defendant continued to collect from Plaintiff franchise fees equivalent to five percent of all billed services, including Internet access services. In June 2002, Defendant decreased the franchise fee charged to Plaintiff to an amount equivalent to five percent of billed cable television services. Defendant did not refund to Plaintiff the franchise fees in excess of five percent of billed cable television services that Defendant collected from Plaintiff until June 2002. Plaintiff alleges that, upon information and belief, Defendant similarly collected and did not refund such excess franchise fees to other subscribers in New York City and throughout the United States.

*2 The class on whose behalf Plaintiff seeks to bring this action is comprised of "all persons who (i) subscribed to the Road Runner Service or any other Internet access service provided by Time Warner Cable and (ii) were assessed 'franchise fees' or other surcharges or taxes on total amounts billed for cable television services and Internet access services combined."Am. Compl. ¶ 8.[FN3]

FN3. The undersigned and her spouse have opted out of any class that may be certified in this action and waived any right to recover based on any claim set forth in this action. *See* Opt Out and Stipulation dated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

May 16, 2006 (Docket # 29). By Order dated May 16, 2006, I stated that I believe that I am not required to recuse myself from this case, but that if any party believes that there is cause for me to recuse myself, that party should write to my Courtroom Deputy by May 24, 2006. No such letters have been received.

Based on the allegations described above, in his Amended Complaint, Plaintiff brings claims against Defendant for violation of the Communications Act of 1934, 47 U.S.C. § 542; violation of the Communications Act of 1934, 47 U.S.C. § 206; violation of the Internet Tax Freedom Act, reproduced at 47 U.S.C. § 151 note § 1101, and the Communications Act of 1934, 47 U.S.C. § 206; breach of contract; restitution; and deceptive practices in violation of New York's General Business Law § 349. Plaintiff asks that this action be certified as a class action pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and seeks, on behalf of himself and the class, damages on each of the counts alleged (as well as a declaration that Defendant has committed violations of the federal and state statutes as alleged), pre-judgment interest, and costs and expenses including attorneys' fees.

Defendant moves to stay proceedings and compel arbitration (and also moves, in the alternative, to dismiss the action).

### III. Discussion

#### A. Issues as to Arbitrability-Generally

"[T]he Federal Arbitration Act (the 'FAA') creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements ... affecting interstate commerce."*Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran,* 445 F.3d 121, 125 (2d Cir.2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983)).[FN4] Under Section 2 of the FAA, "[a] written provision in ... a contract evidencing a

transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [or] transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."9 U.S.C. § 2. "Section 2 is 'a congressional declaration of a liberal federal policy favoring arbitration agreements[.]' " *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 844 (2d Cir.1987) (quoting *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218 (1985) (emphasis in original).

FN4. Both parties assume, without discussion, that the FAA applies to the alleged arbitration agreement at issue here. The FAA refers to contracts "evidencing a transaction involving commerce," 9 U.S.C. § 2, and defines commerce as, *inter alia,* " commerce among the several States," 9 U.S.C. § 1. The Supreme Court has " interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56 (2003). The Court has further concluded that, "[b]ecause the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' *Perry v. Thomas,* 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce'-that is, 'within the flow of interstate commerce,' *Allied-Bruce Terminix Cos.[v. Dobson,* 513 U.S. 265],

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

273, 115 S.Ct. 834[, 130 L.Ed.2d 753 (1995) ] (internal quotation marks, citation, and emphasis omitted)." *Citizens Bank,* 539 U.S. at 56. Moreover, the FAA applies even if the individual transaction, " taken alone, did not have a substantial effect on interstate commerce," *id.*(internal quotation marks and citation omitted), because "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control,' " *id.* at 56-57 (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236 (1948)).*See, e.g., Citizens Bank,* 539 U.S. at 57-58 (finding that the FAA applies to debt-restructuring agreements executed by Alabama residents in Alabama because, *inter alia,* "[n]o elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause"); *Adams v. Suozzi,* 433 F.3d 220, 226 (2d Cir.2005) (noting that Congress's "power [under the Commerce Clause] extends to ostensibly intrastate economic activity that has a cumulative substantial effect on interstate commerce" and finding that the FAA applied to an employment agreement-signed by the County of Nassau and the Nassau County Sheriff Officers Association, and affecting "the wages, pensions, and job security of public employees"-because "no extended discussion is required to show that [such] employment agreements 'evidence[ ] a transaction involving commerce,' 9 U.S.C. § 2") (footnote omitted).

In this case, as discussed further *infra,* the agreement pursuant to which Defendants claim the parties agreed to arbitration is the Customer Agreement for Defendant's cable-modem service. This is a transaction with an obvious effect on interstate commerce.

However, "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration."*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995). Thus, before compelling arbitration on the merits of a dispute, questions regarding whether a dispute is arbitrable must be addressed.

*\*3 Problems of arbitrability usually arise in two contexts. First, and most commonly, this question arises when the issue is whether an arbitration clause in an existing ... agreement covers a particular dispute between the parties.... The second type of arbitrability question deals, not with the scope of the arbitration clause, but with whether there is even a valid agreement to arbitrate in effect at a particular time. This question usually arises in one of two factual scenarios (1) whether the parties ever entered into an arbitration agreement at all, and (2) whether an arbitration agreement has expired or been terminated.

*Abram Landau Real Estate v. Bevona,* 123 F.3d 69, 72 (2d Cir.1997) (citations omitted). As to the question of whether the parties entered into an agreement to arbitrate, a party may challenge either the entire contract in which the arbitration provision is included, or the arbitration provision-or separate arbitration agreement-itself. Moreover, as further discussed *infra,* in challenging a contract as a whole or the arbitration provision specifically, a party may argue that the contract or provision does not exist, or is otherwise not valid. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]."*Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996).*See also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 365 (2d Cir.2003) ("It is clear that questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA.").

*B. Parties' Claims as to Arbitrability*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The parties primarily dispute two issues of arbitrability: 1) whether Plaintiff is bound by an arbitration provision included in a contract that Defendant claims Plaintiff accepted; and 2) whether, if Plaintiff is so bound, Plaintiff's claims in this action fall within the scope of that arbitration provision. In addition, Plaintiff alleges that, even if an agreement to arbitrate exists and it covers his claims in this action, the arbitration agreement should not be enforced because it is unconscionable.

*1. Claims Regarding Whether Plaintiff is Bound by Arbitration Provision*

As to the first issue, Defendant argues that Plaintiff accepted and is bound by the arbitration provision of the subscription agreement for Defendant's cable-modem service (in effect in July 2001) (the "Customer Agreement"); the provision, at Section 13 of the Customer Agreement, states that, with some limited exceptions not relevant here, [FN5]"[a]ny controversy or claim arising out of or related to this agreement ... shall be resolved by binding arbitration commenced with one year[.]" Declaration of James An (in support of Defendant's Motion to Compel Arbitration), Director of Business Operations, High Speed Online Services, for Time Warner N.Y. Cable Inc., dated March 23, 2004 ("First An Decl."), ¶ 10, and Exhibit 2 attached to First An Decl.[FN6] Defendant's argument that Plaintiff accepted and is bound by the Customer Agreement, including its arbitration provision, is based on the following claims 1) Plaintiff installed Defendant's "Road Runner" Internet access service using a self-installation kit, which included a) a CD-ROM containing software that could be installed only if the subscriber clicked a button accepting the terms of the Customer Agreement (which was itself provided, in an electronic version, in the CD-ROM), and b) written materials including a "Getting Started Guide" with installation instructions, and a "Road Runner User Guide," which referred, respectively, to viewing, on screen, the "License Agreement" and "Software License Agreement" (which Defendant states are the same and included the Customer Agreement), Def. Mem. Compel 4, First An. Decl. ¶¶ 2-7; 2)

Plaintiff affirmatively relied on the Customer Agreement in his original Complaint, by claiming a breach of contract, Def. Mem. Compel 4 (citing Compl. ¶¶ 1, 17); and 3) after Defendant's personnel made a service call at Plaintiff's home, Plaintiff signed a work order, dated November 12, 2003, which states, above the signature line, that the signature on the order indicates that the signatory has received and agreed to the terms of the Cable Modem Service Subscription Agreement, including Section 13 of the agreement providing for arbitration, Def. Mem. Compel 4, First An. Decl. ¶ 8 .[FN7]

FN5.*See infra* note 25.

FN6. According to Defendant, the Customer Agreement in effect as of November 2003 had a similar arbitration provision. *See* First An Decl. ¶ 9 & Exh. 6.

FN7. The full text on the work order reads: MY SIGNATURE ON THIS ORDER INDICATES THAT I HAVE RECEIVED AND AGREED TO THE TERMS OF THE CABLE MODEM SERVICE SUBSCRIPTION AGREEMENT SEPARATELY PROVIDED TO ME BY TIME WARNER CABLE OF NEW YORK CITY, INCLUDING SECTION 13 OF THAT AGREEMENT, WHICH PROVIDES THAT THE PARTIES DESIRE TO RESOLVE DISPUTES RELATING TO THAT AGREEMENT THROUGH ARBITRATION. SUBSCRIBER ALSO ACKNOWLEDGES THAT BY AGREEING TO ARBITRATION, SUBSCRIBER IS GIVING UP VARIOUS RIGHTS, INCLUDING THE RIGHT TO A TRIAL BY JURY. THE TERMS OF THE CABLE MODEM SERVICE SUBSCRIPTION AGREEMENT, INCLUDING SECTION 13, ARE INCORPORATED INTO THIS WORK ORDER BY REFERENCE AS IF SET OUT IN FULL HEREIN.

First An. Decl. ¶ 8 and Ex. 5.

*4 Plaintiff claims, however, that he (and other class members) "did not knowingly assent to binding arbitration," Plaintiff's Memorandum of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Law in Opposition to Defendant's Motion to Compel Arbitration ("Pl.Mem.Opp.Compel") 8. He argues that he is not bound by the arbitration agreement because he was not put on "clear notice" of it. Pl. Memo. Opp. To Motion to Compel 6. In particular, as to Defendant's argument regarding the loading of the CD-ROM, Plaintiff recognizes that, in 2001, he initiated his Road Runner Internet service by loading a "Road Runner High Speed Internet software kit," but declares that he has "no recollection ... of having seen, either in hard copy form or electronically, any 'subscription' or ' customer' agreement of the kind attached to [First An Decl. in Exhibits 2 and 6, discussed above]"; he "do[es] not recall in [his] review of the Road Runner guides that accompanied the kit any reference to a licensing agreement, which [he] allegedly had to accept as a precondition to executing the software"; and "had no idea that [his] rights *vis a vis* Time Warner were to be governed by an arbitration clause" and does "not recall ever having seen any notice advising [him] that [he] was compelled to arbitrate."Declaration of Shlomo Bar-Ayal, dated April 21, 2004, in further support of his opposition to Defendant's Motion to Compel Arbitration ("Pl.Decl.") ¶¶ 2, 3, 4, 5.[FN8]

> FN8. As to Defendants' other arguments regarding whether Plaintiff is bound by the arbitration provision, Plaintiff also argues that: 1) the literature accompanying the CD-ROM included only "vague and ambiguous" references to the Customer Agreement, such that Plaintiff did not receive "adequate notice of the agreement in question," including its arbitration provision, Pl. Mem. Opp. Compel 3-4; 2) Plaintiff's claim for contract damages in his original Complaint does not constitute an admission that he accepted the Customer Agreement including its arbitration provision, *id.* at 4-5; and 3) the fact that Plaintiff signed the work order does not establish that he accepted the Customer Agreement and its arbitration provision because a "reasonable person" would not understand that he was so binding himself by signing such a work order, *id.* at 5 n. 5.

Defendant contends that Plaintiff's claim of not having seen any "subscription" or "customer" agreement when loading the Road Runner software is "not credible." Def. Reply Mem. To Compel 2. Defendant states that, when an individual installs the Road Runner software with the CD-ROM provided to new cable-modem-service subscribers in July 2001, the individual is clearly notified of certain agreements, including the Customer Agreement, is repeatedly asked to indicate whether he or she accepts them, and is told that he or she cannot install the software if he or she does not accept the agreements. Def. Reply Mem. To Compel 2-3; Second Declaration of James An (in support of Defendant's Motion to Compel Arbitration), Director of Business Operations, High Speed Online Services, for Time Warner N.Y. Cable Inc., dated April 23, 2004 ("Second An Decl. ").[FN9] The process as described by Defendant will be further discussed *infra.*Plaintiff's counsel submitted, as a sur-reply in further opposition to Defendant's Motion to Compel Arbitration, a Declaration by co-counsel Harley J. Schnall, Esq., dated May 6, 2004 ("Schnall Decl.") [FN10], reporting on co-counsel's own experience when loading a copy of the Road Runner installation CD-ROM described in the Second An Declaration. The Schnall Declaration, which will be further discussed *infra*, points to issues regarding whether or not it would be clear to an individual loading the CD-ROM that he or she was accepting certain agreements, including an arbitration provision; ultimately, Plaintiff's counsel claims that, "[b]ased on [counsel's] own experience in loading the software package, assuming that it is the same package that the plaintiff allegedly loaded in 2001, it is apparent that plaintiff and members of his class were not on fair notice of the existence of an arbitration clause."Schnall Decl. ¶ 30.

> FN9. The original CD-ROM used by Plaintiff to install the Road Runner software has, according to Plaintiff, not been located. Pl. Memo. Opp. To Motion to Compel 8 n. 4. Defendant relies on "a CD-ROM identical to the ones that TWCNYC sent to new cable-modem-service subscribers in July

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 7

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

2001."Second An Decl. ¶ 5. In his Second Declaration, James An states what screens he saw when he installed the software contained on that CD-ROM on a computer; print-outs of the screens are attached to his Second Declaration. The screen print-outs show only what an individual sees on first looking at the screen; on many screens, however, an individual must scroll down to see the entire content.

In response to Plaintiff's counsel's letter dated April 28, 2004 (asking that "plaintiff's counsel be afforded an opportunity to review the CD-ROM that was the subject of Mr. An[ ]'s analysis, or an identical copy thereof, and full print-outs of not only the screens allegedly notifying the user concerning the agreements at issue, but also the full printouts of the agreements, themselves, as they would have been presented electronically"), Defendant's counsel provided that counsel stated to be a "true copy of the CD-ROM described in the Second An Declaration," differing from the original only in that the copy "does not bear the Road Runner logo printed on the original."Letter from Defendant to the Court (Apr. 29, 2004) 1-2, Ex. A. Defendant's counsel also provided full copies of the agreements as they would appear electronically when an individual scrolled down. *Id.* Ex. C.

> FN10. By memo-endorsed Order dated May 10, 2004, the Court accepted Plaintiff's Sur-Reply, "giving it whatever weight it deserves."

**\*5** Plaintiff's arguments as to whether he is bound by the arbitration provision in the Customer Agreement can be understood as a challenge either to the existence of the arbitration provision specifically, or to the existence of the overall Customer Agreement containing the arbitration provision at issue. Indeed, although Plaintiff's focus is on the arbitration provision, he also appears to be arguing, more generally, that he did not see, was not on clear notice of, and did not knowingly accept the Customer Agreement overall.

*2. Scope of Arbitration Provision*

Plaintiff claims that, even if the agreement to arbitrate exists, it does not cover this dispute, because the latter involves the imposition of franchise fees.

*3. Unconscionability Claims*

Plaintiff argues that, even if the arbitration provision at issue is binding on him (and other class members), it should not be enforced because it is unconscionable under New York state law. Plaintiff claims both procedural and substantive unconscionability. As to the procedural element, Plaintiff contends that he lacked meaningful choice in his ability to purchase both cable and Internet services, such that Defendant could "dictate contract terms," and that there was a "significant disparity in bargaining power" between him and Defendant.[FN11]Pl. Mem. Opp. Compel 12. Plaintiff also contends that the arbitration provision is substantively unconscionable because: 1) it replaces the applicable statute of limitations, of three to six years, with a one-year limit for bringing claims; 2) it eliminates the right to a jury trial; 3) it eliminates pre-hearing discovery; 4) it eliminates the possibility of bringing class actions; and 5) it precludes actions in small-claims court, "mandating a costly arbitration process instead."Pl. Mem. Opp. Compel 12.

> FN11. Plaintiff also claims, as part of his argument regarding unconscionability, that he was not put on notice of the Customer Agreement, including its arbitration provision. This overlaps with his initial claim that no agreement to arbitrate exists because he was not on notice of the Customer Agreement generally, and of the Agreement's arbitration provision more specifically.

*C. Who Should Decide Arbitrability Issues*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The first question that must be addressed is *who* should decide arbitrability issues-this Court, or an arbitrator.[FN12]

> FN12. The issue of who must decide issues of arbitrability has not been squarely addressed by the parties. Defendant alternates in its position as to whether issues of arbitrability must be decided by the Court or the arbitrator, without extensively addressing the question. *See* Def. Memo. To Compel 3 (stating that the Court must decide "whether the parties agreed to arbitrate" and "the scope of that agreement," citing *Genesco,* 815 F.2d at 844); Defendant's Reply Memorandum of Law in Support of Time Warner N.Y. Cable's Motion to Stay Proceedings and Compel Arbitration ("Def. Reply Mem. To Compel") 1-2 (briefly stating that the Court need not address any questions of arbitrability because Plaintiff agreed to submit them to the arbitrator). Plaintiff apparently assumes, also without discussion, that the Court must decide issues of arbitrability.

*1. Relevant Law*

"Under the FAA, as interpreted by the Supreme Court, the general presumption is that the issue of arbitrability should be resolved by the courts." *Alliance Bernstein Inv. Research & Mgmt.,* 445 F.3d 121, 125 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-45 (1995); *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986)); *accord Contec Corp. v. Remote Solution Co., Ltd.,* 398 F.3d 205, 208 (2d Cir.2005). Therefore, "the issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec,* 398 F.3d at 208 (internal quotation marks and citation omitted; emphasis in original).*Accord Alliance Bernstein Inv. Research & Mgmt.,* 445

F.3d at 125 ("[T]he issue of whether the parties agreed to arbitrate a matter is to be decided by the courts and not the arbitrators, 'unless the parties clearly and unmistakably provide otherwise.'*AT & T Technologies,* 475 U.S. at 649."); *Abram Landau Real Estate,* 123 F.3d at 72 ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator [;][u]nder these circumstances, any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in favor of arbitration.").

**\*6** However, where a party challenges the *validity of a contract* (that includes an arbitration provision) *as a whole*-rather than the validity of the arbitrator provision itself, or a separate arbitration agreement-the arbitrator must decide that issue. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04 (1967) (regarding a claim of fraudulent inducement of the entire contract) [FN13]; *Buckeye Check Cashing, Inc. v. Cardegna,* 126 S.Ct. 1204, 1209 (2006) (noting that *Prima Paint* established that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance"). Thus, when a party argues that the entire contract (containing an arbitration provision) is unconscionable, the arbitrator must decide that claim. *See JLM Indust., Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 170 (2d Cir.2004) ("Claims of unconscionability and adhesion contracts are similarly included within the *Prima Paint* rule.") (internal quotation marks and citation omitted).

> FN13.*Accord ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.,* 307 F.3d 24, 30 (2d Cir.2002) ("It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.").

But "[t]he issue of the contract's validity is different from the issue of whether any agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 9

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

between the [parties] was ever concluded."*Buckeye Check Cashing, Inc.,* 126 S.Ct. at 1208 n. 1. The former question includes, for example, whether the contract was fraudulently induced, or whether the contract was rendered invalid by a usurious finance charge; the latter includes questions as to whether a party actually signed the contract, was authorized to sign it, or had the mental capacity to consent to it. *Id.* Thus, as suggested by this distinction made by the *Buckeye Cashing Court,* and as found by the Court of Appeals for the Second Circuit [FN14], as well as judges in this district,[FN15] the *Prima Paint* rule does not apply to claims that a contract that includes an arbitration agreement does not, as a whole, exist.

> FN14. In *Sphere Drake Ins. Ltd v. Clarendon Nat. Ins. Co.,* 263 F .3d 26 (2d Cir.2001), the Court of Appeals, in harmonizing *Prima Paint* with *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673 (2d Cir.1972), distinguished between what it referred to as a "void" contract-i.e., a contract "that produces no legal obligation" because it "does not come into existence," for example because the parties have "fail [ed] to agree to essential contract terms,"*id.* at 31-and a "voidable" contract-i.e., "an agreement that 'unless rescinded ... imposes on the parties the same obligations as if it were not voidable,'" *id.* (quoting Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 1:20, at 50 (4th ed.1990)), such as the one involved in *Prima Paint,* where the parties alleged fraud in the inducement as to the entire contract, *id.*The *Sphere Drake* Court found that a party is entitled to a trial before the court on the arbitrability issue only if the party alleges (with some supporting evidence) that the contract containing the arbitration clause is void as a whole, or that the arbitration clause itself is voidable. *Id.* at 31-32.*See also Denney v. BDO Seidman LLP,* 412 F.3d 58, 68 (2d Cir.2005) (referring to "the reasoning underlying [the Court of Appeals'] ruling in *Sphere Drake,* which

seeks to protect parties from arbitration only in those narrowly-limited circumstances where the very existence of a contract is in doubt"). These cases appear to use a different definition of "void " than the *Buckeye Check Cashing* Court, which found that the claim that a contract containing an arbitration is "void for illegality" (because it violated state laws) must be resolved by an arbitrator, not a court; because *Sphere Drake* and its progeny actually use "void" in the sense of "non-existent," those cases appear to be consistent with *Buckeye Check Cashing,* despite the potential confusion caused by the differing use of the same terms.

> FN15. For example, in *In re Nuclear Electric Ins. Ltd. (Central Power and Light Co.),* No. 96 Civ. 2661, 926 F.Supp. 428, 433-35 (May 24, 1996), Judge Stein, in a thorough discussion of *Prima Paint* and its progeny, concluded that challenges to the existence of a contract (where "a party claims that it never actually manifested assent to the contract containing an agreement to arbitrate") must be decided by the court, but challenges seeking to avoid a contract (containing an arbitration provision) that the party "concedes that it willingly manifested assent to" must be decided by the arbitrator, *id.* at 434; as Judge Stein explains, in the former case, "that party cannot be forced to arbitrate until it is first established by a court that the party willingly manifested assent to the underlying contract," whereas in the latter case, "that party's claim is simply a defense to arbitrability that is itself arbitrable,"*id. See also In re Azores Int'l Shipping, Inc. (Panamanian Carriers Corp.),* No. 99 Civ. 850, 1999 WL 493380, at *2, 1999 U.S. Dist. LEXIS 10398, at *4 (S.D.N.Y. July 9, 1999) (finding that the action-in which respondent claimed that it could not be compelled to arbitrate because the party that signed the contract containing the arbitration clause at issue was not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

authorized to enter into agreements on respondent's behalf-was not controlled by *Prima Paint* because *"Prima Paint* and its progeny addressed existing contracts that parties sought to escape[;][n]either the parties in *Prima Paint* nor in the other cases cited by defendant denied the very existence of the contract to be arbitrated"); *PMC, Inc. v. Atomergic Chemetals Corp.,* 844 F.Supp. 177, 181 (S.D.N.Y.1994) (reading *Prima Paint* as " 'limited to challenges seeking to *avoid* or *rescind* a contract-not to challenges going to the very existence of a contract that a party claims never to have agreed to' ") (quoting *Three Valleys Municipal Water Dist. v. E.F. Hutton & Co.,* 925 F.3d 1136, 1140 (9th Cir.1991; emphasis in original)).

Thus, absent clear and unmistakable evidence that the parties intended that questions of arbitrability be resolved by arbitration, the court has two initial tasks when it is asked to compel arbitration and stay judicial proceedings pending the arbitration "first, it must determine whether the parties agreed to arbitrate [FN16]; second, it must determine the scope of that agreement."*Genesco,* 815 F.2d at 844 (citations omitted); *accord Mehler v.. Terminix Int'l Co. L.P.,* 205 F.3d 44, 47 (2d Cir.2000).[FN17]

FN16. As to this question, as discussed *supra,* the Court must address any claims by the non-moving party (seeking to avoid arbitration) regarding the existence of the underlying contract as a whole, or the existence or validity of the arbitration provision (or a separate arbitration agreement) itself, but the Court cannot address any challenge to the validity of the contract as a whole.

FN17. The court then has two additional tasks: "third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the

claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco,* 815 F.2d at 844 (citations omitted). But only the first two inquiries are at issue here. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration 6.

"When contract formation is at issue in an FAA case, we generally apply state-law principles." *Adams v. Suozzi,* 433 F.3d 220, 227 (2d Cir.2005). *See also Alliance Bernstein Inv. Research & Mgmt.,* 445 F.3d at 125 (stating that, where an arbitration agreement is at issue, "courts generally look to state law for guidance as they seek to ascertain the parties' intent"); *Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 48 (2d Cir.2000) ("in deciding whether the parties agreed to arbitrate a certain matter, courts should generally apply state-law principles that govern the formation of contracts").

*2. Analysis*

*a. Whether There is "Clear and Unmistakable Evidence" that Arbitrability Issues Should be Decided by Arbitrator*

*7 As noted above, this Court should decide any claims challenging the existence (but not the " validity") of the contract containing the arbitration provision at issue, and any issues concerning the existence or validity of the arbitration clause specifically, as well as other issues concerning arbitrability, unless the Court finds that "there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator," *Contec,* 398 F.3d at 208 (internal quotation marks and citation omitted).[FN18]

FN18. The relevant state law in *Contec*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

was "New York law, which follows the same standard as federal law with respect to who determines arbitrability generally, it is a question for the court unless there is 'a 'clear and unmistakable' agreement to arbitrate arbitrability.' " *Contec,* 398 F.3d at 208 n. 1 (quoting *Shaw Group Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 121 (2d Cir.2003) (quoting *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993, 689 N.E.2d 884 (1997))).

In this case, the arbitration clause by which Defendant claims Plaintiff is bound states, in relevant part:

ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT (BUT NOT ANY CLAIMS ARISING OUT OF COMMERCIAL ACTIVITIES OR THE THEFT OR OTHER UNAUTHORIZED RECEIPT OF ANY TIME WARNER CABLE SERVICE ON THE PART OF CUSTOMER) SHALL BE RESOLVED BY BINDING ARBITRATION COMMENCED WITHIN ONE YEAR UNDER THE THEN-CURRENT COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (OR ANY CONSUMER RULES ADOPTED BY THE AMERICAN ARBITRATION ASSOCIATION TO WHICH BOTH PARTIES AGREE), EXCEPT THAT EITHER PARTY MAY SEEK EQUITABLE OR INJUNCTIVE RELIEF ONLY IN AN APPROPRIATE COURT OF LAW OR EQUITY.... THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR.

Section 13 of Customer Agreement, First An. Decl. Exh. 2.

The arbitration provision specifically refers the question of the "arbitrability of disputes" to the arbitrator. The "arbitrability of disputes" includes both questions as to the existence and validity of the arbitration agreement, and questions as to the scope of the arbitration provision and whether particular issues are covered by it. Moreover, the phrase encompasses questions as to the existence of the

underlying contract as a whole, if such questions are raised in connection with the issue of arbitrability-e.g., by a party claiming that he or she cannot be compelled to arbitrate because he or she did not enter into the Customer Agreement and therefore cannot be bound by its arbitration provision.

Furthermore, the arbitration provision incorporates, by reference, the Commercial Arbitration Rules of the American Arbitration Association (AAA), which in relevant part provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement," AAA Rule R-7(a).[FN19] American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures (amended and effective September 15, 2005), http://www.adr.org/sp.asp?id=22440# R7.[FN20]In *Contec,* the Court of Appeals found "clear and unmistakable evidence" that the parties intended that the question of arbitrability shall be decided by the arbitrator where the arbitration provision at issue stated that any controversy would be resolved by arbitration " in accordance with the Commercial Arbitration Rules of the American Arbitration Association,"398 F.3d at 208; the *Contec* Court specifically referred to AAA Rule R-7(a). The Court held that when " parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."*Id. Accord Alliance Bernstein Inv. Research & Mgmt.,* 445 F.3d at 126 (quoting *Contec* ). Specifically, the *Contec* Court found that the incorporation of AAA Rule R-7a evidences an intent for the arbitrator to decide issues as to the existence of the contract (that includes the arbitration provision) as a whole; the issue in that case was whether the party seeking to compel arbitration had any rights under an agreement, signed by the other party, that included an arbitration provision, and the Court concluded that this issue must be decided by an arbitrator. *See Contec,* 398 F.3d at 211.

FN19. Section 13 of the Customer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Agreement also incorporates, alternatively, "any consumer rules adopted by the American Arbitration Association to which both parties agree."The AAA's " Supplementary Procedures for Consumer-Related Disputes," effective September 15, 2005, supplement the AAA's commercial dispute resolution procedures. American Arbitration Association, Supplementary Procedures for Consumer-Related Disputes, http://www.adr.org/sp.asp?id=22014.

FN20. This provision concerning the arbitrator's power to rule on his or her own jurisdiction appears in all previous versions of the AAA's commercial arbitration rules since 2000. The archived rules are available at http://www.adr.org/RulesArchives.

*8 The Court concludes that the arbitration provision at issue here, both in its explicit language and its incorporation of the AAA's Commercial Arbitration Rules, constitutes sufficiently clear and unmistakable evidence that the parties intended to have issues of arbitrability decided by the arbitrator.

b. *Whether Plaintiff Is Bound by Arbitration Provision of Customer Agreement*

Plaintiff, however, contends that he (and other class members) "did not knowingly assent to binding arbitration" as set forth in the Customer Agreement. Pl. Mem. Opp. Compel 8. Plaintiff's argument implies, more specifically, that Plaintiff and other class members did not intend to agree to have the issue of arbitrability itself decided by an arbitrator. Thus, this Court must engage in a further inquiry,[FN21] guided by principles of state contracts law. *Cf. Contec,* 398 F.3d at 209 (stating, as to the further question of whether a non-signatory to the agreement that included the arbitration clause could compel a signatory to arbitrate a dispute, that, "[i]n order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each

other and to the rights created under the agreement" -and finding, in the circumstances of that case-including the fact that the party seeking to avoid arbitration had signed the agreement that included the arbitration provision-that it was appropriate to refer the question of arbitrability to arbitration); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 946 (1995) (finding, as to the question of whether a signatory to an agreement that included an arbitration provision could compel non-signatories to arbitrate a dispute, that, "[o]n the record before [the Court], [the signatory] cannot show that the [non-signatories] clearly agreed to have the arbitrators decide (i.e., to arbitrate) the question of arbitrability," because the fact that the non-signatories had filed, with the arbitrators, a written memorandum arguing that the arbitrators did not have jurisdiction over the dispute, did not evidence an intent for issues of arbitrability to be resolved by arbitration).

FN21. This inquiry, in the particular circumstances of this case, is in effect similar to the inquiry that the Court would conduct if it were itself deciding the existence of the Customer Agreement as a whole, and the existence and validity of the agreement to arbitrate more specifically. But the purpose of the Court's inquiry is to determine whether Plaintiff consented to the referral of arbitrability issues to the arbitrator, which is included in the arbitration provision of the Customer Agreement.

i. *Relevant New York law*[FN22]

FN22. The parties do not explicitly address to which state law the Court should look in this case; but the only state law citations in parties' submissions (in Defendant's Reply) are to New York cases. The arbitration provision of the Customer Agreement does not refer to state law, stating instead that " the Federal Arbitration Act, 9 U.S.C.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Section 1 to 16, shall govern the interpretation and enforcement of this paragraph," First An Decl. Exh. 2 ¶ 13 (font altered); furthermore, the Agreement as a whole does not specify a choice of law. The circumstances of this case-including that Plaintiff is a resident of the State of New York and the County of New York, and defendant Time Warner Cable allegedly has its principal place of business in New York, see Am. Compl. ¶ ¶ 5,6-indicate that it is appropriate for this Court to be guided by New York law.

" 'In determining whether a party entered into a binding contract, courts eschew the subjective and look to objective manifestations of intent as established by words and deeds.' " In re Rose BB, 752 N.Y.S.2d 142, 144, 300 A.D.2d 868, 869-870 (3d Dep't 2002) (quoting Ahlstrom Mach. v. Associated Airfreight, 708 N.Y.S.2d 497, 272 A.D.2d 739, 741 (3d Dep't 2000); further internal quotation marks, citation, and added emphasis omitted).See also Genesco, 815 F.2d at 845, 846 (" Under general contract principles a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation" and a court must " focus not on whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract"). "Consent to arbitrate cannot be given by inadvertence." Marek v. Alexander Laufer and Son, Inc., 257 A.D.2d 363, 364, 683 N.Y.S.2d 50, 51 (1st Dep't 1999). An arbitration agreement "must be clear, explicit and unequivocal and must not depend upon implication or subtlety." Waldron v. Goddess, 61 N.Y.2d 181, 183-84, 461 N.E.2d 273, 274, 473 N.Y.S.2d 136, 137 (1984) (internal quotation marks and citations omitted).See also Miner v. Walden, 101 Misc.2d 814, 819, 422 N.Y.S.2d 335, 339 (N.Y.Sup.Ct.1979) (noting that "[a]n agreement to arbitrate has been held to be enforceable if it had been openly and fairly entered into" and "[t]he language whereby a party agrees to or is under a duty to arbitrate should be clear and unequivocal and the burden lies on the party seeking arbitration" (internal quotation marks and citations omitted)).

However, an individual who signs or otherwise assents to a contract without reading it (despite having an opportunity to do so) is bound by that contract, including its arbitration provision. See Tsadilas v. Providian Nat. Bank, 786 N.Y.S.2d 478, 480, 13 A.D.3d 190, 190 (1st Dep't 2004) (finding that "[p]laintiff is bound by the arbitration provision even if she did not read it"); for contracts more broadly, see Peabody v. Northgate Ford, Inc., 794 N.Y.S.2d 452, 454, 16 A.D.3d 879, 880 (3d Dep't 2005); Waters v. New York Property Ins. Underwriting Ass'n, No. 117342/03, 9 Misc.3d 1126(A), 1126(A), 2005 N.Y. Slip Op. 51795(U), 2, 2005 WL 2934822, at *2, 2005 N.Y. Misc. LEXIS 2459, at *5 (N.Y.Sup.Ct. Sept. 29, 2005).

ii. Whether Plaintiff Accepted the Customer Agreement, Including its Arbitration Provision, In Loading the CD-ROM

*9 As noted earlier, Defendant contends that Plaintiff's claim of not having seen the Customer Agreement when loading the Road Runner software is "not credible." Def. Reply Mem. To Compel 2. Defendant describes the loading process, and the information shown to the user as he or she loads the CD-ROM, as follows. The screen immediately following the "welcome" screen notifies the person installing the software that he or she will see two agreements on the screen-the Broad Jump Software License Agreement and the Road Runner Agreement-and further states:

At the end of each agreement, please click on the Accept button if you agree to be bound by all of its terms, and if you are over the age of eighteen. You may thereafter install and complete the Road Runner Self Installation according to those terms. If you do not agree to all of the terms of each agreement, click on the Decline button and do not install or use this CD-Rom. Please understand that if you do not click Accept on both the Broad Jump Software License Agreement and the Road Runner Agreement, you will not be able to install the software and complete the Road Runner Self-Installation.

Second An Decl. ¶ 6 & Exh. 2. If the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 14

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

individual clicks the "Accept" button on this screen, the following two screens provide, respectively, the "Software License Agreement" and the "Road Runner Agreement," which includes a reference to the "Customer Agreement" and other agreements that are part of the Road Runner Agreement; the installing individual is required to click "Accept" on each screen in order to continue. Second An Decl. ¶¶ 7, 8 & Exhs. 3, 4; Exhibit C attached to Defendant's Letter Dated April 29, 2004 (showing full screen shots of agreement, as would appear to an individual if he or she fully scrolls down) ("April 29, 2004, Exh. C") (Screens 3 & 4). The following screen shows the "Customer Agreement," which includes Section 13 concerning arbitration. Second An Decl. ¶ 9 & Exh. 5; April 29, 2004, Exh. C (Screen 5). The following screens show the other parts of the Road Runner Agreement, including the "Acceptable Use Policy," the "Customer Privacy Notice," and the "Note About Multiple Connections"; again, the "Accept" button must be clicked on each screen to continue. Second An Decl. ¶ 10 & Exh. 6; April 29, 2004, Exh. C (Screens 6-8). The screen that then appears states:I have had the opportunity to read and understand each any every term set forth in the Road Runner Agreement, including the terms of the Customer Agreement .... I understand that by clicking the Accept button below, I am agreeing to be bound by all of the terms and conditions detailed therein, as if I had written my signature to each of the agreements, including Section 13 of the Customer Agreement, which provides that the parties desire to resolve disputes relating to the Customer Agreement through arbitration, and that by agreeing to arbitration, I am giving up various rights, including the right to a jury trial. If you agree, click on the Accept button and continue with the Road Runner Self Installation. If you do not accept these conditions, click on the Decline button. Thereafter, do not install or otherwise manipulate the software.

**\*10** Second An Decl. ¶ 11 & Exh. 7. If an individual clicks "Accept," the software installation steps begin. Second An Decl. ¶¶ 11, 13 & Exh. 9.

Plaintiff's Sur-Reply, *i.e.,* the Schnall Declaration, does not dispute the description of the screens noted above, nor that an individual

installing the CD-ROM is required to click "Accept" in order to continue from one screen to the next. But the Sur-Reply points to a few specific issues. First, Plaintiff states that the navigation bar that appears at the bottom of each screen after the welcome screen provides operative buttons only for "Help," "Print," "Accept," and "Decline,"; the "Back" button is inoperative, Schnall Decl. ¶ 10; furthermore, the navigation bar is "static, such that one could inadvertently click 'Accept' before scrolling down to read the entire text or inadvertently click 'Accept' multiple times at once and miss a screen of text entirely,"*id.* ¶ 13.Furthermore, in order to view the full text of the Customer Agreement, an individual must scroll through about 700 lines, Schnall Decl. ¶ 19; indeed, the full print-outs provided by Defendant for the Customer Agreement amount to 38 screens, April 29, 2004, Exh. C. To reach the arbitration provision at Section 13 of the Customer Agreement, an individual must scroll through about 30 screens (600 lines); the text of the arbitration provision is completely capitalized, but it is not "highlighted or set-off in another color or font."Schnall Decl. ¶¶ 19, 20. Moreover, the "Help" button is not always clear or, it seems, accurate: specifically, when "help" is clicked on the screen showing the Customer Agreement (Screen 5) and on the screen that asks for a final acceptance of the Road Runner Agreement (Screen 9), the message that pops up is entitled "Software license agreement" and states that "you must choose whether you do or do not accept the license agreement before you can proceed "). Schnall Decl. ¶¶ 8, 18, 29. Finally, Mr. Schnall argues that in certain instances the screens state policies or information that do not require acceptance, *per se,* yet an individual must click "Accept" to proceed, *id.* ¶ 22, 24, 26 (referring to the screens showing the Road Runner Acceptable Use Policy, the Customer Privacy Notice, and the Note About Multiple Connections); Mr. Schnall appears to claim, therefore, that this constituted another "ambiguit[y]" that "compounded the notice problem," *id.* ¶ 30.

Based on the above, and guided by New York state law, the Court concludes that Plaintiff, in installing the Road Runner software through a similar CD-ROM, accepted the terms of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 15

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Customer Agreement, including its arbitration provision (and including the latter's referral of arbitrability issues to the arbitrator). First, an individual who, like Plaintiff, used a Road Runner self-installation CD-ROM as described above would have been initially informed that, on the following screens, he or she would see certain agreements and that, "at the end of each agreement," he or she should click "accept" if he or she agreed to be bound by all of the terms of the agreements (and should click "decline," if not, in which case the individual would not be able to download the software), Second An Decl. Exh. 2; April 28, 2004, Exh. C (Screen 2-no need to scroll down to see full text). The individual would then have been required to click "accept" eight times in order to install the software, including a final "accept" indicating that the individual "had the opportunity to read and understand each any every term set forth in the Road Runner Agreement, including the terms of the Customer Agreement" and "underst[oo]d that by clicking the Accept button below, [he or she was] agreeing to be bound by all of the terms and conditions detailed therein ... including Section 13 of the Customer Agreement, which provides that the parties desire to resolve disputes relating to the Customer Agreement through arbitration," Second An Decl. Exh. 7; April 28, 2004, Exh. C (Screen 9-no need to scroll down to see full text).

*11 Furthermore, the Customer Agreement, including the arbitration provision-which was written in clear and unequivocal language-was available in full to the individual. It was not hidden or hard to find, but rather presented on the computer screen.[FN23] Although it is true that the individual would have had to scroll down through about 38 screens to read the Customer Agreement in its entirety (including 30 screens before reaching the arbitration provision), it is not significantly more arduous to scroll down to read an agreement on a computer screen than to turn the pages of a printed agreement; that an individual must go through multiple computer screens to read an agreement does not in and of itself mean that he should not be bound by his consent to the agreement as manifested by his clicking of the "accept" button. Furthermore, the agreement could be printed out if an individual found it necessary or

helpful to do so; printed out, the agreement is about nine pages-not an extraordinary length. And the fact that an individual could click the "Accept" button without having to scroll down to the end of the agreement does not mean that an individual's clicking of the "accept" button is therefore inherently meaningless; indeed, an individual who signs or otherwise assents to a contract without reading it is bound by that contract, including its arbitration provision. *See Tsadilas v. Providian Nat. Bank,* 786 N.Y.S.2d 478, 480, 13 A.D.3d 190, 190 (1st Dep't 2004); *Peabody v. Northgate Ford, Inc.,* 794 N.Y.S.2d 452, 454, 16 A.D.3d 879, 880 (3d Dep't 2005).

> FN23. It was clear from the initial " Customer Agreement" screen that appeared that an individual would need to scroll down to see the agreement in its entirety, and the scroll bar would indicate when the end was reached.

Moreover, the arbitration provision itself (including its statement concerning the resolution of arbitrability issues by the arbitrator) was not obscured but rather was the same size print as the rest of the agreement and written in all capitalized letters, thus standing out from the rest; Plaintiff's claim that the provision was not sufficiently visible is therefore unpersuasive. *See Kimi Jewelers, Inc. v. Advance Burglar Alarm Systems, Inc.,* 555 N.Y.S.2d 51, 52 (1st Dep't 1990) ("We reject plaintiff's claim that the waiver provision was deeply and inconspicuously hidden in the agreement. It was set forth in the rather short agreement in the same size print as every other provision of the document and under the heading " LEGAL ACTION", so as to draw one's attention to it."); *Edwards v. North American Van Lines,* 513 N.Y.S.2d 895, 897, 129 A.D.2d 869, 870, (3d Dep't 1987) (finding it "evident that the arbitration clause was not hidden in the fine print of the contract" where "the front of the contract provides in bold print and larger type that the contract 'INCLUDES THE CONDITIONS PRINTED ON THE BACK HEREOF' " and the arbitration provision appears on the back of the contract, under the heading "in bold print and larger type ... 'TIME OF FILING

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 16

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

CLAIM FOR DAMAGES-ARBITRATION' "). And the question of whether the "help" feature was sufficiently informative-on which Plaintiff focuses-is not decisive, because the text in the main screens was sufficiently clear for an individual to understand that he or she was being asked if he or she accepted certain agreements provided in those main screens.[FN24]

> FN24. The Court also finds unpersuasive the claim that, in some instances, an individual should not have been required to click "accept" insofar as he or she was being informed of a policy or given additional information, and that this helped to confuse the issue of what an individual would be accepting. It does not seem inappropriate to require an individual to " accept" the Road Runner Acceptable Use Policy (which states that subscribers accept certain restrictions and agree not to use the service for certain purposes), the Customer Privacy Notice, and the Note About Multiple Connections (which specifies certain requirements and costs involved in having multiple connections). Second An Decl. ¶ 10 & Exh. 6; April 29, 2004, Exh. C (Screens 6-8). In any event, it would be clear to a reasonable would-be subscriber that clicking the "accept" button for the " Customer Agreement" would mean that the individual was accepting the terms of the agreement.

*12 *Specht v. Netscape Communications Corp.,* 306 F.3d 17 (2d Cir.2002), on which Plaintiff primarily relies, is not to the contrary. In *Specht,* the plaintiffs downloaded a browser program called Netscape Communicator, as well as a "plug-in" program called SmartDownload; they brought claims against the defendants related to these programs, and defendants sought to compel arbitration and stay court proceedings. *Id.* at 21-23.All of the plaintiffs except for one downloaded and installed Communicator in connection with downloading SmartDownload. *Id.* at 22.These plaintiffs allegedly came upon a Netscape webpage with the caption "

SmartDownload Communicator"; the page stated " Download With Confidence Using SmartDownload!," and featured, near the bottom of the screen, a "Start Download" prompt with a " tinted button labeled 'Download.' " *Id.* at 22.The plaintiffs clicked on the button and downloaded and installed SmartDownload, which then permitted them to download and install Communicator. When they downloaded Communicator from the Netscape website, the plaintiffs, upon initiating the installation of Communicator, "were automatically shown a scrollable text of that program's license agreement and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the license terms." *Id.* at 21-22.The Court of Appeals noted:

This kind of online software license agreement has come to be known as "clickwrap" (by analogy to "shrinkwrap," used in the licensing of tangible forms of software sold in packages) because it " presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon. The product cannot be obtained or used unless and until the icon is clicked. "

*Id.* at 22 n. 4 (quoting *Specht v. Netscape Communications Corp.,* 150 F.Supp.2d 585, 593-94 (S.D.N.Y.2001)). The Court stated that the plaintiffs "expressly agreed to Communicator's license terms by clicking 'Yes.' " *Id.* at 22.The Communicator license agreement contained an arbitration provision.*Id.*

The Court emphasized that "[t]he signal difference between downloading Communicator and downloading SmartDownload was that no clickwrap presentation accompanied the latter operation."*Id.* at 23."The sole reference to SmartDownload's license terms on the ' SmartDownload Communicator' webpage was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen": if, rather than simply clicking on the " Download" button to obtain SmartDownload, the plaintiffs had scrolled down, they would have seen text asking them to "review and agree to the terms of the *Netscape SmartDownload software license*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 17

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*agreement* before downloading and using the software."*Id.* Plaintiffs averred, however, that they had not seen this. *Id.* After clicking on the " Download" button, moreover, "plaintiffs encountered no further information about the plug-in program or the existence of license terms governing its use."*Id.* Furthermore, even if plaintiffs had scrolled down and seen the text noted above before downloading SmartDownload, " SmartDownload's license terms would not have been immediately displayed in the manner of Communicator's clickwrapped terms"; rather, a user would have had to click on the underlined text to be taken by hyperlink to a separate webpage, with yet another set of links, one of which would have taken the user to another webpage that contained the full text of a license agreement, which included an arbitration provision. *Id.* at 23-24.

\*13 Guided in part by relevant state law (in that case, California law), the Court of Appeals "h[e]ld that a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to SmartDownload's license terms hidden below the 'Download' button on the next screen"; therefore, the Court "conclude[d] that under the circumstances here, plaintiffs' downloading of SmartDownload did not constitute acceptance of defendants' license terms," including its arbitration provision. *Id.* at 35.*See also id.* at 32 (concluding that "in circumstances such as these, where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms" and finding therefore that "plaintiffs did not manifest assent to SmartDownload's license terms"). There was, however, no dispute between the parties that plaintiffs had accepted the Communicator licensing agreement (including its arbitration provision).*Id.* at 35.

In this case, the circumstances are more akin to those in *Specht* surrounding the Communicator license agreement than the SmartDownload agreement individuals seeking to install the Road Runner Internet access service with a

self-installation CD-ROM were "automatically shown a scrollable text of that program's ... agreement[s] and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the ... terms. " *Id.* at 21-22.Plaintiff did not simply happen upon a free download which made no easily visible reference to a binding agreement. Thus, *Specht* (even assuming it would apply here although it is based largely on California state law) does *not* suggest that Plaintiff failed to manifest his or her assent to the terms of the Customer Agreement; on the contrary, the analogies and rationale to be drawn from *Specht* indicate that Plaintiff, by installing the Road Runner software after presumably clicking " Accept" eight times (as he must have in order for the installation to proceed), agreed to the Customer Agreement, including its arbitration provision (and that provision's indication that arbitrability questions should be decided by the arbitrator).*See also Moore v. Microsoff Corp.,* 741 N.Y.S.2d 91, 92, 293 A.D.2d 587, 587 (2d Dep't 2002) (finding that, where terms of agreement contained in defendant's software program were "prominently displayed on the program user's computer screen before the software could be installed" and "the program's user was required to indicate assent to the [agreement] by clicking on the " 'I agree' icon before proceeding with the download of the software," "the defendant offered a contract that the plaintiff accepted by using the software after having an opportunity to read the license at leisure").

### c. Scope of Arbitration Provision

\*14 For the reasons discussed above, the question of whether this action falls within the scope of the arbitration provision is also an issue for the arbitrator to decide.[FN25]

> FN25. The Court notes that, by letter dated March 14, 2005, Plaintiff refers to *Sevier v. Time Warner Cable, Inc.,* No. 03 Civ. 7747 (S.D.N.Y.), Transcript of April 19, 2004, Hearing (*Sevier* Tr.) (attached as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 18

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Exhibit 1 to Declaration of Andrew S. Weinstein in support of Defendant's Motion to Compel Arbitration), in which Judge Sprizzo denied defendant's motion to compel arbitration in a case involving the same arbitration clause as the one at issue here. Judge Sprizzo suggested that the arbitration clause (including its provision that matters of arbitrability are to be decided by the arbitrator) did not apply in that case because of the "commercial activities" exception. *Sevier* Tr. 6-9. But, ultimately, Judge Sprizzo did not clearly hold this, *see Sevier* Tr. 11 ("I would have to determine what commercial activity meant ... but then I don't know where that would shake out ...."); rather, his decision seems to rest primarily on his holding that the arbitration clause "raises substantial policy considerations" because it "has the effect of nullifying statutory remedies" for antitrust violations, *Sevier* Tr. 22; *see also id.* at 13-22 (focusing on this issue).*Sevier* was first mentioned in Defendant's Reply Brief at 1 n. 1. Plaintiff, in discussing *Sevier,* is responding to an update provided by Defendant regarding the case (by letter dated March 10, 2005, informing the Court that the case was remanded to the district court by the Court of Appeals in light of a tentative settlement between the parties). But in doing so, Plaintiff purports to present new arguments that were not raised in his briefs (either his opposition brief or " sur-reply"): namely, 1) that the " commercial activities" exception provides another reason why Plaintiff is not bound by the arbitration agreement, and 2) that, because the arbitration agreement limits recoverable damages, he should not be compelled to arbitrate, insofar as he seeks statutory damages and refunds not related to service interruptions. Letter from Plaintiff to Court 1-2 (Mar. 14, 2005). Responding to Defendant's update as to the procedural history of *Sevier* is not an opportunity to raise entirely new arguments; thus the Court need not consider these arguments. In any event,

Plaintiff's argument concerning the " commercial activities" exception appears to lack merit. Reading that phrase to include, as Plaintiff implies, the activity of using and paying for services provided by Time Warner Cable would result in the exception effectively subsuming the entire arbitration provision and rendering it meaningless; under New York law, a court, although "not free to alter the plain terms of an agreement or to strain language beyond its reasonable and ordinary meaning," must interpret a contract to give all of its provisions "full meaning and effect," *Shaw Group Inc. v. Triplefine Intern. Corp.,* 322 F.3d 115, 124 (2d Cir.2003) (internal quotation marks omitted).

### d. Unconscionability

Plaintiff argues that, even if the arbitration provision at issue is binding on him (and other class members), it should not be enforced because it is unconscionable under New York state law. This argument pertains to the validity of the arbitration provision (rather than to its existence, which has been discussed above). As noted at the outset, Plaintiff makes claims of both procedural and substantive unconscionability. As to the procedural element, Plaintiff contends that Defendant was able to "dictate contract terms" because "upon information and belief, Time Warner has been able to function as a monopoly in the area of cable modem services"; Plaintiff lacked meaningful choice in his ability to purchase both cable and Internet services; there was a "significant disparity in bargaining power" between Plaintiff and Defendant; and Plaintiff was not put on notice of the Customer Agreement, including its arbitration provision.[FN26]Pl. Mem. Opp. Compel 12. Plaintiff also contends that the arbitration provision is substantively unconscionable because: 1) it replaces the applicable statute of limitations, of three to six years, with a one-year limit for bringing claims; 2) it eliminates the right to a jury trial; 3) it eliminates pre-hearing discovery; 4) it eliminates the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

possibility of bringing class actions; and 5) it precludes actions in small-claims court, "mandating a costly arbitration process instead ."Pl. Mem. Opp. Compel 12.

> FN26. This overlaps with Plaintiff's initial claim that no agreement to arbitrate exists because he was not on notice of the Customer Agreement generally, and of the Agreement's arbitration provision more specifically.

The Court must, again, first determine *who* must decide these claims of unconscionability. Plaintiff's procedural unconscionability argument, *see* Pl. Mem. Opp. Compel 12, could be understood to pertain to the entire Customer Agreement. *Cf. JLM Indust., Inc. v. Stolt-Nielsen SA,* 387 F.3d 163, 169-70 (2d Cir.2004) (understanding the argument of the plaintiffs-who argued that the arbitration provision in the standard form contract at issue should not be enforced-to be that the entire contract, rather than only the arbitration clause, was a contract of adhesion, based on an affidavit submitted by plaintiffs stating that, because vessel owners "all use a standard form charter ... *'every charterer has to accept arbitration or they will not be offered a ship* ' " and that therefore plaintiffs " ' have no choice' but to accept the arbitration clauses that are printed in the form contract' "). Although Plaintiff focuses only on the arbitration provision as being unconscionable, Plaintiff's allegations regarding Defendant's monopoly position, Plaintiff's lack of meaningful choice, the resulting disparity of power between the parties, and Defendant's ability to "dictate contract terms"-as well as Plaintiff's argument of lack of notice concerning the Customer Agreement-pertain to the Customer Agreement generally, rather than specifically to the arbitration clause. To the extent that Plaintiff's argument may be viewed as a challenge to the validity of the entire Customer Agreement, it must be decided by an arbitrator. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04 (1967); *Buckeye Check Cashing, Inc. v. Cardegna,* 126 S.Ct. 1204, 1209 (2006); *JLM Indust., Inc.,* 387 F.3d at 170.

**\*15** Plaintiff's claims of procedural unconscionability could be understood, however, as pertaining specifically to the arbitration provision; furthermore, Plaintiff's claims of substantive unconscionability clearly pertain specifically to the arbitration clause. As such, these claims of unconscionability would generally be decided by a court. But, here, issues of arbitrability, including the validity of the arbitration agreement, have been referred to the arbitrator-suggesting that the unconscionability claims should be decided by the arbitrator. A further question arises, however: can the provision referring arbitrability issues to an arbitrator be enforced if the arbitration clause is unconscionable? A defense of unconscionability may invalidate an arbitration agreement, *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996) ; generally, "questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA,"*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 365 (2d Cir.2003). Therefore, out of an abundance of caution, the Court will address Plaintiff's unconscionability claims here.

Under New York law, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made-i.e., ' some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *Gillman v. Chase Manhattan Bank,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988) (quoting *Matter of State of New York v. Avco Fin. Serv.,* 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 406 N.E.2d 1075 (1980); further internal quotation marks and citation omitted).[FN27] *Accord Brower v. Gateway 2000, Inc.,* 246 A.D.2d 246, 253, 676 N.Y.S.2d 569, 573 (1st Dep't 1998). " The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice," focusing on factors such as "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 20

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Gillman,* 73 N.Y.2d at 10-11 (citations omitted). Ultimately, the purpose of the unconscionability doctrine "is to prevent oppression and unfair surprise, not to readjust the agreed allocation of the risks in the light of some perceived imbalance in the parties' bargaining power." *Id.* at 13-14 (citing *Avco Fin. Serv.,* 50 N.Y.2d at 389). *See also Doctor's Assocs., Inc. v. Stuart,* 85 F.3d 975, 980 (2d Cir.1996) ("The purpose of the unconscionability doctrine is to prevent unfair surprise and oppression.") (internal quotation marks and citation omitted).

> FN27. However, "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman,* 73 N.Y.2d at 12.

**\*16** The Court does not find the arbitration provision at issue here to be unconscionable. First, Plaintiff's argument regarding lack of adequate notice has already been discussed at length *supra* and been found to be without merit. Furthermore, Plaintiff has not provided any evidence that he could not obtain high-speed Internet service from another provider. "It does not avail plaintiff to argue that the arbitration provision is unconscionable without offering evidence that he could not have chosen another service provider," *Ranieri v. Bell Atlantic Mobile,* 304 A.D.2d 353, 354, 759 N.Y.S.2d 448, 449 (1st Dep't 2003).FN28 Finally, "[m]ere inequality in bargaining power ... is not a sufficient reason to hold that arbitration agreements are never enforceable,"*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33 (1991), as Plaintiff himself recognizes, *see* Pl. Mem. Opp. Compel 12.

> FN28. Plaintiff offers no support for his conclusory allegation 28 that "upon information and belief, Time Warner has been able to function as a monopoly in the area of cable modem services," Pl. Mem.

Opp. Compel 12. Furthermore, even if Plaintiff's allegation were supported, Plaintiff does not show that he could not obtain a relatively comparable high-speed Internet service from another type of provider.

Plaintiff's claims of substantive unconscionability-for which Plaintiff provides no legal support-are unfounded. *See* 1) as to replacing the statute of limitations with a one-year limit: *Blends, Inc. v. Schottland Mills, Inc.,* 35 A.D.2d 377, 379, 316 N.Y.S.2d 912, 914 (1st Dep't 1970) (upholding one-year period of limitation incorporated in arbitration clause), *aff'd,*29 N.Y.2d 575, 272 N.E.2d 892, 324 N.Y.S.2d 308 (1971); 2) as to eliminating the right to a jury trial: *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31 (1991) (the fact that arbitration proceeding provides more limited discovery is not a ground for invalidating the arbitration agreement) FN29; 3) as to eliminating pre-hearing discovery: *Ciago v. Ameriquest Mortgage Co.,* 295 F.Supp.2d 324, 331 (S.D.N.Y.2003) (implicit waiver of jury trial does not invalidate an arbitration agreement); *In re Ball (SFX Broadcasting Inc.),* 236 A.D.2d 158, 162, 665 N.Y.S.2d 444, 447 (3d Dep't 1997) (finding that right to jury trial may be waived by consenting to arbitration) FN30; 4) as to eliminating the possibility of bringing class actions: *Tsadilas v. Providian Nat. Bank,* 13 A.D.3d 190, 191, 786 N.Y.S.2d 478 (1st Dep't 2004) (holding that "[t]he arbitration provision is enforceable even though it waives plaintiff's right to bring a class action" because "[u]nder New York law, 'a contractual proscription against class actions ... is neither unconscionable nor violative of public policy' " (quoting *Ranieri,* 304 A.D.2d at 354)); 5) as to precluding actions in small-claims court and allegedly "mandating a costly arbitration process instead": *Tsadilas,* 13 A.D.3d at 191 (rejecting plaintiff's argument that the arbitration agreement should be invalidated on the basis that it "exposes her to potentially unaffordable fees," because " '[t]he 'risk' that [plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement. To invalidate the agreement on that basis would undermine the 'liberal federal policy favoring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 21

Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

arbitration agreements' ' ") (quoting *Green Tree Fin. Corp.-Alabama v. Randolph,* 531 U.S. 79, 91 (2000)).[FN31] Furthermore, none of these terms is " grossly one-sided," as Plaintiff claims, Pl. Mem. 11; they affect both parties.

> FN29.*Cf. Postlewaite v. McGraw-Hill, Inc.,* No. 98 CIV. 0611, 1998 WL 751687, at *4, 1998 U.S. Dist. LEXIS 16885, at *10-*11 (S.D.N.Y. Oct. 28, 1998) (finding that arbitral award should not be vacated on the ground that arbitrator denied some of petitioner's pre-hearing discovery requests).

> FN30.*See also Kabia v. Koch,* 186 Misc.2d 363, 368, 713 N.Y.S.2d 250, 254 (N.Y.Civ.Ct.2000) ("Arbitration is a legally legitimate means to resolve disputes because it neither unlawfully deprives a party of access to the courts nor divests them of the constitutional right to trial by jury as these rights are waivable and the agreement to arbitrate waives them. ") (citing *Berkovitz v. Arbib & Houlberg,* 230 N.Y. 261, 130 N.E. 288 (1921)).

> FN31. Plaintiff has provided no indication of what he believes the likely arbitration costs to be. Furthermore, insofar as the arbitration provision specifically refers to the AAA, Plaintiff "could have inquired about the typical fees charged by the AAA and its arbitrators."*Stuart,* 85 F.3d at 981. Moreover, Plaintiff's complaint that the arbitration clause bars him from bringing his action in small-claims court is particularly unpersuasive in light of the fact that Plaintiff brought this action in this Court.

*V. Conclusion*

*17 For the reasons stated above, the Court grants Defendant's motion to stay the proceedings and compel arbitration.

The Clerk of the Court is directed to close this case. Any pending motions are moot.

    SO ORDERED.

S.D.N.Y.,2006.
Bar-Ayal v. Time Warner Cable Inc.
Not Reported in F.Supp.2d, 2006 WL 2990032 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.