Adam Cohn (AC 0056)
Bowles & Cohn, LLP
One Liberty Plaza, 35th Floor
New York, New York  10006
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Bennett Goldberg, | : | Case No. 07 CIVIL 7841 (S.D.N.Y.) (RJH) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Level 3 Communications, LLC | : | |
| | : | |
| Defendant | : | |
| | : | |

## AFFIDAVIT OF ADAM COHN IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

ADAM COHN, ESQ., being duly sworn, hereby deposes and says:

1. I am an attorney admitted to practice in New York and a partner at the law firm of Bowles & Cohn, LLP, attorneys for plaintiff Bennett Goldberg. I submit this affirmation in opposition to defendant's motion to compel arbitration.

2. A true and correct copy of the plaintiff's complaint as served on the defendant on or about August 9, 2007, is attached at Exhibit 1.

3. A true and correct copy of the 2001 Agent Services Agreement ("2001 Agreement") executed between the plaintiff and defendant is attached at Exhibit A to Exhibit 1.

4. A true and correct copy of the 2005 Non-Exclusive High Volume Independent Business Partner Marketing Agreement ("2005 Agreement") executed between the plaintiff and defendant is attached at Exhibit B to Exhibit 1.

Dated: New York, New York
          March 5, 2008

                                        Bowles & Cohn LLP

                                        By: _____
                                             Adam Cohn, Esq. (AC 0056)
                                             One Liberty Plaza, 35th Floor
                                             New York, New York   10006
                                             (646) 257-5001
                                             *Attorneys for Plaintiff*

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| BENNETT GOLDBERG<br><br>Plaintiff,<br><br>- against -<br><br>LEVEL 3 COMMUNICATIONS, LLC<br><br>Defendant. | Index No. 07602609<br><br>**AMENDED COMPLAINT** |

Plaintiff, Bennett Goldberg ("Goldberg" or "Plaintiff"), by his attorney, Adam Cohn, as and for an amended complaint, complains of the Defendant, Level 3 Communications, LLC ("Level 3") and allege as follows:

## DESCRIPTION OF THE PARTIES

1.   Plaintiff Goldberg is a resident of New York with his permanent residence at 300 E. 34th Street, New York, New York 10016.

2.   Defendant Level 3 is a foreign limited liability company organized under the laws of Delaware and doing business in New York with offices at 100 William Street, #19, New York, New York 10038.

## NATURE OF PROCEEDING

3.   Plaintiff brings this action against Defendant Level 3 for breach of contract, reformation of contract, promissory estoppel, breach of express warranty, fraud in the inducement and for violation of New York General Business Law Section 349 (Consumer Protection from Deceptive Acts and Practices). As will be described below, Goldberg entered into two sales contracts with Broadwing Communications (Level 3's predecessor in interest), a supplier of telecommunications services, to sell Broadwing's services to consumers. Goldberg's sole compensation for performance of these marketing duties was a percentage of

1

the value of the services and contracts sold. Under both of those agreements Broadwing was obligated to provide Goldberg's customers with telecommunications services, accurate billing records and other customary customer services such as facilitating the business relationship between Broadwing and its consumers, and consequently benefit Goldberg through his expected percentage of sales. Goldberg was successful in selling Broadwing's services to his customers, but Broadwing consistently and repeatedly failed to perform its obligations under its contract with Goldberg. Broadwing provided substandard telecommunications and customer's services such that many of Goldberg's customers became dissatisfied and cancelled their service contracts with Broadwing. Goldberg had opportunities to ameliorate his situation; by offering his customers alternative telecommunications providers Goldberg could have salvaged his reputation with these dissatisfied customers and protected his future earning potential. But Broadwing induced him to remain a Broadwing salesman, and to convince his customers to remain with Broadwing, by the promise of improved management and an increased percentage of his sales. Broadwing never implemented these promised changes. Moreover, with respect to the 2005 Agreement, Broadwing never intended to. Goldberg's customers became increasingly dissatisfied. His reputation and sales and monthly commission percentage suffered. Ultimately Level 3 terminated his sales contract.

4.     As will be described below, Plaintiffs seek compensatory damages and legal fees from Defendant.

## FACTUAL ALLEGATIONS

### Facts Relating to Goldberg's Course of Dealing with Broadwing

### The 2001 Agreement:

5.     On July 23, 2001 Goldberg, a novice independent contractor to the telecommunications industry, entered into an "Agent Services Agreement" (the "2001 Agreement") with Broadwing Telecommunications Inc. A copy of the 2001 Agreement is attached hereto as Exhibit A ("Ex. A.").

6.     The essence of the 2001 Agreement is that Goldberg would sell Broadwing's services to contacts he would generate in exchange for a commission fee based upon a percentage of Goldberg's

2

customer's actual billing volume.

7. Under the terms of the 2001 Agreement, Goldberg was obligated to commit to reaching, within a year of execution, a minimum of $200,000.00 in services, as well as attain a minimum level of $50,000 in new billed revenue within a year of execution, or face termination.

8. According to the 2001 Agreement, Goldberg, as an independent agent, was obligated to shoulder the burden of all the expenses incurred in attempting to make sales.

9. Under the terms of the 2001 Agreement, Broadwing was obligated to provide, subject to its approval, telecommunications services to Goldberg's clients, maintain accurate records of those accounts, and provide customer service in accord with Broadwing's customary business practices.

10. Under the terms of the 2001 Agreement Broadwing would have no liability whatsoever for any losses to Goldberg attributable to its violation of their covenant to provide accurate and customary levels of customer service.

11. According to the 2001 Agreement, if Goldberg violated certain covenants to which he was bound under the Agreement then Broadwing would be entitled to compel Goldberg to disgorge completely any money earned by Goldberg in connection with that violation.

12. Under the terms of the 2001 Agreement, each party to the Agreement indemnified the other for any liabilities arising out of either party's violation of a covenant in the Agreement.

13. Neither the clause absolutely limiting Broadwing's liability to Goldberg for any breach, nor the clause requiring Goldberg further indemnify Broadwing for any liabilities not so limited, were negotiated aspects of the 2001 Agreement.

14. Under the terms of the 2001 Agreement the parties were obligated to settle any dispute via arbitration in Texas, under the laws of Texas.

15. During the course of dealing between the parties Goldberg expended significant capital, in both time and money, making sales for Broadwing, and Broadwing, at first, provided adequate services to Goldberg's customer and to Goldberg.

3

16. However, around 2003 Goldberg began to note persistent breakdowns in both Broadwing's customer support as well as its agent support via Goldberg's direct channel management team. These breakdowns resulted in chronic customer complaints, eventually leading said customers to cancel their service agreements with Broadwing, and also resulted in Goldberg being undercompensated for the value of some accounts.

17. On information and belief these breakdowns in support from Broadwing were the result of distinct management changes implemented prior to and during Broadwing's merger negotiations with Level 3.

18. When Goldberg complained, on behalf of himself and his customers, about the disruptions caused by Broadwing's failure to provide adequate services he was repeatedly told that management would rectify the problems and that he should do his best to pacify his customers and himself. But the disruptions continued.

19. The net effect of these continued disruptions of service was the loss or diminution, to Goldberg and Broadwing, of seven customer's accounts in good standing and with heretofore lucrative amounts of telecommunications commissions.


**The 2005 Agreement:**

20. Sometime prior to April of 2005 Goldberg was offered a new contract with Broadwing (the "2005 Agreement"). A copy of the 2005 Agreement is attached hereto as Exhibit B ("Ex. B.").

21. As an inducement to sign a new agreement Goldberg was offered a higher sales commission rate.

22. Broadwing also made additional promises that Broadwing's channel management team would change and that Management would act to repair the deficiencies in service to the customers and Goldberg.

23. However, in actual fact Broadwing had at that time a policy opposite to those promises:

4

Broadwing management would only take action to address customer complaints if the salesman who sold these customers on Broadwing's services were generating sufficient revenue.

24. In essence the terms of the 2005 Agreement are similar to the 2001 Agreement, except that the clause limiting Broadwing's liability to Goldberg includes direct, cost of cover, consequential, incidental, reliance, special, exemplary, or punitive damages, but does not include damages that flow directly from Broadwing's actions.

25. As in the case of the 2001 Agreement, the 2005 Agreement contains an indemnification clause, as well as an arbitration clause; none of these clauses was negotiated by the parties.

26. During the course of dealing between the parties, after execution of the 2005 Agreement, the disruptions in customer service continued. As a result more of Goldberg's customers cancelled or failed to renew their agreements with Goldberg and Broadwing.

27. Broadwing's promise to Goldberg to implement changes in management never occurred.

28. While Goldberg continued to try to get Broadwing's management to address his and his customer's complaints, on the belief that both he and his customers were entitled to the service, he was eventually informed by his superior of the actual Broadwing policy: Goldberg, at that time, simply didn't generate enough sales to merit the maintenance of his customer accounts.

29. On information and belief Broadwing merged with Level 3 in early 2007.

30. On February 27, 2007 Level 3, Broadwing's successor in interest, terminated Goldberg's 2005 Agreement. The stated reason was for having failed to meet the $50,000.00 minimum sales level.

### FIRST CAUSE OF ACTION
### REFORMATION OF 2001 CONTRACT

31. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 30 of this Complaint with equal force and effect as if set forth at length herein.

32. The 2001 Agreement, drafted entirely by Broadwing, was not negotiated by the parties.

5

Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses, such as the requirement of arbitration, and the absolute limits on liability, and the indemnification, are standard throughout the telecommunications service industry; if Goldberg wanted to work in his field he had no option but to acquiesce to this contract. This evidences weakness in the contracting process sufficient to constitute procedural unconscionability.

33. To give full effect to the 2001 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual violations of Broadwing's covenants. This result is substantively unconscionable.

34. Plaintiff seeks the reformation of the 2001 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

## SECOND CAUSE OF ACTION
## REFORMATION OF 2005 CONTRACT

35. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 34 of this Complaint with equal force and effect as if set forth at length herein.

36. The 2005 Agreement was not negotiated by the parties. Rather, it represents a standardized agreement presented to Plaintiff on a take-it-or-leave-it basis. On information and belief, many of the more onerous clauses are standards throughout the telecommunications service industry. This evidences weakness in the contracting process such as to constitute procedural unconscionability under the laws of New York.

37. To give full effect to the 2005 Agreement as written and executed would result in a scheme that would compel Goldberg to disgorge to Broadwing all profits earned by Goldberg for violations of certain covenants, while at the same time permitting Goldberg no recourse whatsoever for the actual

violations of Broadwing's covenants. This result is substantively unconscionable.

38. Plaintiff seeks the reformation of the 2005 Agreement to render unenforceable the clauses that compel arbitration in Texas, that exonerate Broadwing from any liability for its breaches, and that indemnify Broadwing for any liabilities that do eventually lie.

## THIRD CAUSE OF ACTION
## BREACH OF 2001 CONTRACT

39. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 38 of this Complaint with equal force and effect as if set forth at length herein.

40. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2001 Agreement.

41. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently lost future earnings.

42. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2001 Agreement.

## FOURTH CAUSE OF ACTION
## BREACH OF 2005 CONTRACT

43. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 42 of this Complaint with equal force and effect as if set forth at length herein.

44. Broadwing failed to maintain records and provide customer service in accord with its customary business practices as it was obligated to do under the terms of the 2005 Agreement.

45. As a result of this breach Plaintiff lost significant revenue, suffered a diminution in his professional reputation, and consequently most future earnings.

46. Plaintiff seeks all damages, direct and consequential, that flow from this breach of the 2005 Agreement.

7

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

47. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 46 of this Complaint with equal force and effect as if set forth at length herein.

48. During the course of dealings between the parties Broadwing made certain promises to Goldberg. Among those promises were, *inter alia*, repeated promises to change the management of Broadwing to the extent that Goldberg believed necessary to rectify the continued disruptions in customer services.

49. These promises were made to induce Goldberg to stay on at Broadwing prior to and during the merger period between Broadwing and Level 3.

50. Goldberg relied upon these promises and did stay on, and used his influence and reputation with his customers to ensure them that services provided by Broadwing would improve.

51. Goldberg relied upon these promises to his detriment; he lost revenue when these customers eventually did leave, and he lost future business with these customers because they no longer believed he could deliver good service.

52. Plaintiff seeks damages that directly and consequentially flow from his detrimental reliance upon these promises.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY IN 2001 AGREEMENT

53. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 52 of this Complaint with equal force and effect as if set forth at length herein.

54. Under the terms of the 2001 Agreement Broadwing warranted that the quality of

8

telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

55. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

56. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2001 Agreement.

57. Goldberg suffered economic loss as a direct result of this breach of warranty.

58. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2001 Agreement.

## SEVENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY IN 2005 AGREEMENT

59. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 of this Complaint with equal force and effect as if set forth at length herein.

60. Under the terms of the 2001 Agreement Broadwing warranted that the quality of telecommunication and customer services that it would supply to Goldberg's customers would be in accord with Broadwing's customary business practices.

61. This quality of the goods and services provided to Goldberg's clients were deficient when measured by either the parties' historic course of dealing or customary industry practices.

62. The quality of the goods and services provided by Broadwing were therefore beneath that which it was obligated to provide under the terms of the 2005 Agreement.

63. Goldberg suffered economic loss as a direct result of this breach of warranty.

64. Goldberg seeks damages directly and consequentially related to this breach of warranty of the 2005 Agreement.

9

**EIGHTH CAUSE OF ACTION**
**FRAUD IN THE INDUCEMENT 2005 AGREEMENT**

65. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 of this Complaint with equal force and effect as if set forth at length herein.

66. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

67. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales quotas.

68. On information and belief, Goldberg's supervisors at Broadwing were aware of the discrepancy between their obligations under the 2005 Agreement and their unarticulated policy in contradiction there-of.

69. On information and belief, Broadwing intended to deceive Goldberg about its unarticulated customer service policy so that Goldberg would sign the 2005 Agreement.

70. Goldberg did sign the 2005 Agreement having been in fact deceived by Broadwing about its customer support policy.

71. Goldberg suffered significant economic loss as a result of his reliance upon the assertions as made in the 2005 Agreement.

72. Goldberg seeks all damages that flow directly and proximately from this fraud, including but not limited to recession of the arbitration clause.

10

## NINTH CAUSE OF ACTION
## PRIVATE RIGHT OF ACTION UNDER NEW YORK GENERAL BUSINESS LAW SECTION 349

73. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 72 of this Complaint with equal force and effect as if set forth at length herein.

74. Under the terms of the 2005 Agreement Broadwing obligated itself to provide a level of customer service to Goldberg and his customers in accord with customary industry practices and the course of dealing between Goldberg and Broadwing. Given the history of Goldberg's and his customer's dissatisfaction with Broadwing's customer support, this contract duty was a significant inducement for Goldberg to sign the 2005 Agreement.

75. When the 2005 Agreement was signed, however, a contrary policy was in place at Broadwing. On information and belief that policy was to deny customer service support to those client's of salesmen, and to the salesmen themselves, who had failed to achieve certain, but undisclosed, sales levels.

76. The discrepancy between Broadwing's promises under the 2005 Agreement and its actual policy with regards to promised levels of customer and agent support constitutes a deceptive act in the conduct of business.

77. Goldberg was injured as a result of this deceptive business act when he lost customers, suffered damage to his business reputation, and lost time and money trying to keep his Broadwing customers satisfied despite the policy of Broadwing itself.

78. Under New York GBL Section 349, any private person injured as a result of a deceptive act in the conduct of business may bring suit to recover his actual damages as well as reasonable attorney's fees.

11

79. Goldberg seeks his actual damages as well as his legal fees.

**WHEREFORE**, Plaintiff pray for judgment against Defendants as follows:

A.    Reformation of the 2001 and 2005 Agreements to correct the oppressive result that would occur if all of the clauses were given full effect;

B.    Money damages that flow directly and consequentially from the various breaches that occurred through the fault of Broadwing under both the 2001 and the 2005 Agreements in an amount to be determined at trial;

C.    Whatever damages would serve the interest of equity for Plaintiff's detrimental reliance upon the promises made to him in the commercial context of the 2001 and 2005 Agreements;

D.    Whatever equitable or money damages that are directly and proximately the result of Broadwing's fraud in inducing Plaintiff to sign the 2005 Agreement;

E.    Whatever relief is available under New York General Business Law Section 349, including but not limiting to Plaintiff's reasonable legal fees in the maintenance of this action.

F.    For such other and further relief as this Court may determine is just, proper and equitable under the circumstances.

Dated: New York, New York
       August 7, 2007

                              Adam Cohn, Esq.
                              Law Offices of David K. Bowles, Attorney for the Plaintiff
                              44 Wall Street, 12th Floor
                              New York, NY 10005
                              (212) 461-7150

                              By: _____
                                    Adam Cohn

# Exhibit A

*Dennis Hawell 800-619-3025*


**Broadwing**

## AGENT SERVICES AGREEMENT BETWEEN

## BROADWING TELECOMMUNICATIONS INC.

## AND

THIS AGREEMENT (the "Agreement") is made and entered into as of this 13th day of _July_, 2001 by and between Broadwing Telecommunications Inc., a Delaware corporation with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas   78746-6426,   hereinafter   referred   to   as   ("Company"),   and _Bennett Goldberg_, a _sole proprietorship_ (corporation, partnership, or sole proprietorship) with its principal place of business of _300 East 34th St ≠ 23G_ (hereinafter referred to as "Agent"). _Nyc, Ny 10016_

### WITNESSETH

WHEREAS, Company is engaged primarily in providing communications services to individuals and businesses; and

WHEREAS, Company desires to expand its customer base to include a greater number of active individual and business customers through a Sales Agent Program; and

WHEREAS, Company has agreed to permit Agent to sell and market Company's communications services to individual and business customers under the terms and conditions hereinafter set forth.

NOW THEREFORE, Company and Agent, for the mutual benefits and under the conditions described below, do agree as follows:

### I. AGENT AGREES TO:

A.    Represent Company, and Company's products and services with the highest degree of ethics, professionalism, and skill.

B.    Assist Company to the best of Agent's ability in providing a high level of customer satisfaction and to properly complete and submit to Company all appropriate application forms for prospective sales.

C.    Agent shall obtain the proper signature or authorization of the customer on Broadwing's then-current standard service agreement, service order form, or other document provided or approved by Broadwing. All service agreements and service order forms are subject to credit approval and acceptance by Broadwing. Broadwing reserves the right to cancel or reject any request for services and any service agreement or service order form for any reason without liability to Agent.

D.    Only sell products and services at then-current Agency rates. Agent understands Company reserves the right to establish, revise, or change the prices and/or terms of its agency rates at

Zoom In   Zoom Out   Reset Size   Printable (Use back button to return)
Statistics
Goto Page(s): 1-5 6-10 11-12


B.   Notwithstanding the foregoing, either party may terminate this Agreement upon sixty (60) days written notice.

C.   In addition, Company may terminate this Agreement effective immediately in the event of any of the following occurrences:

1.   Agent's insolvency, bankruptcy, receivership or dissolution;

2.   Agent's actual or attempted assignment of this Agreement or any duties under this Agreement to another party without Company's prior written consent (such consent shall not be unreasonably withheld by Company);

3.   Agent's material breach of any provision of this Agreement;

4.   Agent's making of misrepresentations about Company;

5.   Agent's attempted or actual sale of unauthorized services or unauthorized rates;

6.   Conduct by Agent or any of Agent's employees or representatives or any other person, firm or entity acting on Agent's behalf which subjects Company to any fine, penalty, complaint, inquiry or investigation regarding customer slamming, cramming, or any other unfair, illegal or unethical business practice.

### VII. AGENT'S STANDARD OF CONDUCT:

A.   In performing this Agreement, Agent will observe the highest standard of integrity and fair dealing, and Agent will do nothing to discredit, dishonor, reflect adversely upon, or in any way injure the reputation or business of Company.

B.   In performing this Agreement, Agent agrees to obey, fulfill, and abide by all terms and conditions hereof including, but not limited to, all terms and conditions regarding customer slamming, cramming, and payment to and indemnification of Company therefor.

### VIII. AUTHORITY TO ENTER INTO THIS AGREEMENT:

Each party hereto warrants and represents that it has full authority to enter into this Agreement and to consummate the transactions contemplated herein and that this Agreement is not in conflict with any other agreement or contract to which such party is a party to or by which it may be bound.

### IX. ASSIGNABILITY:

Company may assign, transfer or encumber this Agreement in whole or in part without obtaining prior written consent from Agent.

### X. CONFIDENTIAL TREATMENT:

A.   The terms and conditions of this Agreement and materials provided by Company including, but not limited to, customer lists, price sheets, price quotes, information regarding Company's facilities, information relating to customers or prospective customers of Agent and/or Company, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Agent shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of three (3) years after termination of this Agreement. Agent shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or

B. For purposes of computing commission payments, Company shall use the gross monthly billings for services provided by Company for the accounts provided by Agent hereunder, net any discounts, directory assistance or operator services, Customer Premise Equipment (CPE), and excluding all credits, pass-through charges, non-recurring charges, and taxes of any kind.

C. All commissions will be paid on billings at the end of the following month of said billings. For example, commissions on July billings will be paid at the end of August.

D. With each commission payment, Company will provide Agent a statement summarizing the computation of the amount paid. All such payments will be final and binding on Agent unless written objection is delivered to Company within thirty (30) days of Agent's receipt of such payment.

E. No commissions will be paid on sales made to existing Company customers (not derived from Agent) converted by Agent to other products or rates without the prior written consent of Company. Company reserves the right to lower a customer's rates in an attempt to avoid cancellation by the customer. Commissions may be adjusted to reflect any changes associated with Agent's customers.

F. Company, in its sole discretion and without prior notice, may cancel an account for any reason including, but not limited to, credit, bankruptcy, or inactivity. No further commission shall be due and payable to Agent on terminated accounts.



G. Company will continue to pay Agent the (applicable) residual commissions for all accounts provided by Agent hereunder for as long as said accounts remain active with Company unless this Agreement is terminated by Company in accordance with Section VI paragraph C or if the totality of the accounts sold by Agent fails to bill in excess of $10,000 in a given month after the Agreement has been terminated. This Subsection G shall survive termination of this Agreement.

H. Company will not pay any commission to Agent for any fraudulent use of the service by any customer provided by Agent.

## V. EXCLUDED ACCOUNTS:

The following customers and/or accounts are hereby excluded from this Agreement and shall not constitute any part hereof:

A. Any account(s) deemed not creditworthy by Company or delinquent accounts resulting in service(s) being denied or disconnected.

B. Any account(s) that is an existing customer of Company or has been converted from one Company product to another by Agent on an account not sold by Agent.

C. Any account(s) not in the service regions where Company presently provides services or where Company determines not to provide services.

## VI. TERM AND DURATION OF AGREEMENT:

A. The term of this Agreement shall be for one (1) year commencing on the date first written above. This Agreement shall be automatically renewed in consecutive additional periods of one (1) year each unless terminated by either party in writing at least thirty (30) days prior to the expiration of the term then in effect.

07/20/2001  15:44  2127798687          OFFICE DEPOT 505          PAGE 07
07/11/2001  09:43  18027969775          SENGELAUB          PAGE 07

representatives, or by any other authorized person having access to such information. Except as specifically authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any such confidential information. At the expiration or termination of this Agreement, Agent shall return to Company all written and tangible materials provided to or produced by Agent to Company. *(as federal information further defined)*

B.    No termination or expiration of this Agreement shall release Agent from the above obligations.

C.    Agent understands that if Agent violates any of the foregoing covenants, Company shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration or other benefits that Agent directly or indirectly realized or may realize as a result of or in connection with the violation. The foregoing remedies shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which Company is or may be entitled to at law, in equity, or under this Agreement.

D.    In the event of a breach or threatened breach by Agent of any of the provisions of this Section, Agent agrees the restrictions contained herein are fair, reasonable, and reasonably required for the protection of the interests of Company.

## XI.  LIMITATION OF LIABILITY:

    Company shall not be liable to Agent in any way for any losses, including but not limited to, loss of commissions or loss of business due to mistakes, omissions, interruptions, delays, errors, defects or otherwise occurring in the course of furnishing the services.

## XII.  INDEMNIFICATIONS, ETC.:

A.    Each party shall indemnify and hold harmless the other from all liabilities, claims, demands, costs (including reasonable attorney's fees), judgments, or any cause of action arising out of or in connection with this Agreement caused by the failure of a party to abide by the terms and conditions herein or the negligence or willful misconduct of that party's employees or representatives.

B.    Agent agrees not to violate any FCC rules or federal, state, or local laws regarding customer slamming or cramming. Agent agrees to fully and immediately reimburse, in cash, Company and the employees, officers, directors, partners, shareholders, successors, and assigns of Company for all claims, damages, liabilities, or expenses of any kind (including reasonable attorney's fees and costs) arising out of the violation by Agent or any of Agent's employees or representatives of any applicable FCC rule or federal, state, or local law regarding customer slamming or cramming. Agent further agrees that Agent will not settle any claim without consulting with Company and obtaining Company's prior written consent. Agent must allow Company to participate in its own defense at Agent's expense.

C.    In connection with the services to be rendered under this Agreement, Agent shall not engage in any pyramid scheme or multilevel marketing plan which violates any state or federal laws. Any such unlawful action will be grounds for immediate termination of this Agreement.

D.    Agent shall be solely and singularly responsible for payment of any commissions owed to Agent's employees, contractors, or representatives.

E.    Nothing contained herein shall be construed to create any obligation by Company whatsoever to pay commissions to any of Agent's employees or representatives. Agent, as an Independent Contractor, warrants and represents that it shall fully and faithfully pay commissions owed to its employees, contractors, and representatives in accordance with its

07/28/2001  15:44   2127798687                OFFICE DEPOT 505                      PAGE  00
07/11/2001  09:09   3002969775                SENGELAUB                            PAGE  00

own internal policies and procedures. Agent shall indemnify and hold harmless Company from and against any and all claims by any Agent's employees, contractors, and representatives for payment of commissions. Company shall have no responsibility for the payment or withholding of taxes in connection with any commissions due hereunder.

## XIII. BINDING ARBITRATION:

A.   The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement promptly through discussions between themselves at the operational level. In the event a resolution cannot be reached, such controversy or claim shall be negotiated between appointed counsel or senior executives of the parties who have authority to settle the controversy.

B.   The disputing party shall give the other party written notice of the dispute. If the parties fail to resolve such controversy or claim within thirty (30) days of the disputing party's notice, either party may seek arbitration as set forth below.

C.   Any controversy or claim arising out of or relating to this Agreement, or a breach of this Agreement, shall be finally settled by binding arbitration in Austin, Texas and shall be resolved under the laws of the State of Texas, without regard to its choice of law principles. The arbitration shall be conducted before a single arbitrator in accordance with the commercial rules and practices of the American Arbitration Association then in effect.

D.   Any award, order, or judgment pursuant to such arbitration shall be deemed final and binding and may be enforced in any court of competent jurisdiction. The parties agree the arbitrator shall have no power or authority to make awards or issue orders of any kind except as expressly permitted by this Agreement, and in no event shall the arbitrator have the authority to make any award that provides for punitive or exemplary damages. All arbitration proceedings shall be conducted on a confidential basis. The arbitrator may, as part of the arbitration award, permit the substantially prevailing party to recover all or part of its attorney's fees and other out-of-pocket costs incurred in connection with such arbitration.

## XIV. FORCE MAJEURE:

Neither party shall be liable for delays in performing, or failure to perform, this Agreement or any obligations hereunder, which are directly attributable to causes beyond the reasonable control of the party so delayed or failing to perform, including but not limited to, acts of God, fires, floods, strikes, war, failure of a common carrier or equipment or suppliers, cable cuts, or acts of intervention by any third party or governmental authority. However, the party whose performance is delayed shall use good faith efforts to minimize the effects of such delay.

## XV.   NOTICES:

A.   Every notice, demand, consent, approval or other communication which either party is required or desires to give to the other party shall be in writing and shall be sent via U.S. Registered Mail, Return Receipt Requested or overnight courier with tracking capabilities as follows:

If to Company:        Broadwing Telecommunications Inc.
                      Two Riverway, Suite 800
                      Houston Texas 77056
                      Attention: Vice President, Alternate Channel Sales

With a copy to:       Broadwing Telecommunications Inc.
                      1122 Capital of Texas Highway South

Austin, Texas 78746-6426
Attention: Legal

If to Agent:   *Bennett Goldberg*

*300 East 34ᵗʰ St #33G*

*Nyc, NY 10016*

Attn:   *Bennett Goldberg*

Said notices may be sent to such other address or addresses as the parties may from time to time designate by written notice hereunder.

B.   Every notice, demand, request or other communication sent in the manner aforesaid shall be deemed to have been given and shall be effective on the third business day after the same has been properly addressed and deposited as aforesaid.

## XVI. GENERAL:

A.   Company may execute similar Agreements with other Agents.

B.   All Preferred Interexchange Carrier charges for customers sold by Agent will be paid by customer.

C.   Company shall in no way be considered or represented as an official endorser of any party or customer represented by Agent.

D.   Company may offset any amounts owed to Company by Agent against any commissions Company may owe to Agent under this Agreement or any other agreement.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, acknowledged and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

COMPANY:
Broadwing Telecommunications Inc.

By: _____

Title: Director - Alt. Channels

AGENT:
Name: *Bennett Goldberg*

By: *Bennett Goldberg*   7/23/01

Title: *Sole proprietor*

Phone Number: *212-447-9733*

Fax Number: *N/A*

E-Mail Address: *silvergold1836@aol.com*

Social Security No: *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*

Tax Id No.: _____

27-Jun-07   14:07   From-FedEx Kinkos                310 477 5836    T-660  P.007/017  F-387
Case 1:07-cv-07841-RJH   Document 13   Filed 03/05/2008   Page 23 of 50

Page 5 of 6

07/20/2001  15:44   2127798687          OFFICE DEPOT 505          PAGE  10
07/16/2001  12:46   18887969775         SEMSELAUD                 PAGE  02

# ATTACHMENT A

## VOLUME TIERS/COMMISSION SCHEDULE

| | |
|---|---|
| $0-50,000 | 11% |
| $50,001-200,000 | 13% |
| $200,001-500,000 | 16% |
| $500,001+ | 19% |

27-Jun-07    14:07    From-FedEx Kinkos                          310 477 5836        T-660   P.008/017   F-387
Case 1:07-cv-07841-RJH    Document 13    Filed 03/05/2008    Page 24 of 50

Page 2 of 6

| 07/20/2001  15:44 | 2127798687 | OFFICE DEPOT 585 | PAGE  02 |
| 07/11/2001  09:43 | 18007969775 | SENGELAUB | PAGE  02 |



## IMPORTANT !!

---

**AGENT SERVICES AGREEMENT BETWEEN**

**BROADWING TELECOMMUNICATIONS, INC.**

**AND**

*Bennett Goldberg*

---

1. For accounting and commission purposes, the information that is provided on this contract must reflect the correct (Business) Name, (business) type and corresponding ID.

2. The 'AND' name provided should be the payable name for commission purposes.

3. The ID - whether, Fed ID, Social Security Number or EIN must match the 'AND' name as it is registered with the Internal Revenue Service.

07/20/2001  15:44   2127798687              OFFICE DEPOT 585                 PAGE  11

## ADDENDUM/AMENDMENT
## TO
## SALES AGENT AGREEMENT

THIS ADDENDUM/AMENDMENT (the "Amendment") is made and entered into as of this 23rd day of July _____, 2001, by and between Broadwing Telecommunications Inc. (hereinafter referred to as "Company"), and _Bennett Goldberg__ (hereinafter referred to as "Agent").

## WITNESSETH

WHEREAS, Company and Agent have previously entered into a Sales Agent Agreement dated the 23rd day of July _____, 2001 (the "Agreement"); and

WHEREAS, Company and Agent now mutually desire to amend the Agreement in certain respects and attach this Amendment as an Addendum to the Agreement.

NOW THEREFORE, Company and Agent, for the mutual benefits and under the conditions described below, do hereby amend the Agreement in the following particulars:

## IV. COMPENSATION

I.    Add the following paragraph in its entirety:

"I. Agent agrees to commit to a minimum of fifty thousand dollars ($50,000) in monthly billings beginning in October 2001, one hundred thousand dollars ($100,000) in monthly billings beginning in January 2002, one hundred and seventy-five thousand dollars ($175,000) in monthly billings beginning in April 2002 and two hundred thousand dollars ($200,000) in monthly billings beginning in July 2002. In consideration of said commitments, Agent will be immediately eligible for the $200,001-$500,000 volume tier and associated commission percentages in Attachment A. Should Agent not reach each of the above commitments, Agent's volume tier and associated commission percentages in Attachment A will be adjusted to reflect Agent's actual billing volume. Agent must maintain the above billing thresholds to be eligible for the associated volume tier and commission percentages or Agent's volume tier and associated commission percentages will be reduced to reflect Agent's actual billing volume."

## X. CONFIDENTIAL TREATMENT

A.    Replace this paragraph in its entirety with the following:

"A. The terms and conditions of this Agreement and materials provided by Company including, but not limited to, customer lists, price sheets, price quotes, information regarding Company's facilities, information relating to customers or prospective customers of Agent and/or Company, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Agent shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of two (2) years after termination of this Agreement. Agent shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or representatives, or by any other authorized person having access to such information. Except as specifically

27-Jun-07  14:08  From-FedEx Kinkos
Case 1:07-cv-07841-RJH  Document 13  310 477 5836  T-660  P.010/017  F-387
Filed 03/05/2008  Page 26 of 50

Page 2 of 3

authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any such confidential information. At the expiration or termination of this Agreement, Agent shall return to Company all written and tangible materials provided to or produced by Agent to Company."

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, acknowledged and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

**COMPANY:**
BroadWing Telecommunications, Inc.

By: _____
Name: Dennis Harrell
Title: Director, Alternate Channel Sales

**AGENT:**

By: _____ 7/23/01
Name: Bennett Goldin
Title: _____



# AMENDMENT No. 1 TO THE
# AGENT SERVICES AGREEMENT

This Amendment No. 1 to the Agent Services Agreement is made and entered into by and between **Broadwing Communications, LLC**, a Delaware limited liability company that is successor in interest to Broadwing Telecommunications Inc., with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas 78746-6426 ("Broadwing"), and **Bennett Goldberg**, with its principal place of business at 300 East 34th Street #33G New York City , New York, 10016 ("Business Partner").

For purposes of this Amendment, terms and conditions set forth herein shall become effective on the last date of execution below (the "Amendment Effective Date").

This Amendment is made with reference to the following facts:

      A.     Business Partner and Broadwing are parties to that certain Agent Services Agreement dated as of 6/1/05 (as amended, the "Agreement").

      B.     The parties desire to amend the Agreement pursuant to the terms set forth below.

### Terms of Amendment

Accordingly, in consideration of the mutual promises set forth below, the parties agree as follows:

      1.     Exhibit B, *Local Access Commission Schedule*, attached hereto shall be added in its entirety to the Agreement.

      2.     All other terms and conditions, provisions, supplements and exhibits of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date last written below.

**Broadwing Communications, LLC**

By: _____

Name: __Zane Long__

Title: __VP__

Date: __8-5-05__

**Full Business Address:**
1122 Capital of Texas Highway South

Austin, Texas 78746-6426
Telephone: 512-742-3700
Facsimile: 512-328-7902

By: _____

Name: __BENNETT GOLDBERG__

Title: __President__

Date: __6/6/05__

**Full Business Address:**
300 East 34th Street #33G New York City, New York, 10016

Telephone: ████████
Facsimile: ████████

*C:\Documents and Settings\BallP\Local Settings\Temporary Internet Files\OLK202\Agent Loop Trial Amendment 6 " 05 (3).doc*

*Broadwing – Confidential & Proprietary*

Subj:      **Fwd: Commission rate**
Date:      5/20/2005 7:41:50 PM Eastern Daylight Time
From:      Silvergold1836
To:        zane.long@broadwing.com
CC:        michael.sargenti@broadwing.com

Good evening Zane,

Hope the week went very successfully for you. As you may be aware, I spoke with Carolyn Rogers a few
evenings ago, (after hours) and she had asked me how my conversations with you are going and what the
status is of the new Broadwing agent agreement that you had asked me to sign. I mentioned to her that you,
(along with Mike Sargenti) and I worked out the details and made some changes to the agreement that I had
requested. Furthermore, I mentioned to her (that she also told me that you spoke with her about previously)
concerning your agreement to increase my Broadwing commission rate from 11% to 13% Voice and 16% data
going back to 4/1/05 as long as my agreement was signed and given back to you by 5/25/05 according to your
email to me that I am forwarding you with this email. I subsequently sent you an email which I am
also forwarding to you with this email mentioning that before I sign the new Broadwing agreement, I needed to
hear back from you via email acknowledging that in addition to the 13% going back to April 1, 2005 for voice,
that you agreed to in your email to me, that I would also be getting 16% on data, (internet etc.) going back to
April, 1 2005 as well, which is consistent with the Commission Schedule, "Attachment A" that you sent to me
with the Broadwing agreement. Carolyn Rogers mentioned to me in our conversation that in order for me to
receive the increased commissions (on this upcoming commission check) from 11% to 13% and 16%
respectively on data, going back to the April 1, 2005 date what needs to happen is that on the top of
the very first page of the Broadwing agreement, the date needs to say April, 1, 2005 and the most recent copy
of the Broadwing agreement says May, 2005. Would you kindly change the date from May to April and email
me the newly revised first page reflecting that change as early as possible on Monday, 5/23/05. As you may
know, I am really looking forward to meeting with Mike Sargenti for lunch at 1:00p.m. east coast time
on Monday, 5/23/05 and I want to be able to have that agreement signed when I see him and that change
needs to be there.

Thanks for your help.

Enjoy your weekend.

Ben

------------
Forwarded Message:
Subj:      **Fwd: Commission rate**
Date:      5/19/2005 4:05:30 PM Eastern Daylight Time
From:      Silvergold1836
To:        zane.long@broadwing.com
CC:        michael.sargenti@broadwing.com

Good afternoon Zane,

  I just received the new and revised agent agreement with the associated amendments that we discussed. As I
see it, the items in the agreement seem to be fine. I am getting together with Mike Sargenti for lunch on
Monday, 5/23/05 at 1:00p.m. for lunch so we can discuss opportunities and equally as important, so I can give
him two original signatures where specified on the agreement and subsequently he will return them to you to
also sign and to promptly return back to me for my records. BEFORE I sign the agreement, I ask you kindly to
refer to the email that I am now forwarding to you dated 5/18/05 at approximately 6:08p.m. in the evening
where I requested you in that email, to provide me with your acknowledgment that the language and the
content in that email that I sent you is accurate and correct and that I will, in fact, receive effective 4/1/05, (with
this upcoming commission check) an increase in commission to 13% for Voice services and 16% for Data
services on a continous monthly basis until I hit my next revenue target of $50,001.00 which will bring my
commission rate to the next tier of 14% for Voice and $18% for Data.

Friday, May 20, 2005 America Online: Silvergold1836

Looking forward to sharing much success, with you, Mike and Broadwing.

Thanks for your, (you and Mike's) help, in seeing all of this through.

Ben

Forwarded Message:

| Subj: | **Fwd: Commission rate** |
| Date: | 5/18/2005 6:07:50 PM Eastern Daylight Time |
| From: | Silvergold1836 |
| To: | zane.long@broadwing.com |
| CC: | michael.sargenti@broadwing.com |

Good evening Zane,

thanks for your time on the phone with me earlier today. Per the email that I am now forwarding to you-would you please re-send me the email with a modification-the modification being that–it says in your email that the entire base of business would be moved up to 13%. Please say that the voice revenue would be moved to 13% and the data revenue would be moved up to 16% effective 4/1/05.

Thanks. I will review the agreement and get back to you tomorrow, with any questions and hope to get it to you signed before this weekend as long as the revisions that are supposed to be there– are in fact there.

Ben

Forwarded Message:

| Subj: | **Commission rate** |
| Date: | 5/17/2005 12:13:41 PM Eastern Daylight Time |
| From: | Zane.Long@broadwing.com |
| To: | Silvergold1836@aol.com |
| CC: | Michael.Sargenti@broadwing.com |
| Sent from the Internet (Details) | |

This e-mail serves as a commitment, that if the new Broadwing Agent Agreement is signed and received by 5-25-05 close of business, commission rate for entire base of business will be moved to new commission rate of 13% effective 4-1-05.

If new Agent Agreement is received after 5-25-05, rate of 13% will be effective 5-1-05.

**Zane Long**
Vice President
Channel Sales
Broadwing Communications, LLC
  Phone: 817-741-7879
  Cell: 817-291-6557
  Fax: 817-796-1049
  1821 Barrington Dr.
  Roanoke, TX 76262
  www.broadwing.com

**Broadwing**

Friday, May 20, 2005 America Online: Silvergold1836

Subj:    **Fwd: Commission rate**
Date:    5/19/2005 4:05:30 PM Eastern Daylight Time
From:    Silvergold1836
To:      zane.long@broadwing.com
CC:      michael.sargenti@broadwing.com

Good afternoon Zane,

I just received the new and revised agent agreement with the associated amendments that we discussed. As I see it, the items in the agreement seem to be fine. I am getting together with Mike Sargenti for lunch on Monday, 5/23/05 at 1:00p.m. for lunch so we can discuss opportunities and equally as important, so I can give him two original signatures where specified on the agreement and subsequently he will return them to you to also sign and to promptly return back to me for my records. BEFORE I sign the agreement, I ask you kindly to refer to the email that I am now forwarding to you dated 5/18/05 at approximately 6:08p.m. in the evening where I requested you in that email, to provide me with your acknowledgment that the language and the content in that email that I sent you is accurate and correct and that I will, in fact, receive effective 4/1/05, (with this upcoming commission check) an increase in commission to 13% for Voice services and 16% for Data services on a continous monthly basis until I hit my next revenue target of $50,001.00 which will bring my commission rate to the next tier of 14% for Voice and 18% for Data.

Looking forward to sharing much success, with you, Mike and Broadwing.

Thanks for your, (you and Mike's) help, in seeing all of this through.

Ben

---

Forwarded Message:
Subj:    **Fwd: Commission rate**
Date:    5/18/2005 6:07:50 PM Eastern Daylight Time
From:    Silvergold1836
To:      zane.long@broadwing.com
CC:      michael.sargenti@broadwing.com

Good evening Zane,

thanks for your time on the phone with me earlier today. Per the email that I am now forwarding to you-would you please re-send me the email with a modification-the modification being that--it says in your email that the entire base of business would be moved up to 13%. Please say that the voice revenue would be moved to 13% and the data revenue would be moved up to 16% effective 4/1/05.

Thanks. I will review the agreement and get back to you tomorrow, with any questions and hope to get it to you signed before this weekend as long as the revisions that are supposed to be there— are in fact there.

Ben

---

Forwarded Message:
Subj:    **Commission rate**
Date:    5/17/2005 12:13:41 PM Eastern Daylight Time
From:    Zane.Long@broadwing.com
To:      Silvergold1836@aol.com
CC:      Michael.Sargenti@broadwing.com
Sent from the Internet (Details)

This e-mail serves as a commitment, that if the new Broadwing Agent Agreement is signed and received by 5-25-05 close of business, commission rate for entire base of business will be moved to new commission rate of

13% effective 4-1-05.

If new Agent Agreement is received after 5-25-05, rate of 13% will be effective 5-1-05.

Zane Long
Vice President
Channel Sales
Broadwing Communications, LLC
  Phone: 817-741-7879
  Cell: 817-291-6557
  Fax: 817-796-1049
  1821 Barrington Dr.
  Roanoke, TX 76262
  www.broadwing.com



**Cc:** Sargenti, Michael
**Subject:** Commission rate

This e-mail serves as a commitment, that if the new Broadwing Agent Agreement is signed and received by 5-25-05 close of business, commission rate for entire base of business will be moved to new commission rate of 13% effective 4-1-05.

If new Agent Agreement is received after 5-25-05, rate of 13% will be effective 5-1-05.

**Zane Long**
Vice President
Channel Sales
Broadwing Communications, LLC
  Phone: 817-741-7879
  Cell: 817-291-6557
  Fax: 817-796-1049
  1821 Barrington Dr.
  Roanoke, TX 76262
  www.broadwing.com

*Broadwing*

Subj:   **Fwd: Agent Agreement Changes**
Date:   5/16/2005 6:07:45 PM Eastern Daylight Time
From:   Silvergold1836
To:     michael.sargenti@broadwing.com

4D --instead of 60 days please make it one year.

quota- 9 mth ramp up, 10K annual commit begins at end of ramp up period. Essentially, 21 months from commencement of ramp up period 10k needs to be met and then 10k annual commit for each year thereafter. 13% commission on all existing voice business with Broadwing and 16% on data business retroactive to 4/1/05 and 13% on voice business going forward and 16% on data business going forward until next tier of 50K and subsequent tiers are met whereby ALL existing commission, retroactive to dollar "1" will be paid based on that subsequent revenue level.

9A-period of 2 years after termination- termination only for "cause" and not just termination for any reason.

9B-strike the word "profits".

Looking forward to getting the revised agreement.

Ben


--------------

Forwarded Message:
Subj:   **Agent Agreement Changes**
Date:   5/16/2005 5:34:14 PM Eastern Daylight Time
From:   Michael.Sargenti@broadwing.com
To:     Silvergold1836@aol.com
Sent from the Internet (Details)

Section 4 D 30 days to 60 days

Section 9 paragraph a partner should keep 3 years to 2 years  Reason for cause

Changes quota

Section 9 paragraph b brw should be entitled of all repayment of all profits strike

14% from dollar qualifying will increase on all billing



Michael Sargenti

Northeast Channel Manager

D-212-812-8213

C-917-582-4913

E-fax-646-390-6472

www.Broadwing.com

# Exhibit B



**NON-EXCLUSIVE HIGH VOLUME INDEPENDENT
BUSINESS PARTNER MARKETING AGREEMENT**

THIS AGREEMENT (the "Agreement") is made and entered into as of this 1st day of April 2005 (the "Effective Date") by and between Broadwing Communications, LLC, a Delaware limited liability company with its principal place of business at 1122 Capital of Texas Highway South, Austin, Texas 78746-6426, hereinafter referred to as ("Broadwing"), and, Ben Goldberg a sole proprietorship with its principal place of business at 300 East 34th Street, #33G, New York, New York 10016 (hereinafter referred to as "Business Partner").

## WITNESSETH

WHEREAS, Broadwing is engaged primarily in providing communications services; and

WHEREAS, Broadwing desires to expand its customer base to include a greater number of active business customers through a Business Partner Marketing Program; and

WHEREAS, Broadwing has agreed to permit Business Partner to sell and market Broadwing's communications services to business customers under the terms and conditions hereinafter set forth.

NOW THEREFORE, Broadwing and Business Partner, for the mutual benefits and under the conditions described below, do agree as follows:

## 1. BUSINESS PARTNER RESPONSIBILITIES.

A.    In performing under this Agreement, Business Partner represents, warrants, and covenants that it shall:

1.  comply with the Terms and Conditions of this Agreement;

2.  conduct itself in an honest, professional, and ethical manner and do nothing to discredit, dishonor, reflect adversely upon, or in any way injure the reputation or business of Broadwing;

3.  comply with all applicable federal, state and local laws, rules, regulations, and ordinances;

4.  only employ personnel who are fully qualified to perform Business Partner's duties hereunder;

5.  deal directly with, and only with, designated Broadwing personnel with regard to all matters arising hereunder;

6.  provide current customer information requested by Broadwing as reasonably required for customer site surveys;

lower pricing offered by Business Partner and that agreement must be in writing, and signed by an authorized representative of Broadwing in order for such pricing to be accepted by and binding on Broadwing.

B.     For purposes of computing commission payments, Broadwing shall use the Qualifying Charges.   "Qualifying Charges" is defined as: the gross monthly recurring revenue billed for services provided by Broadwing for the accounts provided by Business Partner hereunder net any discounts, directory assistance or operator services, 976/900 services, Customer Premise Equipment (CPE), local loop access charges, and excluding all credits, pass-through charges, non-recurring charges, and Federal, State, or local taxes, surcharges, and any FCC charges including Preferred Inter Exchange Carrier Charges ("PICC") and Payphone Surcharges.   Business Partner's commission amount will be adjusted to reflect any credits, billing errors, charge-backs, bad debt, write offs, or any other adjustments made by Broadwing.  Broadwing will offset (and therefore reduce) any commission payments owed to Business Partner by any credits, billing errors, charge-backs, bad debt, write offs, or any other adjustments to a customer's account regardless of the amount of time that has passed between the date the customer's account was billed and the date said credit, billing error, charge-back, bad debt, write-off, or other adjustment to a customer's account was made.

C.     All commissions will be paid pursuant to Section IV, Subsection B thirty (30) days from the customer's invoice date.

D.     With each commission payment, Broadwing will provide Business Partner a statement summarizing the computation of the amount paid.  All such payments will be final and binding on Business Partner unless written objection is delivered to Broadwing within sixty (60) days of Business Partner's receipt of such payment.

E.     No commissions will be paid on sales made to existing Broadwing customers (not derived from Business Partner) converted by Business Partner to other products or rates without the prior written consent of Broadwing.  Broadwing reserves the right to lower a customer's rates in an attempt to avoid cancellation by the customer.  Commissions to Business Partner may be adjusted to reflect any such changes.

F.     Broadwing, in its sole discretion and without prior notice, may cancel an account for any reason including, but not limited to, credit, bankruptcy, or inactivity.  No further commission shall be due or paid to Business Partner on cancelled, disconnected, or terminated accounts.

G.     Broadwing will continue to pay Business Partner the applicable residual commissions for all accounts provided by Business Partner hereunder for the term of the original customer agreement and as long as said accounts remain active with Broadwing, unless this Agreement is terminated by Broadwing in accordance with Section VI Subsections B, 1 through 8. In the event the foregoing occurs, Broadwing will discontinue payment of residual commissions to Business Partner.

H.     Broadwing will not pay any commission to Business Partner for any fraudulent or illegal use of the service as defined by Broadwing by any customer provided by Business Partner.

7. maintain documents and records as required in the normal course of business, supporting its promotion and marketing of Broadwing services to customers, in a commercially reasonable manner and in compliance with all applicable laws;

8. make only representations concerning Broadwing and the services that have been expressly approved in advance by authorized Broadwing personnel and refrain from doing anything which might discredit, reflect adversely upon or in any way injure the name or reputation of Broadwing;

9. use commercially reasonable efforts to give prompt, courteous, and efficient service to customers and to act in accordance with the highest standards of honesty and integrity in all customer dealings; and

10. immediately notify Broadwing of: (a) any customer or prospective customer complaints relating to Broadwing or the services about which the Business Partner has knowledge; (b) any Business Partner actions, customer actions, or prospective customer actions about which the Business Partner has knowledge, relating to this Agreement or otherwise relating to Broadwing's provision of services, that are or may be in violation of any laws or otherwise give rise to liability of Broadwing.

11. not engage in any pyramid scheme or multilevel marketing plan which violates any state or federal laws in connection with this Agreement or the services to be rendered pursuant to this Agreement.

B.     Business Partner shall obtain the proper signature or authorization of the customer on Broadwing's then-current standard service agreement, service order form, and/or other documents provided or approved by Broadwing. All service agreements and service order forms are subject to prior credit approval and acceptance by Broadwing. Broadwing reserves the right to cancel or reject any request for services and any service agreement or service order form for any reason without liability and without any further commissions due to Business Partner.

C.     Business Partner shall only sell Broadwing products and services at Broadwing's then-current Business Partner rates. Business Partner understands and agrees that Broadwing reserves the right to establish, revise, or change the prices and/or terms of its customer's rates at any time regardless of how it affects Business Partner's commissions. When such changes are provided in writing to Business Partner or posted on Broadwing's Business Partner Channel extranet site, such changes are automatically and immediately effective and shall become part of this Agreement without further action.

## II. **BROADWING RESPONSIBILITIES.**

A.     Broadwing will provide communications services to those customers offered by Business Partner and accepted by Broadwing, subject to the exclusions set forth in Section V below.

B.     Broadwing will maintain records indicating the accounts provided to Broadwing by Business Partner and the services and products (including the rates and charges) purchased by said customers.

C.     Broadwing will provide customer service, billing, postage, and collection services in accordance with Broadwing's customary business practices.

D.      Broadwing will compensate Business Partner according to Section IV below.

E.      Broadwing will allow Business Partner to use Broadwing's name and logo on sales brochures and other advertising material provided Business Partner obtains prior written approval from Broadwing's Marketing Department of the form and content of all printed material before using or circulating any such material. Broadwing may provide advertising and other sales collateral material to Business Partner from time to time.

### III. BUSINESS PARTNER IS AN INDEPENDENT CONTRACTOR.

A.      Although the term "Partner" is used to describe the relationship between the parties, Business Partner is nevertheless an Independent Contractor, and the relationship that exists between Business Partner and Broadwing is not a legal partnership in any way.

B.      This Agreement does not contemplate, create, or constitute a joint venture, partnership, or similar relationship between Business Partner and Broadwing. Business Partner is, and shall act, operate, and hold itself out only as, an Independent Contractor and as such shall be solely responsible for all costs associated with operating its business and incurred by Business Partner in procuring, promoting, marketing, and/or soliciting orders from customers or prospective customers. Business Partner shall have no right, authority, or power to represent or act on behalf of Broadwing unless expressly authorized to do so in this Agreement. Business Partner shall have no right or authority, nor shall Business Partner hold itself out as having any right or authority, to create any contract or obligation, express or implied, binding upon Broadwing, including accepting orders for services or agreeing to or offering prices, or terms and conditions of sale that in any way differ from the current standard prices, terms and conditions provided by Broadwing to Business Partner. Nothing in this Agreement shall restrict Broadwing, its affiliates or its representatives from independently procuring, promoting, marketing and/or soliciting services to any third party nor shall Business Partner be restricted from marketing competing products and services to prospective customers.

C.      Neither Business Partner nor its employees and/or its representative shall be deemed to be Broadwing's employees, and Business Partner assumes all responsibility for the supervision, control, acts, and omissions of its employees, agents, and representatives. Consequently, neither Business Partner, its representatives, nor anyone employed by Business Partner shall be considered an employee or agent of Company for any purpose including but not limited to Unemployment or Workman's Compensation coverage, the same being expressly waived and excluded by the parties hereto.

D.      Business Partner will be responsible for payment of its own taxes and other fees due as a result of Broadwing's payments of commissions to Business Partner hereunder.

### IV. COMPENSATION.

A.      In exchange for Business Partner's performance under this Agreement, Broadwing will compensate Business Partner for providing qualified sales prospects who become Broadwing customers in accordance with Attachment A. Business Partner understands that any pricing below Broadwing's then-current standard Business Partner pricing levels may be subject to reduced commissions at Broadwing's discretion. Broadwing must accept and agree and in advance to any

## V.  EXCLUDED ACCOUNTS.

A.    The following customers and/or accounts are hereby excluded from this Agreement and shall not constitute any part hereof for any purpose whatsoever including the payment of commissions:

1.    any account(s) deemed not creditworthy by Broadwing, delinquent accounts, or accounts resulting in service(s) being suspended, denied, or disconnected.

2.    any account(s) that is an existing customer of Broadwing or has been converted from one Broadwing product to another by Business Partner on an account not sold by Business Partner.

3.    any account(s) not in the service regions where Broadwing presently provides services or where Broadwing reasonably determines not to provide services for any reason.

B.    Broadwing reserves the right to offset from future commission payments, any amounts previously paid as commission on accounts that later become excluded accounts for any of the above reasons.

## VI.  DURATION OF AGREEMENT.

The term of this Agreement shall be for one (1) year commencing on the Effective Date.  This Agreement shall be automatically renewed on a month-to-month basis unless terminated by either party with at least sixty (60) days written notice prior to the first anniversary of the agreement or thereafter.

A.    Broadwing reserves the right to terminate this Agreement on 30 days notice if the aggregate Qualifying Charges for any calendar quarter does not meet or exceed the aggregate Qualifying Charges minimum set forth in Attachment A or, with respect to renewal terms, as otherwise agreed.

B.    Either party may terminate this Agreement (reserving cumulatively all other rights and remedies at law and in equity unless otherwise expressly stated herein) immediately, without affording the other party an opportunity to cure if a party:

1.    has intentionally or recklessly made any materially false representation, report, or claim relative to the other party's company, its business, or its services;

2.    materially breaches any representation, warranty, or covenant contained herein;

3.    becomes insolvent, invokes as a debtor any laws providing for the relief of debtors or the rights of creditors, or had such law invoked against it;

4.    becomes subject to a proceeding for the liquidation or termination of its business;

5.    is adjudicated as bankrupt;

6.    makes an assignment for the benefit of its creditors;

7.   ceases doing business, liquidates, or dissolves without the appointment of a direct successor in interest; or

8.   engages in any unlawful activity.

C.   Business Partner shall have a Net Billed Revenue Minimum of $10,000 in new Qualifying Charges for Services per calendar year commencing on the ninth (9th) month from the date of this Agreement; after this period Business Partner will be required to sell a minimum of $10,000 of new Qualifying Charges each year, after the initial nine (9) months of the program. Failure to meet this minimum may result in termination from the Agent program.

D.   Either party may terminate this Agreement after providing written notice for any other breach of this Agreement if the breach is not cured to the reasonable satisfaction of the other party within thirty (30) days.

## VII.  AUTHORITY TO ENTER INTO THIS AGREEMENT.

Each party hereto warrants and represents that it has full authority to enter into this Agreement and to consummate the transactions contemplated herein and that this Agreement is not in conflict with any other agreement or contract to which such party is a party to or by which it may be bound. Both Parties understand and agree this is a Non-Exclusive Agreement, and that each party is free to enter into other agreements similar to this Agreement.

## VIII.  ASSIGNMENT.

Neither this Agreement nor the rights, obligations, or duties of Business Partner may be assigned or delegated to any other entity without the prior written consent of Broadwing, which consent will not be unreasonably withheld. Broadwing may assign all of its rights and obligations hereunder to a subsidiary, affiliate, successor, or purchaser of Broadwing. Broadwing agrees that if Business Partner goes public, this Agreement will remain in full force and effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

## IX.  CONFIDENTIAL TREATMENT.

A.   The terms and conditions of this Agreement and the materials provided by Broadwing including, but not limited to, customer lists, price sheets, price quotes, information regarding Broadwing's facilities, information relating to customers or prospective customers of Business Partner and/or Broadwing, marketing and business plans and projections, are disclosed in confidence and are intended to be used solely to carry out the terms and conditions of this Agreement. Business Partner shall keep all such information confidential and shall not release or disclose it to any other party during the term of this Agreement and for a period of three (3) years after termination of this Agreement, regardless of the reason for termination. Business Partner shall take appropriate precautions to prevent the unauthorized disclosure or misuse of all confidential information by any of its employees or representatives, or by any other authorized person having access to such information. Except as specifically authorized by the parties in advance and in writing, neither party will publish, communicate, or otherwise disclose to any third party any confidential information. At

## XII.  BINDING ARBITRATION. 

A.      The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement promptly through discussions between themselves at the operational level.  In the event a resolution cannot be reached at the operational level, the disputing party shall give the other party written notice of the dispute and such controversy or claim shall be negotiated between appointed counsel or senior executives of the parties who have authority to settle the controversy.  If the parties fail to resolve such controversy or claim within thirty (30) days of the disputing party's notice, either party may seek arbitration as set forth below.

B.      Any controversy or claim arising out of or relating to this Agreement, or a breach of this Agreement, shall be finally settled by binding arbitration in Austin, Texas and shall be resolved under the laws of the State of Texas.  The arbitration shall be conducted before a single arbitrator in accordance with the commercial rules and practices of the American Arbitration Association then in effect.

C.      Any award, order, or judgment obtained pursuant to such arbitration shall be deemed final and binding and may be enforced in any court of competent jurisdiction.  The parties agree that the arbitrator shall have no power or authority to make awards or issue orders of any kind except as expressly permitted by this Agreement, and in no event shall the arbitrator have the authority to make any award that provides for punitive or exemplary damages.  All such arbitration proceedings shall be conducted on a confidential basis.  The arbitrator may, as part of the arbitration award, permit the substantially prevailing party to recover all or part of its attorney's fees and other out-of-pocket costs incurred in connection with such arbitration.

## XIII.  FORCE MAJEURE.

Neither party shall be liable for delays in performing, or failure to perform, this Agreement or any obligations hereunder, which are directly attributable to causes beyond the reasonable control of the party so delayed or failing to perform, including but not limited to, acts of God, fires, floods, strikes, war, failure of a common carrier or equipment or suppliers, cable cuts, or acts of intervention by any third party or governmental authority.  However, the party whose performance is delayed shall use good faith efforts to minimize the effects of such delay.

## XIV.  NOTICES.

A.      Every notice, demand, consent, approval, or other communication which either party is required or desires to give to the other party shall be in writing and shall be sent via U.S. Registered Mail, Return Receipt Requested or overnight commercial courier with tracking capabilities as follows:

If to Broadwing:
To:             Broadwing Communications, LLC
                1122 Capital of Texas Highway South
                Austin, TX 78746
                Attention:  General Counsel

With a copy to:     Broadwing Communications, LLC

the expiration or termination of this Agreement, Business Partner shall return to Broadwing all written and tangible materials provided to or produced by Business Partner to Broadwing.

B.      Business Partner understands that if Business Partner violates any of the foregoing covenants, Broadwing shall be entitled to an accounting and repayment of all compensation, commissions, remuneration, or other benefits that Business Partner directly or indirectly realized or may realize as a result of or in connection with the violation.  The foregoing remedies shall be in addition to and not in limitation of any injunctive relief or other rights or remedies Broadwing is or may be entitled to at law, in equity, or under this Agreement.

C.      In the event of a breach or threatened breach by Business Partner of any of the provisions of this Section, Business Partner agrees the restrictions contained herein are fair, reasonable, and reasonably required for the protection of the interests of Broadwing.

## X.  LIMITATION OF LIABILITY.

Broadwing will not be liable to Business Partner or any third party for any indirect, cost of cover, consequential, incidental, reliance, special, exemplary, or punitive damages regardless of the legal theory of recovery.  In no event will Broadwing be liable to Business Partner for any amount in excess of the aggregate net, billed revenue from the accounts sold by Business Partner.

## XI.  INDEMNIFICATIONS.

A.      Each party shall indemnify and hold harmless the other from all liabilities, claims, demands, costs (including reasonable attorney's fees), judgments, or any cause of action arising out of or in connection with this Agreement caused by the failure of a party to abide by the terms and conditions herein or the negligence or willful misconduct of that party's employees or representatives.

B.      Business Partner agrees not to violate any FCC rules or federal, state, or local laws regarding customer slamming or cramming.  Business Partner agrees to fully and immediately reimburse, in cash, Broadwing and the employees, officers, directors, partners, shareholders, successors, and assigns of Broadwing for all claims, damages, liabilities, or expenses of any kind (including reasonable attorney's fees and costs) arising out of the violation by Business Partner or any of Business Partner's employees or representatives of any applicable FCC rule or federal, state, or local law regarding customer slamming or cramming.  Business Partner further agrees that Business Partner will not settle any claim without consulting with Broadwing and obtaining Broadwing's prior written consent.

C.      Business Partner shall be solely and singularly responsible for payment of any commissions owed to its employees, contractors, and representatives; Business Partner represents and warrants that it shall fully and faithfully pay commissions owed to its employees, contractors, and representatives in accordance with its own internal policies and procedures.  Nothing contained herein shall be construed to create any obligation of Broadwing to pay commissions to any of Business Partner's employees, contractors, or representatives.  Business Partner shall indemnify and hold harmless Broadwing from and against any and all claims by any Business Partner's employees, contractors, and representatives for payment of commissions.  Broadwing shall have no responsibility for the payment or withholding of taxes in connection with any commissions due hereunder.

1821 Barrington Dr.
Roanoke, TX 76262
Attention: Vice President, Channel Sales

Said notices may be sent to such other address or addresses as the parties may from time to time designate by written notice hereunder.

B.    Every notice, demand, request, or other communication shall be deemed to have been given upon confirmed receipt or on the third business day after the same has been properly addressed and deposited as aforesaid, whichever is sooner.

## XV.  GENERAL.

A.    This is a Non-Exclusive Agreement.  Both parties may execute similar Agreements with other companies.

B.    Broadwing shall be the carrier of record for Broadwing customers for the services provided by Broadwing.

C.    Broadwing shall in no way be considered or represented as an official endorser of any party or customer represented by Business Partner.

D.    Broadwing may offset any amounts owed to Broadwing by Business Partner against any commissions Broadwing may owe to Business Partner under this Agreement or any other agreement.

E.    The provisions of Sections IV, X, XI, XII, and XIII hereof shall survive the termination of this Agreement, regardless of the reason for termination.

**IN WITNESS WHEREOF**, the parties hereto have caused these presents to be executed, acknowledged, and delivered in a form and manner proper and sufficient at law, all as of the date and the year first above written.

**BROADWING**

Broadwing Communications, LLC

By: _____

Name: Zane Long

Date: ___5-27-05___

Title:  Vice President

Phone Number:  817-741-7879

**BUSINESS PARTNER**

Ben Goldberg

By: _____

Name: ___Ben Goldberg___

Date: ___4/1/05___

Title: ___President___

Phone Number: ___917-655-5000___

## Attachment A

Commission Schedule

Net Billed Revenue Minimums

$10,000 in new Qualifying Charges for Services per calendar year commencing on the ninth (9th) month from the date of this Agreement; after this period Business Partner will be required to sell a minimum of $10,000 of new Qualifying Charges each year, after the initial nine (9) months of the program. Failure to meet this minimum may result in termination from the Agent program.

Broadwing acknowledges that Business Partner's Residual Commission(s) for accounts established as of April 1, 2005 is at the $25,001 - $50,000 level.

| Qualifying Charges (U.S. Dollars) | Voice Commission % | Data Commission % |
|---|---|---|
| $1.00 - $25,000.00 | 12% | 14% |
| $25,001.00 - $50,000 | 13% | 16% |
| $50,001.00 - $75,000 | 14% | 18% |
| $75,001.00 + | 16% | 19% |

1)    Qualifying Charges shall be calculated in accordance with Section IV, Subsection B of the Agreement.

1)    Commissions will be paid for the life of the customer and as long as said accounts remain active with Broadwing, providing the Business Partner remains in good standing. (Section IV, Subsection G)

2)    Commission adjustments will be retroactive to the beginning of the month when Business Partner meets or exceeds each qualifying billing threshold; Business Partner will be paid that commission percentage for their entire base of business on a going-forward basis.

3)    Commission percentages are subject to any adjustments Broadwing makes in accordance with the Agreement.

# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
BENNETT GOLDBERG,                          :
                                           :           Index No. 07602609
                           Plaintiff,      :
                                           :           **NOTICE OF FILING OF**
                                           :           **NOTICE OF  REMOVAL**
                                           :           **IN FEDERAL COURT**
v.                                         :
                                           :
LEVEL 3 COMMUNICATIONS, LLC,               :
                                           :
                           Defendant.      :
-------------------------------------------------------------x

TO:    Law Offices of David K. Bowles
       Attn: Adam Cohn, Esq.
       44 Wall Street, 12th Floor
       New York, New York 10005


       PLEASE TAKE NOTICE that defendant Level 3 Communications, LLC  ("Level 3")

filed on September 5, 2007, a Notice of Removal in the United States District Court for the

Southern District of New York to remove this entire action from the Supreme Court of the State

of New York, County of New York to the United States District Court for the Southern District

of New York.  A copy of the Notice of Removal filed by defendant Level 3 is attached hereto as

Exhibit 1.  Pursuant to 28 U.S.C. § 1446 (d), given that defendant Level 3 is filing a copy of this

Notice of Filing of Notice of Removal in Federal Court with the Clerk of the Supreme Court of

the State of New York, County of New York, "the State court shall proceed no further unless and

until the case is remanded."

Dated:  September 5, 2007

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By: _____
        James J. Stricker
        Olga Fuentes Skinner
1633 Broadway
New York, New York 10019
(212) 506-1700

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC

JUDGE HOLWELL

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BENNETT GOLDBERG,

                Plaintiff,

    v.

LEVEL 3 COMMUNICATIONS, LLC,

                Defendant.

------------------------------------------------------------x



07 Civ.      07 CIV   7841

**NOTICE OF REMOVAL**

RECEIVED SEP 05 2007 U.S.D.C. S.D. N.Y. CASHIERS

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, defendant Level 3 Communications,

LLC ("Defendant"), by and through its undersigned attorneys, files this notice of removal of this

case from the Supreme Court of the State of New York, County of New York, to the United

States District Court for the Southern District of New York, on the following grounds:[1]

    1.    This Court has original diversity jurisdiction over this action as provided in 28

U.S.C. § 1332(a) and (c) because the citizenship of all parties is diverse and plaintiff seeks

damages which exceed the sum or value of $75,000, exclusive of interest and costs. Defendant

is thus entitled to remove this action to the District Court in accordance with 28 U.S.C. §

1441(a).

    2.    Plaintiffs filed the complaint in this action in the Supreme Court of the State of

New York, County of New York, on August 7, 2007. A copy of the complaint is attached hereto

as Exhibit A.

---

[1] By filing this Notice of Removal, defendant does not waive, and specifically reserves, all of its rights with respect
to this action, including, but not limited to, the defendant's right to challenge jurisdiction and to assert its right to
compel arbitration. See Moss v. Atlantic Coast Line R.R. Co., 157 F.2d 1005, 1006 (2d Cir. 1946) ("defendant is
not precluded from having the suit dismissed because its motion to remove was in any sense a waiver of a right, for
it has waived nothing by taking that action"); Media Edge v. W.B. Doner, Inc., 112 F. Supp. 2d 383 (S.D.N.Y.)
(removal to federal court prior to moving to compel arbitration does not waive right to arbitration).

3.    This notice is being filed within thirty days of notice of the complaint and within one year of the commencement of this action.  Accordingly, this notice of removal is timely filed pursuant to 28 U.S.C. § 1446 (b).

4.    Plaintiff Bennett Goldberg ("Goldberg" or "Defendant") is a resident of the State of New York.  (Complaint ¶ 1.)

5.    Defendant Level 3 is a foreign limited liability company organized under the laws of Delaware.  (Complaint ¶ 2.)

6.    Defendant Level 3 has its principal place of business in the State of Colorado.

7.    Plaintiff alleges in the complaint that he is claiming damages based on a five-year contractual relationship between the parties and attorney's fees.  (Complaint ¶¶ 5, 20.)  Plaintiff's claim for damages and attorney's fees is worth in excess of $75,000.

8.    Defendants have attached all process, pleadings, and orders in this action.

Dated:  September 5, 2007

Respectfully submitted,

KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP

By:    _____
            James J. Stricker (JS 5337)
            Olga Fuentes Skinner (OF 6956)
1633 Broadway
New York, New York 10019
(212) 506-1700

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC